IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| KEVIN B. BURNS, | ) | |
| | ) | |
| Petitioner, | ) | No. 06-2311-SHM-dkv |
| | ) | |
| vs. | ) | Death Penalty Case |
| | ) | |
| RICKY BELL, Warden, Riverbend | ) | |
| Maximum Security Institution | ) | |
| | ) | |
| Respondent. | ) | |

AMENDED PETITION FOR WRIT OF HABEAS CORPUS

I.    INTRODUCTION

1. At a Melrose Park pick up basketball game, Tommie Blackman pulled a gun on Carlito Adams. That night, Blackman drove slowly past Adams's house as if he were going to shoot into it.

2. On April 20, 1992, Adams called Kevin Shaw and told him about the trouble he was having with Blackman. Shaw agreed to round up friends to accompany Adams to a confrontation with Blackman. Shaw mustered Benny Buckner, Derrick Garrin, Richard Morrise, and Kevin Burns. They met at Shaw's house, went to Adams's house, and from there walked to a parked car in which Blackman sat.

3. Damon Dawson, Tracy Johnson, and Eric Thomas sat in the parked car with Blackman. Shaw and Adams approached the car. Adams instructed Blackman to get out. Blackman threw his car door open and ran. Shots were fired at Blackman, who got away.

4. After Blackman ran away, shots were fired into the car leaving Dawson and Johnson dead and Thomas severely wounded. The State charged Burns with, among other things, two counts of felony-murder.

5.  Court-appointed counsels' investigation consisted of going to the crime scene, interviewing Burns, and meeting with Burns's mother and father.

6.  At Burns's trial, the State asserted that Burns was part of a gang that planned a robbery, carried out that plan, and then killed the victims.  It singled out Burns as the man who shot and killed Dawson.  The only evidence that Burns did so came from two witnesses: Eric Thomas and Mary Jones.

7.  Eric Thomas identified Burns as the man who shot Dawson and him.  At Derrick Garrin's prior trial, however, Thomas identified Garrin as the person who shot Dawson and him, and the State argued that Thomas's testimony made Garrin Dawson's shooter.  Garrin's jury agreed, convicting him of murder.  Kevin Burns's trial counsel failed to cross-examine Thomas with his previous testimony or otherwise inform the jury of the Garrin proceedings.

8.  Mary Jones testified that she saw a man with a jheri curl hairstyle run up to the driver's side of the car and fire a gun into it.  She said Burns was the man with the jheri curl hairstyle.  At the time of the incident, however, Burns did not have a jheri curl hairstyle and did not have enough hair on his head to support such a hairstyle.  Because trial counsel performed no investigation, however, the jury did not hear these truths.

9.  After the State rested, Burns's appointed counsel presented no witnesses.  The jury convicted Burns of, among other things, two counts of felony-murder.

10.  At sentencing, the jury concluded that Burns (1) did not shoot Johnson; but (2) did shoot Dawson.  It therefore sentenced him to life for Johnson's killing and death for Dawson's.

11.  Had trial counsel conducted an investigation, counsel would have discovered and presented, among other evidence, evidence that (1) robbery did not motivate the men to accost

Blackman and his friends, and, indeed, whether a robbery actually occurred was itself uncertain; (2) Kevin Shaw was the man with the jheri curl hairstyle who shot Dawson; and (3) Burns did not shoot Dawson, or anyone else, during the incident.

II.     JURISDICTION/VENUE

12.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a).

13.  Venue is proper in Tennessee's Western District.  28 U.S.C. § 2241(d).

III.    PARTIES

14.  Petitioner Kevin Burns is an inmate of the Tennessee Department of Correction (TDOC).  Mr. Burns's TDOC number is 254315.  The TDOC currently houses Mr. Burns in Unit 2, Riverbend Maximum Security Institution (RMSI), 7475 Cockrill Bend Industrial Road, Nashville, Tennessee 37209.

15.  Respondent Ricky Bell is the RMSI Warden and an agent of the State.  Warden Bell's address is Riverbend Maximum Security Institution, 7475 Cockrill Bend Industrial Road, Nashville, Tennessee 37209.

IV.    PROCEDURAL HISTORY

16.  This petition challenges the convictions and sentences of the Shelby County Criminal Court rendered under indictment numbers 05131 (Dawson) and 05132 (Johnson).

17.  Counsel pleaded Mr. Burns not guilty and a jury trial ensued.

18.  Mr. Burns was initially represented by court-appointed attorneys Harold D. Archibald and Clim Madlock.  Court-appointed attorneys Glenn Wright and William Johnson replaced attorneys Archibald and Madlock and represented Mr. Burns at trial.

19.  Mr. Burns did not testify.

20.  Mr. Burn's jury convicted him of two counts of felony murder and two counts of attempted felony murder.  On the felony-murder counts, the jury sentenced Burns to life on Indictment 05132 (Johnson) and death on Indictment 05131 (Dawson).

21.  Mr. Burns appealed his convictions and sentences to the Tennessee Court of Criminal Appeals.  In the Statement of Issues section of Mr. Burns's brief, the following issues are presented:

    21.1.  The evidence is insufficient to support the jury's guilt verdict.

    21.2.  The court erred in failing to suppress Mr. Burns's statement.

    21.3.  The court erred in giving a flight instruction.

    21.4.  Whether attempted felony-murder is an offense.

    21.5.  The court erred in failing to declare a sua sponte mistrial.

    21.6.  The court erred in allowing inflammatory evidence before the jury.

    21.7.  The court erred in refusing to answer questions from the jury.

    21.8.  The evidence is insufficient to support the jury's death sentence.

    21.9.  Whether a felony-murder conviction supports a death sentence.

    21.10.  The court erred in allowing victim impact evidence before the jury.

    21.11.  The Tennessee death penalty statute is unconstitutional.

22.  On July 25, 1997, the Tennessee Court of Criminal Appeals affirmed Mr. Burns's convictions for felony murder and resulting death and life sentences, but reversed his convictions for attempted felony murder.

23.  Mr. Burns appealed the Tennessee Court of Criminals Appeals's decision affirming his felony murder convictions and sentences to the Tennessee Supreme Court.  In the Statement

4

of Issues section of Mr. Burns's briefs, the following issues are presented:

23.1.  The State's closing argument was improper.

23.2.  The court erred in allowing victim impact evidence before the jury.

23.3.  Tennessee's proportionality review is inadequate and Mr. Burns's death

sentence is disproportionate.

23.4.  The evidence is insufficient to support the jury's guilt verdict.

23.5.  The court erred in failing to suppress Mr. Burns's statement.

23.6.  The court erred in giving a flight instruction.

23.7.  The court erred in failing to declare a sua sponte mistrial.

23.8.  The court erred in allowing inflammatory evidence before the jury.

23.9.  The court erred in refusing to answer questions from the jury.

23.10.  Whether a felony-murder conviction supports a death sentence.

23.11.  The Tennessee death penalty statute is unconstitutional.

23.12.  Whether Mr. Burns's death sentence is disproportionate.

24.  On November 9, 1998, the Tennessee Supreme Court affirmed the Tennessee Court

of Criminal Appeals's decision.

25.  On June 24, 1999, the United States Supreme Court denied certiorari to the

Tennessee Supreme Court.

26.  On August 18, 1999, Mr. Burns filed a pro-se post-conviction petition in the Shelby

County, Tennessee, criminal court.  That petition raised the following issues:

26.1.  Improper use of a confession.

26.2.  The prosecution withheld evidence.

26.3.  Trial counsel rendered ineffective assistance.

27.  The Shelby County Criminal Court appointed Tennessee's Office of the Post-Conviction Defender (PCDO) to represent Mr. Burns.

28.  The PCDO filed an amended post-conviction petition.  That petition raised the following issues:

28.1.  Trial counsel rendered ineffective assistance.

28.2.  Appellate counsel rendered ineffective assistance.

28.3.  State action denied Mr. Burns a fundamentally fair trial and appeal.

28.4.  Tennessee's death penalty is unconstitutional.

29.  The PCDO filed a second amended post-conviction petition.  That petition added the following issues:

29.1.  Improper considerations influenced the jury.

29.2.  Trial counsel rendered ineffective assistance.

29.3.  Mr. Burns's attempted felony murder convictions are void.

29.4.  The prosecution made improper remarks during closing argument.

29.5.  The Memphis Police Department improperly destroyed audio tapes of witness statements.

30.  The PCDO filed a third amended post-conviction petition.  That petition added the following issues:

30.1.  Tennessee's death penalty is unconstitutional.

30.2.  The indictment charging Mr. Burns was insufficient.

30.3.  Imposition of the death penalty in Mr. Burns's case violates the

6

Constitution.

   30.4. Mr. Burns's role in the incident was insufficient to support his death sentence.

  31. On February 20, 2004, the Shelby County Criminal Court denied Mr. Burns post-conviction relief.

  32. Mr. Burns appealed the Shelby County Criminal Court's denial of post-conviction relief to the Tennessee Court of Criminal Appeals. The Statement of Issues section of Mr. Burns's brief presents the following issues:

   32.1. The Shelby County Criminal Court misapplied applicable standards.

   32.2. Mr. Burns's post-conviction hearing did not comply with constitutional standards.

   32.3. Jury misconduct denied Mr. Burns a fair trial.

   32.4. The State used conflicting theories at Garrin's and Burns's trials.

   32.5. Trial counsel rendered ineffective assistance.

   32.6. Mr. Burns's death sentence is unconstitutional.

   32.7. The indictment charging Mr. Burns was insufficient.

   32.8. Tennessee's death penalty is unconstitutional.

   32.9. Execution by lethal injection violates the constitution.

   32.10. Mr. Burns's convictions and sentences violate International Law.

  33. On December 21, 2005, the Tennessee Court of Criminal Appeals affirmed the Shelby County Criminal Court's denial of post-conviction relief.

  34. On April 24, 2006, the Tennessee Supreme Court denied Mr. Burns's Application

For Permission To Appeal.

35. On May 23, 2006, Mr. Burns filed a pro se habeas corpus petition in this Court. This "Amended Petition" supplements that petition - it does not supersede it.

V.    FACTS

36. On or around April 17, 1992, Carlito Adams and Tommie Blackman got into an argument relating to a Memphis neighborhood basketball game at Melrose Park.

37. On or around April 18, 1992, Adams approached Blackman at Melrose Park. Blackman pointed a handgun at Adams. Adams walked away.

38. On or around April 18 and 19, 1992, Blackman drove by Adams's home slowly, as though he was going to shoot into it.

39. On or about April 20, 1992, Adams called Kevin Shaw and told him of the incidents described in paragraphs 36-38, above. Shaw agreed to help Adams confront Blackman, but told Adams he needed a ride to his house.

40. On or about April 20, 1992, Adams called Benny Buckner and told him of the incidents described in paragraphs 36-38, above. Adams asked Buckner to pick up Kevin Shaw and come to his home.

41. On or about April 20, 1992, Shaw called Derrick Garrin and Kevin Burns, who were in West Memphis, Arkansas, and told them that four black males had jumped his cousin. Shaw asked Garrin and Burns to come to Memphis to confront those men.

42. On or about April 20, 1992, Buckner drove to Shaw's house.

43. On or about April 20, 1992, Derrick Garrin drove himself, Richard Morrise, and Burns to Shaw's house.

44.  The group of five left Shaw's house for Adams's house in Buckner and Garrin's cars.

45.  When Shaw, Buckner, Garrin, Burns, and Morrise arrived at Adams's home

    45.1.  Adams was average height and weight and had a short "fade" hairstyle.

    45.2.  Shaw had a jheri curl hair style and wore a trench coat.

    45.3.  Buckner had razor burn on his face and wore a hat.

    45.4.  Garrin was the largest member of the group, both by height and weight, and was the only one who wore glasses.

    45.5.  Burns had a short "fade" hairstyle with no jheri curl.  Indeed, Burns's hair was cut so short that it could not support a jheri curl hairstyle.

    45.6.  Morrise was average height and weight and had a short "fade" hairstyle.

46.  At Adams's house, Adams and Shaw had a conversation.  Afterwards, the group walked from Adams's house to 1550 David Street in Memphis's Orange Mound neighborhood.

47.  At 1550 David, Damon Dawson, Tracy Johnson, Eric Thomas, and Tommie Blackman sat in Dawson's parked car, backed into a driveway.

48.  Dawson sat in the driver's seat, Johnson sat in the front passenger seat, Thomas sat in the rear seat behind the driver's seat, and Blackman sat in the rear seat behind the front passenger seat.

49.  Adams and Shaw approached Dawson's car, accosting it on the passenger side. Buckner, Garrin, Burns, and Morrise remained at or around the front of the driveway.

50.  Adams instructed Blackman to get out of the car.

51.  Dawson instructed Blackman to stay inside the car and reached for a handgun tucked

into the waist of his pants.

52.  Blackman threw open the rear passenger door of the car and ran away.

53.  Shots were fired at Blackman.

54.  Some combination of Adams, Shaw, Buckner, Garrin, Burns, and Morrise
approached Dawson's car.

55.  Burns did not intend for a robbery to take place.

56.  Shots were fired into Dawson's car.  Dawson, Johnson, and Thomas were shot.
Dawson and Johnson died.  Thomas survived.

57.  On or around June 23, 1992, Federal Bureau of Investigation (F.B.I.) Agents arrested
Burns in a Chicago, Illinois, neighborhood.

58.  As the agents transported Burns to headquarters, agents interrogated Burns without
advising him of his Fifth Amendment rights.

59.  At headquarters, F.B.I. Agents advised Burns of his Fifth Amendment rights and
created a document purporting to recount a statement Burns gave them after Burns had been
advised of his Fifth Amendment rights.  (Burns Statement).

60.  According to the Burns Statement , Burns went to 1550 David and fired a handgun
Shaw had given him three times at a man who was running away from a parked car.

61.  The F.B.I. Agents arrested Burns, and he was transported to the Shelby County,
Tennessee, Jail.

62.  Adams, Burns, and Garrin were arrested and held for trial.

63.  Shaw, Buckner, and Morrise were not arrested.

64.  While the police obtained possession of handguns that Shaw and Buckner brandished

10

at the scene, the police returned those handguns to Shaw's father.

65.  The State indicted Burns for two counts of felony-murder, two counts of premeditated murder, two counts of attempted felony-murder, and two counts of attempted premeditated murder.

66.  On July 20, 1992, the Shelby County Criminal Court appointed Harold D. Archibald and Clim Madlock to represent Burns.

67.  During Archibald and Madlock's representation of Burns, the State offered Burns the opportunity to plead guilty and receive a sentence of life imprisonment.

68.  Burns declined the State's plea offer.

69.  On February 19, 1993, the trial court replaced attorneys Archibald and Madlock with attorneys Glenn Wright and William Johnson.  At this time, Messrs Archibald and Madlock had performed no investigation and had not identified any defense theories.

70.  On or around September 10, 1993, the trial court held a hearing on defense counsels' motion to suppress the Burns Statement.  At the suppression hearing F.B.I. Agent John Landman testified that

70.1.  upon Burns's arrest in Chicago, Burns was placed in a car that Landman was driving.

70.2.  F.B.I. Agent Lee Harbaugh got into Landman's car, and Landman drove Harbaugh and Burns to the downtown headquarters.

70.3.  Harbaugh and he did not speak to Burns during the drive to headquarters.

70.4.  At headquarters, Harbaugh and he took Burns into an interrogation room and, for the first time, advised Burns of his Fifth Amendment rights.

70.5.  After Burns was advised of his rights, Burns gave the Burns Statement.

71.  At the conclusion of the suppression hearing, the trial court denied defense counsels' motion to suppress the Burns Statement.

72.  On or around March 21, 1994, the State began Derrick Garrin's trial.  At that trial

72.1.  Eric Thomas testified that

72.1.1.  Adams and another man who had a curl-like fade hairstyle approached Dawson's car, and he first saw a weapon when the man with Adams pulled out a gun.

72.1.2.  After Blackman ran off, three additional men came to the parked car.  Thomas described them as a big man, heavy set, with glasses (Garrin); a short man with a slim build and dark complexion (Burns); and a man with a bumpy face from shaving, wearing a hat (Buckner).

72.1.3.  The big man (Garrin) positioned himself at Dawson's door and shot Thomas and Dawson.

72.2.  Mary Jones testified that she saw a big guy and another man run up to a parked car and immediately started shooting into it.

72.3.  In closing argument the State asserted that Thomas's testimony established that Garrin shot Thomas and Dawson.  Specifically the prosecution asserted

72.3.1.  "There's only one big guy in the Adams' gang.  The big guy with glasses over here ...."

72.3.2.  "There wasn't but one big guy out there.  There wasn't but one big guy with glasses and that's the man over there."

12

72.3.3.  "The defendant out there is the only big guy."

72.3.4.  "Damon Dawson ... was shot by the defendant."

73.  The Garrin jury credited Thomas's testimony and the State's closing argument.  It convicted Garrin of murder and sentenced him to life imprisonment.

74.  On or around January 26, 1995 the State began the Carlito Adams trial.  At that trial

74.1.  Eric Thomas did not identify the man who shot him.

74.2.  Mary Jones testified that she did not witness a robbery before shots were fired.

75.  The jury convicted Adams of murder and sentenced him to life imprisonment.

76.  Prior to Burns's trial, Messrs Wright and Johnson visited the crime scene, interviewed Burns, and met with Burns's mother and father.

77.  On or around September 18, 1995, the State began the Kevin Burns trial.  At that trial

77.1.  Eric Thomas testified that a photograph numbered "5" in a photographic array shown him was a photograph of the person who shot Dawson and him.  Photograph number "5" depicted Kevin Burns as Burns appeared a year or so prior to his trial, well under six feet tall, slightly built, and without glasses.

77.2.  Trial counsel did not cross-examine Thomas with his prior testimony at Garrin's trial describing Garrin, the "big fellow with glasses", as the person who shot Dawson and him.

77.3.  Mary Jones testified that

77.3.1.  she saw two men run up to a parked car and shoot into it.

13

77.3.2.  one of the men she saw was a big guy who stood about 6'4" and weighed 200 pounds.

77.3.3.  the other man she saw had a jheri curl hairstyle.

77.3.4.  Kevin Burns was the man she saw with the jheri curl hairstyle shooting into Dawson's car.

77.4.  Trial counsel did not cross-examine Jones with, or otherwise present evidence that, at the time of the incident Burns did not have a jheri curl hairstyle and did not have enough hair on his head to support such a hairstyle.

77.5.  F.B.I. Agent Scott Bakken testified that

77.5.1.  upon Burns's arrest in Chicago, Burns was placed in a car that Bakken was driving.

77.5.2.  Bakken drove Burns and to a scene where Bakken made another arrest.

77.5.3.  Bakken thereafter drove Burns to headquarters.

77.5.4.  At headquarters, Bakken turned Burns over to F.B.I. Agents Landman and Harbaugh.

77.6.  F.B.I. Agent Harbaugh testified that

77.6.1.  he spoke with Burns when he was brought to headquarters.

77.6.2.  he advised Burns of his Fifth Amendment rights.

77.6.3.  after Burns was advised of his Fifth Amendment rights, Burns gave the Burns Statement.

77.6.4.  the photograph numbered "5" in the photographic array shown

14

Thomas was a picture of Kevin Burns.

77.7.  Trial counsel did not cross-examine F.B.I. Agents Bakken and Harbaugh with Agent Landman's previous testimony at the September 1993 suppression hearing that he took custody of Burns and, with Harbaugh, transported Burns from the scene of Burns's arrest to the downtown headquarters.

78.  The State entered into evidence the Burns Statement.

79.  Burns's defense counsel presented no evidence.

80.  In closing argument, the State asserted that prior to approaching the car, Adams, Shaw, et al. planned a robbery of those inside the car, and Burns approached the car with that intent.  The jury agreed, convicting Burns of two counts of felony-murder and two counts of attempted felony-murder.

81.  At the sentencing hearing, trial counsel presented a Sunday School teacher, two persons who worked at the Shelby County Jail, and Burns's father, mother, and brother.

82.  The jury found as an aggravating circumstance that Burns created a great risk of death to two or more others during an act of murder.  Based on its finding that Burns did not shoot Johnson, it sentenced him to life for Johnson's killing.  Based on its finding that Burns shot and killed Dawson, it sentenced him to death for Dawson's killing.

V.    CLAIMS FOR RELIEF

CLAIM 1: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT STAGE

83. Burns incorporates the preceding paragraphs.

A.    Trial Counsel Failed To Investigate And Present Available Evidence

84.  Trial counsels' entire investigation consisted of visiting the crime scene, interviewing Burns, and meeting with Burns's father and mother.

85.  Trial counsel did not interview available witnesses, including, but not limited to, Eric Thomas, Tommie Blackman, Carlito Adams, Benny Buckner, Derrick Garrin, Richard Morrise, Kevin Shaw, Mary Jones, Tyrone Jones, Eric Jones, George Richmond, Charlie Jackson, Andrew Ransom, Glenn Murray, Deloris Morrise, Antonio James, Steven Lowery, Benny Brown, Solomon Adams, Moleko Fields, Virgie Buckner, Dessie DuBose, Ivor Kevin Shaw, Sr., Annie Morrise,  Terry Bullocks, Michael Hissong, Kevin Whitaker, Samuel Brooks, Rodney Witherspoon, Renita Burns, Terrence Thomas, Rodrick Daniels, Thomas Daniels, Terrence Daniels, F.B.I. Agent Landman, F.B.I. Agent Harbaugh, and F.B.I. Agent Bakken.

86.  While trial counsel received limited discovery of State investigatory documents, counsel failed to recognize and/or employ the information contained therein.

87.  Trial counsel failed to obtain and/or review, and employ effectively, transcripts from the trials of Derrick Garrin and Carlito Adams.

88.  Had counsel interviewed the persons identified in paragraph 85, above, had counsel recognized the significance of information contained in documents they did possess, had counsel obtained and/or recognized the significance of information contained in the transcripts of the Garrin and Adams trials, counsel would have presented the jury evidence that

88.1.  The incident for which Burns was convicted of felony-murder stemmed from a prior altercation between Adams and Blackman.  The group of men that went to 1550 David on April 20, 1992, did not go there intending to commit a robbery.  Rather, they went there with the intent of providing Adams support during Adams's confrontation with Blackman.

16

88.2.  Burns did not travel to 1550 David with the intent of committing a robbery. Indeed, whether a robbery even occurred is questionable.

88.3.  If a robbery did occur, it was Kevin Shaw's spur of the moment decision.

88.4.  Burns did not fire any weapon he had at the scene.

88.5.  Burns did not shoot Dawson or anyone else.

88.6.  Derrick Garrin shot Dawson.

88.7.  At Derrick Garrin's trial, Eric Thomas described Garrin as the man who shot Dawson and him.

88.8.  Kevin Shaw shot Dawson.

88.9.  At the time of the incident, Kevin Burns did not have a jheri curl hairstyle, but Kevin Shaw did.  Mary Jones's testimony that a man with a jheri curl hairstyle thus implicates Shaw as the man who shot Dawson.

88.10.  Carlito Adams shot Dawson.

88.11.  Adams, Shaw, Buckner, Garrin, and/or Morrise fired weapons at the scene.

88.12.  Prior to any shots being fired, Dawson reached for a handgun tucked into the waistband of his pants.

88.13.  In exchange for information and/or services, authorities did not charge or prosecute Shaw, Buckner, and/or Morrise, and, indeed, returned to Shaw's father handguns that Shaw and Buckner brandished during the incident.

B.    Trial Counsel Failed To Cross-Examine Effectively Eric Thomas, Mary Jones, And F.B.I. Agents Involved In The Creation Of The Burns Statement

89.  While Eric Thomas testified that he identified a photograph of Kevin Burns as the

17

man who shot Dawson and him, at Derrick Garrin's trial Thomas had previously described Garrin as Dawson's shooter.  Trial counsel failed to cross-examine Thomas with his prior testimony.

90.  While trial counsel cross-examined Thomas with his previous statement that "Carlito" shot him, counsel did not rebut Thomas's story explaining why he had previously said "Carlito" shot him.  Specifically, Thomas claimed that he made this statement because he thought he was going to die when he made it, Carlito Adams was the only person he knew in the group that accosted Dawson's car, and he wanted to make sure the police had a lead on who perpetrated the incident.  When Thomas gave his statement, however, it was the day after the incident, and he was in stable condition at the hospital.

91.  While Mary Jones identified Kevin Burns as the man with the jheri curl hairstyle that ran up to the driver's side of the car and shot Dawson, counsel failed to cross-examine Ms. Jones with the fact that at the time of the incident, Burns did not have, and did not have enough hair on his head to support, a jheri curl hairstyle.

92.  F.B.I. Agent Bakken testified that upon Burns's Chicago arrest, Burns was placed in Bakken's car, and Bakken drove Burns downtown to headquarters where he turned Burns over to F.B.I. Agents Landman and Harbaugh.  F.B.I. Agent Harbaugh testified that upon Burns's arrival at headquarters, he informed Burns of his Fifth Amendment rights and thereafter took from him the Burns Statement.  Trial counsel failed to cross-examine Bakken and Harbaugh with F.B.I. Agent Landman's suppression hearing testimony that upon Burns's arrest, Burns was placed in Landman's car, and Landman drove Burns and Harbaugh downtown to headquarters.

C.    Trial Counsel Failed To Have Thomas's Identification Testimony Suppressed

18

93.  At Burns's trial, Eric Thomas identified the person who shot Dawson and him as the person depicted in photograph number "5" of a six-person photographic array shown Thomas.

94.  Photograph number "5" depicted Kevin Burns as Burns appeared a year or so prior to his trial.

95.  The photographic array shown Thomas unduly suggested that Thomas should pick photograph number 5 because

95.1.  Photograph 5 depicts a man without facial hair, while four of the remaining photographs depict men with facial hair and the only other photograph depicts an excessively feminine man.

95.2.  Photograph 5 had a piece of tape directly underneath it and was the only photograph to have a piece of tape underneath it.

95.3.  Photograph 5 is the only picture that has a cinder block wall as a background.

96.  Trial counsel failed to establish that the photographic array shown Thomas was unduly suggestive and to have Thomas's identification testimony suppressed on that ground.

D.    Trial Counsel Failed To Have Burns's F.B.I. Statement Suppressed

97.  On or around June 23, 1992, F.B.I. Agents interrogated Kevin Burns about any involvement he had in the incident.

98.  After interrogating Burns, F.B.I. Agents created the Burns Statement.

99.  According to the Burns Statement, Burns went to 1550 David and fired a handgun Shaw had given him three times at a man who was running away from a parked car.

100.  F.B.I. Agents did not advise Burns of his Fifth Amendment rights prior to Burns

making statements to them.

101.  Trial counsel failed to establish that F.B.I. Agents created the Burns Statement in violation of the Fifth Amendment and to have that statement suppressed on that ground.

102.  The State introduced the Burns Statement at Burns's trial.

E.      Kevin Burns Was Prejudiced By Trial Counsels' Failures

103.  A reasonable probability exists that if trial counsel had conducted an investigation, and/or effectively cross-examined Eric Thomas and Mary Jones, and/or had Thomas's identification testimony suppressed, and/or had the Burns Statement suppressed, the jury would not have convicted Kevin Burns of two counts of felony-murder.

CLAIM 2: IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE STATE WITHHELD MATERIAL, EXCULPATORY EVIDENCE

104.  Burns incorporates the preceding paragraphs.

A.  The State Withheld Documents

105.  The State withheld documents containing exculpatory, material, information.  These documents include, but are not limited to, the following documents containing the following information:

105.1.  The 4/20/02 Statement of Tyrone Jones in which Jones told police that he saw two persons shooting into Dawson's car, one he described as between 6'2" and 6'4", weighing about 230 pounds, the other he described as wearing a black full length coat.  Jones states that theses persons "didn't do nothing but just shoot."

105.2.  The 4/20/92 Statement of Eric D. Jones in which Jones told police that just before hearing any shots, he saw a large man, at least 6'4" or 6'5", weighing about 200 pounds,

and wearing a long black jacket, pointing a black automatic handgun at Dawson.

　　　　　105.3.  The 5/1/92 Statement of Mary Lee Jones in which Jones told police that she saw "the young men running up to the car with the guns out, and they started shooting.  I didn't see anything else.  That was all I saw, The shooting."  Jones goes on to describe the men see saw fire weapons into Dawson's car - one being a real heavy man, around 6'4" tall - the other being a man who had a medium build and a jheri curl hairstyle.

　　　　　105.4.  The 4/20/92 Statement of Tommie Blackman in which Blackman told police that in the days prior to the incident, Carlito Adams and he had an altercation at a basketball game.

　　　　　105.5.  The 4/21/92 Statement of Benny Buckner in which Buckner told police that the group went to David Street so that Carlito could fight Blackman and that there was not supposed to be any gun play.  Buckner also states that Shaw told him that prior to any shots being fired, Dawson reached for a pistol tucked into the waist of his pants.  Buckner goes on to state that (1) at the scene Shaw fired a weapon; and (2) a man who he called Spoon, who was not Burns, shot twice at the person sitting in the driver seat.

　　　　　105.6.  The 4/22/92 Statement of Kevin Shaw in which Shaw told police that he and others went to 1550 David, not to commit a robbery, but to confront Blackman and his friends about the altercations between Adams and Blackman.  Shaw also states that when Adams and he first approached the car, before any shots were fired, Dawson pulled out a gun and Shaw yelled, "They got a gun."

　　　　　105.7.  The 4/24/92 Statement of Richard Morrise in which Morrise told police that Adams told the group the plan was for Adams to knock on the door of a house, and when

Blackman came to the door, Adams would grab him, drag him outside, and beat him up.  Morrise

specifically states that no robbery plans were made.

105.8.  A 5/23/92 Memphis Police Department Firearms Release Form which

informed that police returned to Kevin Shaw's father handguns that Shaw and Buckner

brandished during the incident.

105.9.  A 5/5/94 Pre-Sentence Report on Derrick Garrin in which

105.9.1.  the "Official Version" of the incident states Garrin shot and

killed Dawson and Johnson.

105.9.2.  Defendant's version states that "This was not a robbery attempt.

This was a fight between some people that I did not even know. ....  "The shooting took place

when somebody hollered 'Don't pull the gun out!' ...."

105.10.  The 3/21/95 Indictments charging Benny Buckner with killing Dawson

and Johnson during a robbery and with killing those persons with premeditation.

B.  The State Withheld Information

106.  In addition to documents, the State withheld information that

106.1.  No robbery occurred at 1550 David.

106.2.  Any robbery that did occur was the result of Kevin Shaw's spur of the

moment decision.

106.3.  Burns did not intend for a robbery to occur.

106.4.  Burns did not fire any weapon he had at the scene.

106.5.  Burns did not shoot Dawson or anyone else.

106.6.  Derrick Garrin shot Dawson.

106.7.  Kevin Shaw shot Dawson.

106.8.  Carlito Adams shot Dawson.

106.9.  Adams, Shaw, Buckner, Garrin, and/or Morrise fired weapons at the

scene.

106.10.  Prior to any shots being fired, Dawson reached for a handgun tucked into

the waistband of his pants.

106.11.  In exchange for information and/or services, authorities did not charge or

prosecute Shaw, Buckner, and Morrise, and, indeed, returned to Shaw's father handguns that

Shaw and Buckner brandished during the incident.

106.12.  F.B.I. Agents took the Burns Statement prior to advising Burns of his

Fifth Amendment rights.

106.13.  Burns did not make the statements the Burns Statement attributes to him.

C.    Kevin Burns Was Prejudiced By The State's Withholding Of Material,
      Exculpatory Evidence

107.  Had the State not withheld the above-described material, exculpatory evidence, a

reasonable probability exists that the jury would not have convicted Burns of two counts of first-

degree murder and/or sentenced him to death.

CLAIM 3: IN VIOLATION THE SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE STATE
ASSERTED AT BURNS'S TRIAL THAT HE SHOT DAMON DAWSON WHEN THE
STATE HAD PREVIOUSLY ASSERTED AT DERRICK GARRIN'S TRIAL THAT
GARRIN SHOT AND KILLED DAWSON

108.  Burns incorporates the preceding paragraphs.

109.  At Derrick Garrin's trial, the State presented Eric Thomas's testimony that "the big

fellow with the glasses" shot Dawson and him.  Thomas reiterated that he was sure the "big

23

fellow with the glasses" shot Dawson because he saw the bullets go into Dawson's body.

110.  At closing argument at Garrin's trial, the prosecution argued that Thomas's testimony established that Garrin shot Thomas and Dawson because "there's only one big guy" in the group of men that went to 1550 David.  The prosecutor emphasized, "There wasn't but one big guy with glasses and that's the man over there", and "Damon Dawson ... was shot by the defendant."

111.  Garrin's jury credited Thomas's testimony and the State's argument, and convicted Garrin of murder.

112.  At Burns's trial, Thomas identified the person who shot Dawson and him as the person depicted in photograph number "5" of a photographic array shown Thomas.

113.  Photograph number "5" depicted Kevin Burns as Burns appeared a year or so prior to his trial, well under six feet tall, slightly built, and without glasses.

114.  At closing argument at Burns's trial, the prosecution argued that Thomas's testimony at Burns's trial established that Burns shot Thomas and Dawson.

CLAIM 4: IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE STATE KNOWINGLY PRESENTED ERIC THOMAS'S FALSE TESTIMONY THAT KEVIN BURNS SHOT DAWSON AND HIM

115.  Burns incorporates the preceding paragraphs.

116.  At Burns's trial, Eric Thomas identified the person who shot Dawson and him as the person depicted in photograph number "5" of a photographic array shown Thomas.

117.  Photograph number "5" depicted Kevin Burns as Kevin Burns appeared a year or so prior to his trial, well under six feet tall, slightly built, and without glasses.

118.  When the State presented Thomas's testimony, it knew that Thomas had previously

24

testified at Garrin's that the person who shot Dawson and him was a "big fellow with glasses."

119.  When the State presented Thomas's testimony at Burns's trial, it knew that it had previously obtained Garrin's murder conviction by arguing that Thomas's testimony at Garrin's trial established that Garrin shot Thomas and Dawson.

120.  Had the State not knowingly presented Thomas's perjured testimony, a reasonable probability exists that the jury would not have convicted Burns of first-degree murder and/or sentenced him to death.

> CLAIM 5: IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE STATE KNOWINGLY PRESENTED FALSE TESTIMONY THAT A ROBBERY OCCURRED

121.  Burns incorporates the preceding paragraphs.

122.  At Burns's trial, the State presented the testimony of Eric Thomas and Eric Jones that before Dawson, Johnson, and Thomas were shot, persons outside Dawson's car demanded and/or took from them money and jewelry.

123.  Eric Jones did not see persons outside Dawson's car demand and/or take from persons inside the car money and jewelry.  Despite knowing this, the State knowingly presented Jones's false testimony that he saw persons outside Dawson's car demand and/or take from persons inside the car money and jewelry.

124.  Eric Thomas did not see persons outside Dawson's car demand and/or take from him and the others inside the car money and jewelry.  Despite knowing this, the State knowingly presented Thomas's false testimony that persons outside Dawson's car demanded and/or took from persons inside the car money and jewelry.

125.  Had the State not knowingly presented the perjured testimony of Thomas and

Jones, a reasonable probability exists that the jury would not have convicted Burns of first-

degree murder and/or sentenced him to death.

> CLAIM 6: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
> AMENDMENTS, THOMAS'S TESTIMONY THAT PHOTOGRAPH 5 WAS A
> PHOTOGRAPH OF THE PERSON WHO SHOT DAWSON AND HIM WAS BASED
> ON AN UNDULY SUGGESTIVE PHOTOGRAPHIC ARRAY

126.  Burns incorporates the preceding paragraphs.

127.  At Burns's trial, Eric Thomas identified the person who shot Dawson and him as

the person depicted in photograph number "5" of a six-person photographic array shown

Thomas.

128.  Photograph number "5" depicted Kevin Burns as Burns appeared a year or so prior

to his trial.

129.  The photographic array shown Thomas unduly suggested that Thomas should pick

photograph number 5 because

129.1.  Photograph 5 depicts a man without facial hair, while four of the

remaining photographs depict men with facial hair and the only other photograph depicts an

excessively feminine man.

129.2.  Photograph 5 had a piece of tape directly underneath it and was the only

photograph to have a piece of tape underneath it.

129.3.  Photograph 5 is the only picture that has a cinder block wall as a

background.

CLAIM 7: IN VIOLATION OF THE FIFTH, EIGHTH, AND FOURTEENTH

26

AMENDMENTS, THE TRIAL COURT ENTERED THE BURNS STATEMENT INTO
EVIDENCE

130.  Burns incorporates the preceding paragraphs

131.  On or around June 23, 1992, F.B.I. Agents interrogated Kevin Burns about his

involvement in the incident.

132.  After interrogating Burns, F.B.I. Agents created the Burns Statement.

133.  According to the Burns Statement, Burns went to 1550 David and fired a handgun

Shaw had given him three times at a man who was running away from a parked car.

134.  F.B.I. Agents did not advise Burns of his Fifth Amendment rights prior to Burns

making statements to them.

135.  The State introduced the Burns Statement at Burns's trial.

CLAIM 8: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS, THE STATE KNOWINGLY PRESENTED THE FALSE
TESTIMONY OF THE F.B.I. AGENTS WHO TOOK THE BURNS STATEMENT

136.  Burns incorporates the preceding paragraphs.

137.  At a suppression hearing on the Burns Statement, the State knowingly presented

F.B.I. Agent Landman's false testimony that

137.1.  upon Burns's arrest in Chicago, Burns was placed in a car that Landman

was driving.

137.2.  Agent Lee Harbaugh got into Landman's car, and Landman drove

Harbaugh and Burns to the downtown headquarters.

137.3.  Harbaugh and he did not speak to Burns during the drive to headquarters.

137.4.  At headquarters, Harbaugh and he took Burns into an interrogation room

and, for the first time, advised Burns of his Fifth Amendment rights.

27

137.5.  After Burns was advised of his rights, Burns gave the Burns Statement.

137.6.  The Burns Statement accurately reflects statements Burns made.

138.  At trial, the State knowingly presented Agent Bakken's false testimony that

138.1.  upon Burns's arrest in Chicago, Burns was placed in a car that Bakken was driving.

138.2.  Bakken drove Burns to a scene where Bakken made another arrest.

138.3.  Bakken thereafter drove Burns to headquarters.

138.4.  at headquarters, Bakken turned Burns over to Landman and Harbaugh

139.  At trial, the State knowingly presented F.B.I. Agent Harbaugh's false testimony that

139.1  he spoke with Burns when Burns was brought to headquarters.

139.2  he advised Burns of his Fifth Amendment rights.

139.3.  after Burns was advised of his Fifth Amendment rights, Burns gave the Burns Statement.

139.4.  The Burns Statement accurately reflects statements Burns made.

140.  Had the State not presented the false testimony of Landman, Bakken, and Harbaugh, a reasonable probability exists that the jury would not have convicted Burns of first-degree murder and/or sentenced him to death.

CLAIM 9: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE TRIAL JUDGE

PROVIDED JURY INSTRUCTIONS AT THE GUILT STAGE WHICH WERE
UNCONSTITUTIONAL OR OTHERWISE RELIEVED THE PROSECUTION OF
PROVING EACH ELEMENT OF THE OFFENSE BEYOND A REASONABLE
DOUBT

141.  Burns incorporates the preceding paragraphs.

142.  Unconstitutional jury instructions given at guilt stage include, but are not limited to

142.1.  An instruction on the meaning of "intentional" which allowed the jury to
find specific intent to kill or commit a robbery based solely upon a conscious intent to engage in
conduct, not necessarily to cause the result, which thereby relieved the prosecution of its burden
of proving the specific intent required for conviction of first-degree murder

142.2.  Instructions on parties to an offense and criminal responsibility which
allowed the intentional or deliberate actions of others to be attributed to petitioner when
petitioner's own actions did not, beyond a reasonable doubt, establish the elements of first-
degree murder. This instruction therefore relieved the prosecution of proving the elements of the
offense as charged in the indictment, namely, that petitioner committed first-degree murder.

142.3.  An instruction on felony-murder which allowed for conviction based
solely on the fact that someone had been killed, even if petitioner did not intend to kill, and
which allowed the intent to rob of "perpetrators," not necessarily petitioner, to satisfy the
elements of first-degree murder. By allowing the jury to convict petitioner of first-degree murder
based on someone else killing and intending to rob absent specific proof of petitioner's intent to
rob and/or kill (especially where the instruction on "intentional" was also unconstitutional, see ¶
N, *supra*), the felony-murder instruction relieved the prosecution of proving petitioner's guilt
beyond a reasonable doubt.

142.4.  An instruction on premedication which allowed a finding of this element

29

without any finding that the purpose to kill pre-existed for any definite period of time, which allowed for the finding of premeditation under virtually any circumstance.

142.5.  An instruction on deliberation which allowed the finding of deliberation even if an accused was in a state of passion or excitement, which by definition negates deliberation.  This instruction was confusing and relieved the prosecution's burden on the element of deliberation beyond a reasonable doubt.

142.6.  Instructions on the range of punishment for lesser offenses which induced the jury to convict petitioner of the greater offense to permit greater punishment.

142.7.  Instructions which allowed the jury to convict based upon a mere "satisfactory conclusion" or "moral certainty" of guilt, which prohibited the consideration of doubts which were possible, and which allowed the jury to merely "approach" the idea of moral certainty as "nearly as possible," (thus allowing the jury to convict based upon something even less than moral certainty), and which allowed for a conviction based upon what the jurors felt "truth dictates and justice demands" rather than proof beyond a reasonable doubt, all of which misstated the prosecution's burden of proving all elements beyond a reasonable doubt and thereby relieved the prosecution of its burden of proof.

CLAIM 10: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, EXTRANEOUS, IMPROPER INFLUENCES AFFECTED THE JURY'S VERDICT

143.  Burns incorporates the preceding paragraphs.

144.  During juror deliberations at the guilt stage, one juror held out against finding Burns guilty of first-degree murder.

145.  The jury foreman read from a Bible to the holdout juror Isaiah 55:8 - "My thoughts

30

are not your thoughts and my ways are not your ways."

146.   After the foreman read the Biblical passage to the holdout juror, the holdout juror

relented, voted guilty, and the jury thereby convicted Burns of first-degree murder.

147.   There were two or three Bibles in the jury room and jurors read them and quoted

passages from them during their deliberations at both guilt and sentencing.

148.   The jurors engaged in group prayer to ascertain the jury's guilt and sentencing

verdicts.

> CLAIM 11:  IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
> AMENDMENTS TO THE UNITED STATES CONSTITUTION, TRIAL COUNSEL
> RENDERED INEFFECTIVE ASSISTANCE AT THE SENTENCING STAGE

149.   Burns incorporates the preceding paragraphs.

150.   At the sentencing hearing, trial counsel presented no challenge to the sole

aggravating circumstance the jury found.  As to mitigation evidence, counsel presented the

testimony of six witnesses: a Sunday School teacher, two persons who ministered at the Shelby

County Jail, Burns's father, mother, and brother.  The testimony of these witnesses covers

eighteen transcript pages.  They testified that Burns attended church.  The family members

additionally testified that Burns was a good son.  That was the entire penalty phase case - Burns

was a good son who went to church.

    A.      Failure To Challenge The Aggravating Circumstance

151.   At the sentencing stage, Burns's jury sentenced him to death on the Dawson felony-

murder count.

152.   To authorize its death sentence, the jury found one aggravating circumstance: "The

defendant knowingly created a great risk of death to two (2) or more persons, other than the

31

victim murdered, during the act of murder." (Great Risk Of Death Circumstance).

153.  As discussed in paragraphs 84-103, above, trial counsel rendered ineffective assistance in investigating and presenting evidence about the facts and circumstances of the crime.  Had counsel performed effectively, counsel would have presented evidence that Burns was not responsible for whatever harm threatened persons other than Dawson and/or Johnson during the incident.  Had counsel presented such evidence there exists a reasonable probability that the jury would not have found the Great Risk Of Death Circumstance and it would not have sentenced Burns to death.

      B.      Failure To Investigate And Present Mitigating Evidence

            1.      Failure To Investigate And Present Evidence Relevant To The Facts And Circumstances Of The Crime

154.  Finding that Mr. Burns did not shoot Johnson, the jury sentenced him to life on the Johnson felony-murder count.  Finding that Burns shot Dawson, it sentenced him to death on the Dawson felony-murder count.

155.  As discussed in paragraphs 84-103, above, trial counsel did not investigate and present evidence demonstrating that Burns did not shoot Dawson.  The only evidence that he did so came from the testimonies of Eric Thomas and Mary Jones, and counsel failed to cross-examine effectively those witnesses with evidence demonstrating they did not see Burns shoot Dawson.

            2.      Failure To Investigate And Present Evidence Relevant To Burns's Background And Character

156.  Trial counsel failed to create a working relationship with Mr. Burns's mother. Instead, counsel treated her with subservient disdain, meeting her but a handful of times.

157.  Trial counsel met with Mr. Burns's father, Obra Carter, only once - immediately before Burns's trial.

158.  Trial counsel did not travel to West Memphis, Arkansas, and did not do any investigation into the neighborhood in which Burns grew up.

159.  Trial counsel did not interview or present evidence from available witnesses.  These witnesses include the family members, friends, and neighbors identified in paragraphs 162-252, below.

160.  Trial counsel did not obtain relevant documents.  These documents include social service records, welfare records, school records, medical records, family court records, criminal court records, civil court records, family birth, marriage and death records, and police incident reports.

161.  Had counsel developed a working relationship with Burns's mother, had counsel met with Obra Carter more than just once immediately before trial, had counsel interviewed relevant witnesses, and had counsel obtained relevant documents, counsel could have presented the jury the following mitigating evidence.

I.    Louise Burns - Kevin's Mother - Before Meeting Obra Carter

162.  Arlena Campbell, Kevin Burns's great grandmother, gave birth to twins in 1928 who at age one died of crib death when in the care of a baby sitter.

163.  The following year, Arlena Campbell gave birth to Kevin Burns's grandmother, Rosalie Campbell.

164.  Rosalie Campbell gave birth to Kevin Burns's mother Leslie.

165.  Rosalie's husband deserted her and Leslie.  Leslie saw her father twice, the last

time when she was seven years old.  At Rosalie's husband's funeral, Leslie learned that her father had other children, all younger than she was.

166.  At age 16, Rosalie gave birth to Barbara, her second daughter and left both Leslie and Barbara with Arlena, who did not let either girl participate in school activities.  The family moved frequently, always within a poor area of West Memphis, Arkansas.

167.  Arlena heated her impoverished three room house with kerosene and gas.  When Barbara was about four, she fell into a fireplace and sustained severe burns to her head and arm, which left scars.  From that time on Leslie felt Arlena favored Barbara out of guilt over the burn accident.

168.  Leslie led an unhappy life in Arlena's home where her sister was favored, and she felt like Arlena hated her.  Arlena left to work in the fields at 4:00 in the morning, and when Leslie and Barbara visited her at work they also worked in the fields.

169.  Rosalie worked as a live-in maid on a Southern plantation where she resided in what could be described as "servants' quarters."   Leslie and Barbara sometimes visited her there in the summer.  The economic disparity between the wealthy landowners and Rosalie was great.

170.  In 1954, Rosalie gave birth at Arlena's home to Alex Rogers III, who was 16 years younger than his half-sister Leslie.  Alex Rogers later shot and killed Kevin Burns's brother, Nathaniel Burns, Jr during an argument.  Alex never got over what he had done, and he eventually became homeless.

171.  Leslie dropped out of school in the eighth grade.

172.  Leslie was deprived of basic information needed by young girls as they develop.  She was confused and guilt ridden when her menses began and was afraid to question Arlena

34

about what was happening to her. She thought she must have done something wrong.

173. Leslie ran away from Arlena's home when she was 14 and soon thereafter met Nathaniel Burns, age 19.

174. Leslie married Nathaniel Burns when she was 15 years old somewhere in Mississippi, but she never received a marriage certificate. A year after the marriage, Nathaniel's legal wife, Rebecca, showed up, but Nathaniel stayed with Leslie.

175. Leslie and Nathaniel Burns were very poor.

176. Leslie had no prenatal care.

177. At age 15, Leslie gave birth to Billy Ray Burns, the first of Leslie Burns's ten children.

178. Billy Ray Burns was born at home after a difficult labor, with the help of a 78 year old mid wife. An ambulance had taken Leslie to the hospital, but she was turned away because she had no money.

179. Billy Ray Burns developed very slowly, was significantly delayed physically and profoundly delayed mentally. He suffered from high fever and seizures as an infant, which his mother tried to treat with home remedies. Billy Ray was diagnosed with meningitis and brain damage.

180. At age 17, before Billy Ray turned two, Leslie gave birth to Brenda Faye, again aided by a mid-wife.

181. In 1958 Kevin Burns's father Nathaniel had an accident that resulted in the amputation of half his foot and required a long hospitalization. From then on there was little income for the home other than public assistance, and, as a result, the family moved frequently.

35

182.  In May 1959, Leslie gave birth to Nathaniel Burns, Jr.

183.  In September 1960, Leslie gave birth to Patricia Ann Burns.

184.  In February 1962, Leslie gave birth to Michael Burns.  As a child, Michael lost an eye when a sibling threw a dart at him.

185.  After Michael's birth, Leslie gave birth to a still born baby.

186.  The Burns home was troubled, not only by the constant demands required by Billy Ray's myriad special needs, and the care of the other babies and small children, but also due to the fighting between the parents.  Leslie frequently sustained black eyes and body bruises inflicted by Nathaniel.

187.  Nathaniel Burns began a relationship during the marriage with one of Leslie's friends, which further eroded the home environment.

188.  Nathaniel and Leslie Burns separated in 1962.  Ms. Burns soon thereafter began a relationship with Obra Carter.

II.    Obra Carter

       A.    The Zettie Clark Relationship

189.  In 1961, Obra Carter, Jr., at age 20, married Zettie Lee Clark, age 17 when Zettie's father discovered Obra had impregnated Zettie.  Obra beat Zettie, even during her pregnancy, and was cruel to her.  He left her and their daughter alone in an apartment in the projects with no food while he enjoyed night life.

190.  When Zettie Clark's father learned of the abuse and neglect of his daughter by Obra Carter, he removed her from Obra's home.  Obra Carter later attacked Zettie Carter on the street by striking her with his fist.

36

191. Obra's marriage to Zettie lasted approximately one year and produced one child.

B.    The Louise Bell Relationship

192. Obra began a relationship with Louise Bell during his marriage to Zettie.

193. In 1962, Louise gave birth to twins, Reginald and Ronald, fathered by Obra.

194. Obra and Louise produced seven additional children: Marcus, born in 1965; Frederick, born in 1966; Yolando, born in 1967; Philip, born in 1968; Michael, born in 1971; Stephen, born in 1972; and Derrick, born in 1985.

195. Throughout his relationship with Louise, Obra beat her. He did so for any number of reasons, such as food not being ready to eat when he came home from work. According to Philip, the beatings often produced a lot of blood.

196. The Obra/Louise Carter family lived in the projects and various other impoverished residences in West Memphis.

C.    The Leslie Burns Relationship

197. Leslie Burns met Obra Carter in 1963, after she had separated from Nathaniel Burns in 1962.

198. Leslie met Obra at a club in West Memphis.

199. Although Leslie and Obra never lived together they had their first child, Kevin, on April 20, 1969.

200. Leslie had five children with Obra: Kevin, Sharon, born in 1971, twins Robin and Lisa, born in 1973, and Renita, born in 1974.

201. Throughout his relationship with Leslie, Obra beat her. Leslie often had black eyes that were so severe her eyes swelled shut. One beating was so severe that Obra broke Leslie's

jaw.  Leslie had to spend weeks in a hospital and wear a brace on her jaw for four months.

202.  Obra did not live with Leslie and her children.  Rather, he lived with his other girlfriend Louise and her children.

203.  Leslie and her children moved several times during her relationship with Obra.

204.  It was difficult for Leslie to find housing due to the number of children in her family.  At one point she was evicted from public housing because she had become pregnant.

205.  In addition to her children with Obra, Leslie Burns had the responsibility of caring for the five children she had by Nathaniel Burns, including Billy Ray and his special needs.

206.  In 1974, Obra helped Leslie buy a three bedroom house with a living room, small dining area, kitchen and one bath.  The house totaled 1,000 square feet.

207.  Obra put the house solely in his own name and used it as leverage to control Leslie.

208.  Leslie ended her relationship with Obra in 1979 or 1980.  Obra responded by placing a for sale sign in her yard.

D.       Obra Carter's Physical And Mental Abuse Of His Children

209.  Obra Carter created arbitrary rules and harshly punished the children if they were not in compliance when he chose to drop by the Burns' house.  Often, the arbitrary rules created by Obra were contrary to those established by Leslie, leaving the children subject to severe punishment while in compliance with the everyday rules of the household.

210.  For example, Obra whipped the Burns children with a switch or belt for visiting friends' homes in the neighborhood, even though Leslie knew the children were visiting friends and had approved of it.  Obra would simply start beating the children and would not allow them to explain that Leslie had approved their absence from the house.  One such beating that Obra

38

inflicted on Kevin's sister Renita caused her to wet her clothes.

211.  The Burns children never knew when Obra was coming to their house.  He would show up unexpectedly, whip his children, and get into arguments, verbal and physical, with Leslie.

212.  Obra regularly beat Kevin when he would come by the house and Kevin was not around.  He would summon one of the other Burns children to find Kevin and tell him to come to the house.  When Kevin did so, Obra beat him.

213.  In addition to beatings for not being home when Obra chose to drop by, Kevin also would be beaten if, when Obra came by, Kevin was fussing with his sisters.

214.  Obra did not attend any of the birthday events for the Burns children, and he never gave them presents for their birthday or for Christmas.

215.  On New Year's Days Obra came by the Burns home and gave the children a long lecture about how the coming year would be different than the last.  Sometimes the lecture was in a soft tone and at other times was loud.  All five children were required to listen to the lecture.

216.  Obra had numerous arrests for alcohol-related incidents, including fights and drunk driving.

217.  At times, when they did not have food in the house, one of the children would call Obra to ask him to bring groceries.  None of the children liked to make these calls.  During the calls Obra would give them a long lecture, always being critical and never giving them any praise.

218.  At some point, Leslie's and Louise's children began to hear rumors that they had

brothers and sisters living in West Memphis that they had not met. When the children asked
Obra about this possibility, Obra went to the Burns home one Sunday after church, gathered the
children he sired with Leslie, took them to the Carter house, and told them to hug one another.

III.    The Environment In Which Kevin Burns Grew Up

219.   The 1,000 square foot home in which Burns grew up housed Leslie and her ten
children, the oldest of which, Billy Ray, had special needs.

220.   Billy Ray suffered seizures from the time he was three weeks old. As Billy Ray
aged, the seizures became more severe.

221.   Billy Ray suffered brain damage and paralysis on one side.

222.   Leslie Burns cared for Billy Ray and kept him at her home until he was seventeen
years old when she placed him in a State institution in Little Rock. At that time he had an I.Q. in
the twenties.

223.   Billy Ray's profound limitations greatly strained Leslie and affected her ability to
nurture, care, and supervise her other children. Leslie had the almost impossible task of trying to
physically and emotionally provide for all of her children while simultaneously providing Billy
Ray the constant care he required. At some point this impossible task caused Leslie to ask
medical personnel to sterilize her. Because she had no money, he request was refused.

224.   Through his childhood, Kevin lived in a neighborhood characterized by poverty and
violence.

225.   Kevin Burns was considered to be poor in a community that was itself poor. Peers
teased Kevin at school because he was so poor and had ill-fitting clothes. In 1983, a social
worker's report indicated that Leslie's family income was $140 per month.

40

226.  A housing project and a liquor store were directly behind the Burns home.

227.  The Burns children regularly heard gunfire coming from the project.  One night a bullet was fired into the Burns home, shattering a bedroom mirror.

228.  The liquor store was the scene of regular fights and other chaos.  Men often urinated in the Burns backyard.

229.  The neighborhood containing the Burns home was, and remains, the highest crime area in West Memphis, Arkansas.

230.  In the Burns neighborhood there was a gang known as the Rayfield Posse.

231.   In the neighborhood containing the Carter home, there was a gang known as the Delta Dogs.

232.  Kevin was a member of neither gang.

233.  The gangs fought regularly, using brass knuckles, bats, sticks, guns, knives and ice picks.  Often they fought around the liquor store behind Kevin's house, which was also the place where Kevin caught the bus for school.

234.  On one occasion, as Kevin and his friend Paul Burks got off the school bus, Burks was attacked by the Delta Dogs.  Kevin ran and escaped, but Burks was injured.

235.  Although Kevin and Paul were not  members of the Rayfield Posse, Delta Dog gang members attacked them because they were from the Rayfield Posse neighborhood.

236.  Junior Lewis, a friend of Kevin's, died a couple years after high school from the trauma he received from being regularly attacked by the Delta Dogs.


IV.    Kevin Burns's Character Amidst The Chaos

237.  Martha Dawson remembers that Kevin Burns was four years older than her son, Devon, and visited in her home when he was young.  She describes Kevin as a "nice young man" who was mannerly and "never talked back."

238.  Bobbie Owens Nelson, a former teacher at Wonder Junior High, taught Kevin Burns 7th grade geography.  Mrs. Nelson remembers Kevin as quiet and introverted.  He missed a lot of school, and his clothes were rumpled.  Mrs. Nelson believes that Kevin had no curfew and his family situation wasn't very good.  She recalls that his mother, Leslie, was trying to raise all the children without a father around.

239.  At Wonder Junior High School, Kevin played football for Coach William Ball.  Coach Ball recalls young Mr. Burns as "small, but feisty, a young man who loved football."  Ball characterizes Kevin Burns as a good kid, who was never a disciplinary problem in the classroom and was responsible in his attendance. He further describes him as mild-mannered, respectful, quiet young man.

240.  Childhood friend Samuel Brooks attended school with Kevin, lived in the same area, and played football with him at Wonder Junior High.  Brooks remembers that Kevin watched out for and was protective of girls and younger children in their neighborhood.  Brooks never knew Kevin to use drugs.

241.  Mrs. Arlee Bruce, Kevin's high school English teacher, remembers Kevin as an eager, energetic student whom she enjoyed teaching.  He was well-liked, never in trouble, and always respectful and mannerly.

242.  Judy McCullum, an educator who taught Kevin Burns, recalls Kevin in a very positive manner.  She knew some of both the Burns and Carter families and thought the Carter

children were better off since they had both parents.  Mrs. McCullum remembers Mr. Burns as a

good kid, a polite decent boy who never talked back.

243.  Barbara Burks, the sister of Kevin's childhood friend Paul, describes Kevin as

sweet and respectful.  Ms. Burks remembers that Kevin was particularly kind to her invalid

sister, Fay.  Even when he was young, Kevin took time to visit with Fay and talk with her.

Kevin helped with chores in the Burks' home, repaired appliances and put together a cabinet for

them, though he would not accept money for his work.

244.  Childhood friends Keith Ruffins and Michelle Terry describe Kevin as respectful

and nice.

245.  Childhood friend Chris Dukes describes Kevin as easy-going, willing to help

anyone who was down and out.

246.  Childhood friend Kevin Whitaker remembers that Kevin was not a drug user in a

neighborhood where drug use was common.  He  describes Kevin Burns as the "most friendliest

and honest person I've ever met."

247.  Childhood friend Rodney Witherspoon remembers Mr. Burns as a straight forward

person who did not do drugs.

248.  Kevin's half-brother Phillip Carter describes Kevin as an honest, nice, young man.

Kevin was a kind, a good worker and dependable. Carter agrees that Kevin was not a drug user

249.  In 1987, Kevin graduated from West Memphis, Arkansas High School.  His father,

Obra Carter, did not attend his graduation.  Mr. Carter sent his son $15.  Kevin Burns is the only

one of his mother's children to graduate from high school.  His mother Leslie recalls that he had

talked about joining the National Guard, but in the end, he stayed and worked to help his mother

support the other children.

250.  About 1989 Kevin Burns moved to Jonesboro, Arkansas.  He worked at a Shoney's there during 1990.  Later that year, he moved back to West Memphis.

251.  In 1990, Kevin Burns dated Sherita Andrews.  Ms. Andrews remembers that Kevin did not use drugs and did not get into fights.

252.  Between Burns's arrest and conviction, his family experienced significant loses. His mother Leslie lost seven relatives, including both her mother and sister.   Leslie became "soul-sick", so depressed she could not eat or work and really did not want to live.   Her son, Kevin, was helpful to her because of his own faith and involvement in an inmate choir.

3.  Failure To Present Mental Health Evidence

253.  On or around October 27, 1992, a Midtown Mental Health Center (MMHC) Forensic Coordinator wrote the trial judge, with a carbon copy sent to trial counsel, that MMHC had evaluated Burns on October 15 and 22, 1992.  MMHC opined that Burns was competent to stand trial and an insanity defense could not be supported.  After receiving this letter, trial counsel decided that all mental health issues were foreclosed.  As a result, trial counsel did not investigate or present expert evidence on mental impairments or the developmental effects of Burns's childhood experiences.

254.  Had counsel investigated expert mental health evidence, they would have discovered and presented evidence that

254.1.  Burns demonstrates a defensive denial that could contribute to difficulty understanding the implications of his circumstances and behavior.

254.2.  Burns has trouble processing new information quickly, potentially

44

delaying his ability to comprehend his surrounding circumstances despite knowing better.  Burns

fails to grasp the implications of his behavior when he is under stress and is required to quickly

understand a complex situation.  At times Burns acts precipitously, failing to gather all the

necessary information before making a decision.

       254.3.  Burns has a psychological profile of a follower, not a leader.  Burns does

not recognize the motivation and intention of others.

       254.4.  The traumatic stress Burns experienced during his childhood resulted in

the above symptoms.

       254.5.  Burns and his family members suffer from mood disorders such as bipolar

disorder and depression.

       254.6.  A biologically driven deficit, including but not limited to brain damage,

interfered with Burns's ability to exercise reflection and judgment during the incident.

     C.     Trial Counsel Failed To Present Evidence About Burns's Relative Culpability

     255.  By the time of Burns's sentencing hearing, Garrin had been sentenced to life

imprisonment, Adams had been sentenced to life imprisonment, Buckner had pleaded guilty to a

lesser offense, and Shaw and Morrise had not been charged.  Trial counsel failed to inform the

jury of these matters and argue that the jury should sentence Burns to no more than the

punishments meted out to others: life imprisonment.

     D.     Trial Counsels' Failures Prejudiced Mr. Burns

     256.  Had trial counsel challenged the Great Risk Of Death Circumstance, investigated

and presented evidence about the facts and circumstances of the crime, investigated and

presented evidence of Burns's background and character, investigated and presented expert

mental health evidence, and presented evidence about Burns's relative culpability, a reasonable

probability exists that the jury would not have sentenced Mr. Burns to death.

CLAIM 12: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS, THE STATE PRESENTED VICTIM IMPACT TESTIMONY AT
THE SENTENCING HEARING

257.  Burns incorporates the preceding paragraphs.

258.  At the sentencing hearing the State presented the testimony of

258.1.  Damon Dawson's mother that

258.1.1.  Dawson was an exceptional football player - so good that

persons told her that if Dawson got through high school, he'd make a lot of money.

258.1.2.  persons used to call Dawson the "million-dollar kid."

258.1.3.  Dawson and she agreed that she would go back to school to take

bookkeeping so that she could keep track of all the money Damon would make during his

football career.

258.1.4.  the killings of Dawson and Johnson destroyed the neighborhood

in which she had lived.

258.1.5.  since her son's murder she has been divorced and has moved

away from the neighborhood.

258.2.  Tracey Johnson's mother testified that

258.2.1. Johnson had a job and was saving money for his baby daughter.

258.2.2.  Johnson's death has adversely affected his daughter.

259.  The mothers' testimonies improperly influenced the jury to vote for death.

CLAIM 13: THE TRIAL JUDGE PROVIDED BURNS'S SENTENCING JURY
INSTRUCTIONS THAT VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH

AMENDMENTS TO THE UNITED STATES CONSTITUTION

260.  Burns incorporates the preceding paragraphs.

261.  Unconstitutional jury instructions given at sentencing stage include, but are not limited to

261.1.  Instructions which allowed for the finding of aggravating circumstances merely to a "moral certainty," while prohibiting the consideration of possible doubts, which thereby relieved the prosecution of its burden of proving aggravating circumstances beyond a reasonable doubt.

261.2.  Instructions on "knowingly" creating a great risk of death to two or more persons which incorporated a definition of "knowing" from the guilt phase of trial, which allowed a finding of knowledge based merely on the awareness of circumstances, which relieved the prosecution of its burden of proving this aggravating circumstance beyond a reasonable doubt, because this instruction is unconstitutional as applied to the aggravating circumstance which requires of actual knowledge of creating a great risk of death, as opposed to mere proof of mere knowledge of petitioner's actions, which do not establish knowledge of the effect of those actions.

261.3.  Instructions on mitigating circumstances which stated that evidence to be considered mitigating had to be "favorable," when mitigating circumstances include reasons not to impose the death sentence, even if not specifically "favorable" to a defendant.

CLAIM 14: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE PROSECUTION MADE IMPROPER REMARKS DURING CLOSING ARGUMENT AT THE

SENTENCING STAGE

262.  Burns incorporates the preceding paragraphs.

263.  During closing argument at the sentencing stage, the prosecution told jurors "You know what your duty before God is."

CLAIM 15: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE TRIAL COURT DID NOT ANSWER QUESTIONS THE JURY ASKED DURING SENTENCING DELIBERATIONS

264.  Burns incorporates the preceding paragraphs.

265.  During sentencing deliberations the jury asked the trial court

265.1.  How many years for life?

265.2.  What does a "life sentence" mean?

265.3.  Can we ask for life without parole?

265.4.  Can we stipulate life plus so many years?

265.5.  Can we ask for consecutive life sentences?

265.6.  What does it mean if you're sentenced to death and life?

266.  The trial court refused to answer the jury's questions.  Had the court provided the jury the requested information the jury would not have sentenced Burns to death.

CLAIM 16: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, MR. BURNS WAS INDICTED BY A GRAND JURY FROM WHICH WOMEN WERE SYSTEMATICALLY EXCLUDED AS GRAND JURY FOREPERSONS

267.  Burns incorporates the preceding paragraphs.

268.  Kevin Burns was indicted by a Shelby County Grand Jury in May 1992.  The foreperson of that grand jury was a male.

48

269.  Between September 1987 and December 1989, 28 grand juries were convened in Shelby County. The foreperson for each was a man, Herbert Robinson. Between January 1990 and December 1991, 47 more grand juries were convened. For 42 of those 47 grand juries, the grand jury foreperson was male. A female was foreperson for only 5 such grand juries. In 1992, leading up to Kevin Burns' indictment in May 1992, 10 additional grand juries were convened: None had a woman as foreperson.

270.  All told, therefore, between September 1987 and May 1992 – when Kevin Burns was indicted – there were 85 grand juries convened, but only 5 times was the foreperson a female.  Females, however, comprised approximately 52% of the total population of Shelby County. One would expect that, had the system for selecting forepersons not been discriminatory, 43 of the grand juries would have had a woman as foreperson. The actual number of 5 female grand jury forepersons represents a total which is approximately 8 standard deviations below the mean.

271.  Under Tennessee law, the grand jury foreperson was appointed under Tenn.R.Crim.P. 6, which gave discretion to a judge to personally select the grand jury foreperson, and such discretion was susceptible to abuse.

272.  Because women were thus under represented as forepersons and Kevin Burns was indicted by a grand jury which did not have a woman as a foreperson, Kevin Burns was indicted by a grand jury from which women were systematically excluded, in violation of his right to a grand jury selected from a fair cross-section of the community, his right to due process of law, and his (and excluded female jurors') right to the equal protection of the laws under the Sixth, Eighth, and Fourteenth Amendments.

49

CLAIM 17: IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION, THE INDICTMENTS
AGAINST BURNS DID NOT ALLEGE AGGRAVATING CIRCUMSTANCES

273.   Burns incorporates the preceding paragraphs.

274.   The indictments against Burns did not allege aggravating circumstances.

CLAIM 18:   MR. BURNS'S DEATH SENTENCE VIOLATES THE SIXTH, EIGHTH,
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

275.   Burns incorporates the preceding paragraphs.

276.   Mr. Burns has a fundamental right to life.

277.   By offering Mr. Burns a life sentence, the State demonstrated that means less

restrictive than a death sentence exist to effectuate its interests in punishing Mr. Burns for

Damon Dawson's death.

278.   By seeking a death sentence against Mr. Burns because he chose to go to trial, the

State unconstitutionally burdened Mr. Burns's trial right.

CLAIM 19: IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION, NO UNIFORM
STANDARDS GUIDE TENNESSEE PROSECUTORS IN DECIDING WHETHER TO
SEEK THE DEATH PENALTY, AND NO STANDARDS GOVERNED THE
PROSECUTOR IN THIS CASE

279.   Burns incorporates the preceding paragraphs.

280.   No state-wide standards exist in Tennessee to guide prosecutor's in deciding

whether or not to seek the death penalty against a person charged with murder.

281.   No standards guided the prosecutor in this case in making his decision to seek the

death penalty against Burns, but not to charge, let alone seek the death penalty against, Kevin

Shaw, Benny Buckner, and Richard Morrisse.

CLAM 20: MR. BURNS'S DEATH SENTENCE VIOLATES THE EIGHTH AND

FOURTEENTH AMENDMENTS BECAUSE IT IS ARBITRARY

282.  Burns incorporates the preceding paragraphs.

283.  It is arbitrary that Mr. Burns has been sentenced to death while Kevin Shaw was not charged for his participation in the incident.

284.  It is arbitrary that Mr. Burns has been sentenced to death while Richard Morrise was not charged for his participation in the incident.

285.  It is arbitrary that Mr. Burns has been sentenced to death while Benny Buckner was afforded an opportunity to plead guilty to a lesser charge.

286.   It is arbitrary that Mr. Burns has been sentenced to death while Derrick Garrin was sentenced to life.

287.  It is arbitrary that Mr. Burns has been sentenced to death while Carlito Adams was sentenced to life.

CLAIM 21: MR. BURNS'S CONVICTION AND DEATH SENTENCE VIOLATE ARTICLE VI, CLAUSE 2, OF THE UNITED STATES CONSTITUTION BECAUSE THE STATE DISREGARDED RIGHTS ACCORDED MR. BURNS BY INTERNATIONAL LAW

288.  Burns incorporates the preceding paragraphs.

289.  Mr. Burns possesses rights under international law, including, but not limited to:

289.1.  His rights under treaties ratified by the United States. As such, these treaties are the supreme law of the land, and the rights guaranteed under them preempt any contradictory state laws.  U. S. Const., art. VI, cl.2; *see, e.g.*, Breard v. Greene, 118 S. Ct. 1352, 1355 (1998).  Those treaties include:

289.1.1.  International Covenant on Civil and Political Rights, Dec. 19, 1966, G.A. Res. 2200, U.N. GAOR, Supp. No. 16 at 52, U.N. Doc. A/6316 (1967), 999 U.N.T.S.

51

171, art. 24 [hereinafter ICCPR], which was ratified by the United States on June 8, 1992;

        289.1.2.   The International Convention on the Elimination of All Forms of Racial Discrimination, Mar. 7, 1966, G.A. Res. 2106A, U.N. GAOR, 20th Sess., Supp. No. 14 at 47, U.N. Doc. A/6014 (1965) [hereinafter Race Convention], which was ratified by the United States on October 21, 1994; and

        289.1.3.   The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10 1984, G.A. Res. 39/46, U.N. GAOR, 39th Sess., Supp. No. 51, at 197, U.N. Doc. 39/51 (1984) [hereinafter Torture Convention], which was ratified by the Untied States on October 21, 1994.

        289.2.   His rights under treaties entered into and signed by the President of the United States.  The President's action in the area of foreign relations, including the rights guaranteed under these treaties, preempts any contradictory state law.  United States v. Belmont, 301 U.S. 324, 57 S. Ct. 758 (1937).  Those treaties include:

        289.2.1.   The American Convention on Human Rights, Nov. 22, 1969, O.A.S.T.S.No. 36, O.A.S. Off. Riec. OEA/Ser. L./V./II.23/Doc. 21 Rev. 6 [hereinafter American Convention]  signed on June 1, 1977;

        289.2.2.   The Convention on the Elimination of All Forms of Discrimination Against Women, Dec. 18, 1979, G.A. Res. 34/180, U.N. GAOR, 34th Sess., Supp. No. 46 at 193, U.N. Doc. A/34/46 (1979) [hereinafter Women's Convention], which was signed on July 17, 1988; and

        289.2.3.   The International Covenant on Economic, Social and Cultural Rights, Dec. 15, 1966, 1976, 999 U.N.T.S. 3 [hereinafter Economic Covenant], which was

signed on October 5, 1977.

       289.3.  His rights under customary international law.  Customary international law and *jus cogens* norms are binding upon the courts as the law of the land.   "The law of nations . . . is part of the law of the land." <u>The Paquete Habana</u>, 175 U.S. 677, 700, 20 S. Ct. 290 (1900).  Evidence of customary international laws can be found, *inter alia*, in other treaties and international proclamations neither signed nor ratified by the United States, including but not limited to:

       289.3.1.  The American Declaration of the Rights and Duties of Man, May 2, 1948, Res. XXX, at 38, Final Act, Ninth Int'l Conf. of American States, Bogata, Columbia, Mar. 30-May 2, 1948 (Pan-Am 1948), O.A.S. Off. Rec. OEA/Ser. L./V./ II.23/Doc. 21 Rev. 6 (1979), Art. XX [hereinafter American Declaration] and

       289.3.2.  Universal Declaration of Human Rights, G.A. Res. 217, U.N. GAOR, 3d Sess., pt.1, U.N. Doc. A/810 (1948) [hereinafter Universal Declaration].

       289.4.  Those rights guaranteed to Mr. Burns through treaties and customary international law that counsel failed to raise, include, but are not limited to:

       289.4.1.   The right to life[1];

       289.4.2.   The right to be free from racial discrimination[2];

       289.4.3.   The right to be free from gender discrimination[3];

---

[1]ICCPR, art. 6(1); American Declaration, art. I; Universal Declaration, art. 3; American Convention, art. 4(1).

[2]ICCPR, arts. 3, 14(1), 16, and 26; Universal Declaration, arts. 1,  2,  6, and  7; American Declaration, art. II; American Convention, arts. 3 and 24; Race Convention.

[3]ICCPR, arts. 3, 14(1), 16, and art. 26; Universal Declaration, arts. 1,  2,  6, and 7; American Declaration, art. II; American Convention, arts. 3 and  24; Women's Convention.

289.4.4.  The right to be free from discrimination on the basis of economic status[4];

289.4.5.  The right not to be sentenced to death for this crime because it was not sufficiently serious to warrant a sentence of death[5];

289.4.6.  The right not to be put to death by electrocution, because death by electrocution constitutes cruel, inhumane and degrading punishment[6];

289.4.7.  The right to not be executed by lethal injection, because death by lethal injection constitutes cruel, inhumane and degrading punishment[7];

289.4.8.  The right to a fair and impartial trial[8];

289.4.9.  The right to be presumed innocent until proven guilty according to law[9];

289.4.10.  The right to detailed notice of the charges against him/ her[10];

---

[4]ICCPR art. 26; *see* ICCPR, arts. 3, 14(1), and 16; Universal Declaration, arts. 1,  2, 6, and 7; American Declaration, art. II; American Convention, arts. 3 and 24; Economic Convention.

[5]ICCPR, art. 6(2); American Convention, art.4(2).

[6]ICCPR, arts. 7, 10, and 16; Universal Declaration, art. 5; American Declaration, art. XXV, American Convention, art. 5; Torture Convention.

[7]ICCPR, arts. 7,10, and 16; Universal Declaration, art. 5; American Declaration, art. XXV, American Convention, art. 5; Torture Convention.

[8]ICCPR, art. 14; Universal Declaration, art. 10; American Declaration, art. XV, art. XVII; American Convention, art. 8.

[9]ICCPR, art. 14(2); Universal Declaration, art. 11(1); American Declaration, art. XXVI; American Convention, art. 8(2).

[10]ICCPR, art. 9(2); American Convention, art. 8(2).

289.4.11.  The right to adequate time and resources in which to prepare his

defense[11];

289.4.12.  The right to obtain the attendance of witnesses to testify in his

defense[12];

289.4.13.  The right to examine witnesses against him/her[13];

289.4.14.  The right to be free of coercion to confess guilt[14];

289.4.15.  The right to refrain from testifying against him/herself[15];

289.4.16.  The right to be free from detention while awaiting trial[16];

289.4.17.  The right to be tried without undue delay[17];

289.4.18.  The right to be free from arbitrary searches[18];

---

[11]ICCPR, art. 14(3); Universal Declaration art. 11(1); American Convention, art. 8(2); *see also* American Convention, art. 8(2)("the right . . . to obtain the appearance, as witnesses, of experts of other persons who may throw light on the facts.").

[12]ICCPR, art. 14(3)("To examine. . . the witnesses against him and to obtain the attendance and examination of witnesses on this behalf *under the same conditions as witnesses against him.*)(emphasis added); American Convention, art. 8(2); *see also* Universal Declaration, art. 11(1)(The right to "all the guarantees necessary for his defence.").

[13]ICCPR, art. 14(3)("To examine. . . the witnesses against him and to obtain the attendance and examination of witnesses on this behalf *under the same conditions as witnesses against him.*)(emphasis added); American Convention, art. 8(2); *see also* Universal Declaration, art. 11(1) (The right to "all the guarantees necessary for his defence.").

[14]ICCPR, art. 14(3); American Convention, art. 8, (2-3).

[15]ICCPR, art. 14(3); American Convention, art. 8 (2).

[16]ICCPR, art. 9.

[17]ICCPR art. 14(3); American Declaration, art. XXV; American Convention, art. 8(1).

[18]ICCPR, art. 17(1); Universal Declaration, art. 12; American Convention, art. 11(2); American Declaration, arts. IX-X.

289.4.19.  The right to be free from arbitrary detention[19]; and

289.4.20.  The right to have his detention review by a court without undue

delay[20].

### CLAIM 22: BURNS'S CONVICTION AND SENTENCE VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS ACTUALLY INNOCENT

290.  Burns incorporates the preceding paragraphs.

291.  Burns is actually innocent of felony-murder because he did not possess the requisite

mens rea to support the underlying felony of robbery.

292.  Burns is actually innocent of the death penalty because

292.1. only one aggravating circumstance, the Great Risk Of Death Circumstance,

supports Burns's death sentence.

292.2.  Burns was not responsible for whatever harm threatened persons other

than Dawson and/or Johnson during the incident.

### CLAIM 23: IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION MR. BURNS IS INCOMPETENT TO BE EXECUTED

293.  Burns incorporates the preceding paragraphs.

294.  At the time of any execution of Mr. Burns he will not comprehend the punishment

---

[19]ICCPR, art. 9(1); Universal Declaration, art.9; American Declaration, art. XXV; American Convention, art. 7(3).

[20]ICCPR, art. 9(3); Universal Declaration, art.9; American Declaration, art. XXV; American Convention art. 7(3).

he is about to receive or the reason for it.

> CLAIM 24: IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE

295.  Burns incorporates the preceding paragraphs.

296.  To the extent that this Court concludes that counsel failed to raise on appeal a meritorious issue, appellate counsels' failure to do so was a prejudicial, deficient performance.

> CLAIM 25: THE CUMULATIVE EFFECT OF CONSTITUTIONAL ERRORS RENDERS MR. BURNS'S FIRST-DEGREE MURDER CONVICTIONS AND DEATH SENTENCE UNCONSTITUTIONAL

297.  Burns incorporates the preceding paragraphs.

298.  To the extent this Court finds two or more constitutional errors, yet determines that those errors are individually harmless, the cumulative effect of those errors renders Mr. Burns's conviction and/or death sentence unconstitutional.

## VI.    PRAYER FOR RELIEF

For the foregoing reasons, Mr. Burns's convictions and/or sentences are void or voidable because of the abridgment of his rights guaranteed by the United States Constitution, and he therefore respectfully requests that this Court:

A.    Grant Mr. Burns leave to conduct discovery on Mr. Burns's fact-based claims;

B.    Hold an evidentiary hearing on Mr. Burns's fact-based claims;

C.    After holding such a hearing, grant Mr. Burns an unconditional writ of habeas corpus;

D.    After holding an evidentiary hearing, grant Mr. Burns a conditional writ of habeas corpus; and

E.    Grant whatever additional relief this Court deems to be equitable and appropriate.

Respectfully Submitted,

Christopher M. Minton
Assistant Federal Public Defender

Office of the Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, Tennessee 37203
(615) 736-5047

By:/s/ Christopher M. Minton

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was filed electronically.  Notice of this Filing will be sent by operation of this Court's electronic filing system to counsel for respondent, Alice Lustre, Esq., 425 Fifth Avenue North, Nashville, Tennessee 37243. on February 20, 2007.

/s/ Christopher M. Minton