IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|                                        |   |                      |
|----------------------------------------|---|----------------------|
| KEVIN B. BURNS,                        |   |                      |
|                                        |   |                      |
|     Petitioner,    |   |                      |
|                                        |   |                      |
| vs.                                    |   | No. 06-2311-SHM-dkv  |
|                                        |   |                      |
| RICKY BELL, Warden, Riverbend          |   |                      |
| Maximum Security Institution,          |   |                      |
|                                        |   |                      |
|     Respondent.    |   |                      |

---

ORDER DIRECTING CLERK TO OPEN CASE
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
ORDER DENYING PETITIONER'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254
ORDER OF DISMISSAL
ORDER GRANTING LIMITED CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING LIMITED APPEAL WOULD BE TAKEN IN GOOD FAITH

---

On May 23, 2006, Petitioner Kevin B. Burns, Tennessee Department of Corrections prisoner number 254315, a death-sentenced inmate at the Riverbend Maximum Security Institution ("RMSI") in Nashville, Tennessee, filed a pro se habeas corpus petition under 28 U.S.C. § 2254, a motion for appointment of counsel, and a motion for leave to proceed in forma pauperis. (Docket Entries ("D.E.") 1-3.) On June 1, 2006, the Court entered an order appointing counsel, denying leave to proceed in forma pauperis, and directing Petitioner to pay the habeas filing fee. (D.E. 4.) On June 15, 2006, Petitioner paid the habeas filing fee. On July 20, 2006, the Court granted the parties' joint motion for a scheduling order. (D.E. 7.) On February

20, 2007, Petitioner, through counsel, filed an amended petition for writ of habeas corpus. (D.E. 8.) On June 14, 2007, Respondent Ricky Bell filed a notice of manual filing of documents. (D.E. 28.) On June 29, 2007, Respondent filed an answer to the amended petition. (D.E. 33.) On April 1, 2008, Petitioner filed a motion to abate all proceedings related to his habeas corpus petition in federal court. (D.E. 52.) On May 13, 2008, Respondent filed a motion for summary judgment and supporting memorandum. (D.E. 57 & 58.) On July 2, 2008, the Court denied the motion to abate all proceedings without prejudice. (D.E. 70.) On January 30, 2009, Petitioner filed a motion for partial summary judgment[1], a supporting memorandum, and a response to the Respondent's motion for summary judgment. (D.E. 84-86.) On March 11, 2009, the Court entered an order administratively closing this case until such time as the parties had fully briefed Respondent's May 13, 2008 motion for summary judgment. (D.E. 90.) On March 27, 2009, Respondent filed a response in opposition to Petitioner's motion for partial summary judgment. (D.E. 91.) On May 27, 2009, Respondent filed a reply to Petitioner's response in opposition to Respondent's motion for summary judgment. (D.E. 94.)

The May 13, 2008 motion for summary judgment has been fully briefed. The Court DIRECTS the Clerk to open this case for further proceedings.

---

[1]    Petitioner's motion for summary judgment addresses only the claim asserting that counsel's failure to challenge the testimony of Eric Thomas and Mary Jones amounted to ineffective assistance of counsel at the sentencing hearing (Claim 11B). (D.E. 84 at 1.)

2

I.    <u>STATE COURT PROCEDURAL HISTORY</u>

Burns was indicted on two counts of murder in the perpetration of a robbery (felony murder), two counts of premeditated murder, two counts of attempted first-degree murder during the perpetration of a robbery (attempted felony murder), and two counts of attempted premeditated first-degree murder. <u>State v. Burns</u>, No. 02C01-9605-CR-00170, 1997 WL 418492, *1 (Tenn. Crim. App. July 25, 1997). The jury convicted Burns on two counts of felony murder and two counts of attempted felony murder and sentenced Burns to death for the murder of Damond Dawson. <u>Id</u>. at **1, 16. On July 25, 1997, the Tennessee Court of Criminal Appeals affirmed the felony murder convictions and sentences, reversed and dismissed the convictions for attempted felony murder, and remanded the case for retrial on the two counts of attempted premeditated first-degree murder. <u>Id.</u> at **1, 9-12. On automatic review, the Tennessee Supreme Court affirmed Burns' convictions and sentences for first-degree felony murder. <u>State v. Burns</u>, 979 S.W.2d 276, 278 (Tenn. 1998), <u>cert. denied</u>, 527 U.S. 1039 (1999). Burns' application for post-conviction relief was denied. <u>Burns v. State</u>, No. W2004-00914-CCA-R3-PD, 2005 WL 3504990 (Tenn. Crim. App. Dec. 21, 2005), <u>perm. app. denied</u> (Tenn. Apr. 24, 2006).[2]

---

[2]    Burns attempted to reopen his state court post-conviction proceedings to address Claim 16 - that he was denied due process because of discrimination in the selection of the grand jury foreperson, and Claim 18 - that the death penalty is unconstitutional. (<u>See</u> D.E. 56 at 1-2.) On April 9, 2008, the Shelby County Criminal Court denied the motion to reopen. (D.E. 54.) On May 29, 2008, the Tennessee Court of Criminal Appeals denied relief. (D.E. 86-37.) On July 25,
(continued...)

To assess the claims Burns raises in this petition, it is necessary briefly to set forth the proof, as found by the Tennessee Supreme Court:

> On April 20, 1992, four young men, Damond Dawson, Tracey Johnson, Eric Thomas, and Tommie Blackman, were sitting in a car in Dawson's driveway in Memphis. Dawson was in the driver's seat, Johnson was in the front passenger seat, Thomas was in the back seat behind Dawson, and Blackman was in the back seat behind Johnson.
>
> The [petitioner] and Carlito Adams, who knew Blackman, walked up to the passenger side of the car. Adams pulled out a handgun and told Blackman to get out of the car. When Blackman refused, Burns pulled out a handgun and went around to the driver's side of the car. Blackman got out of the car and fled. Adams said "get him," and three or four more men appeared from behind hedges and fired at Blackman.
>
> Eric Jones, age fourteen, was playing basketball at Dawson's house with three friends. Jones saw the men in the car removing jewelry and pulling money from their pockets. Seconds later, Jones saw Blackman running toward him. Amidst gunshots, Jones and Blackman escaped to the back of the house; Jones' three friends ran to an adjacent yard. Once inside the house, Jones heard seven or eight more gunshots.
>
> Mary Jones, Eric Jones' mother, lived across the street from the Dawsons. She saw Adams shoot Johnson once in the chest. She saw Kevin Burns shoot Dawson several times, walk to the front of the car, and then shoot Dawson again. Ms. Jones unequivocally identified Burns and stated that she got "a real good look in his face" as he ran toward her after the shootings.
>
> Tracey Johnson died at the scene. Damond Dawson, who suffered five gunshots to his arm, buttocks, chest, and

---

[2]    (...continued)
2008, Burns notified this Court that he had filed an application for permission to appeal the denial of his motion to reopen to the Tennessee Supreme Court. (D.E. 73 at 2.) On September 29, 2008, the Tennessee Supreme Court denied that application. (D.E. 86 at 123.) On June 15, 2009, the United States Supreme Court denied a petition for writ of certiorari. Burns v. Tennessee, 129 S.Ct. 2791 (2009).

hip was alive when police arrived but died after being
transported to the hospital. Eric Thomas, who sustained
gunshots to his chest and stomach, survived and made a
photo identification of Kevin Burns two days after the
incident. Thomas testified that Burns and the others had
"opened fire" after robbing him and his friends of their
jewelry and money. Thomas said that he initially told
police he had been shot by Adams, but explained that he
believed he was going to die and gave police the only
name he knew, which was Adams.

On June 23, 1992, [the petitioner] was found in Chicago
and arrested. After being advised of his rights and
signing a waiver, the [petitioner] gave a statement in
which he admitted his role in the killings. He said that
he had received a telephone call from Kevin Shaw, who
told him that four men had "jumped" Shaw's cousin. Burns,
Shaw, and four others intended to fight the four men, and
Shaw gave Burns a .32 caliber handgun. As the others
approached a car with four men sitting in it, Burns
stayed behind. He heard a shot, saw a man running across
the yard, and fired three shots. He then left the scene
with the other men.

After the guilt phase of the trial, the jury deliberated
and returned verdicts of guilty for two counts of felony
murder and two counts of attempted felony murder. The
trial moved into the penalty phase of the proceedings for
the jury to determine the punishment for each of the
felony murder convictions.

....

Jonnie Dawson, mother of Damond Dawson, testified that
Damond was the youngest of her three children and
seventeen years of age when he was killed. She said he
was a good son who was very good at athletics. The
neighborhood had changed after the killings; people
locked their doors and were afraid. Ms. Dawson testified
that she no longer knew what it was like to be happy.

Brenda Hudson, mother of Tracey Johnson, testified that
Tracey was the oldest of her three children and twenty
years of age when he was killed. He had been working at
Wal-Mart and saving money for his four-month-old
daughter. Tracey's death had greatly affected Ms. Hudson'
(sic) other two children, Tracey's grandfather, and
Tracey's young daughter:

When you go over to her house to see her, she has a picture in a frame and she will show you. She'll say, "this is my father-this is my daddy, Tracey. He lives in God's house up in heaven." And it's hard for me to go see her a lot because it breaks my heart to hear her say that.

In mitigation, Leslie Burns, the [petitioner's] mother, testified that the [petitioner] was twenty-six years of age and had twelve brothers and sisters. He had graduated from high school and presented no disciplinary problems while in school. The [petitioner's] father, Reverend Obra Carter, testified that his son had always been obedient and well-mannered. Phillip Carter, the [petitioner's] brother, testified that the [petitioner] had been active in the church and had always tried to avoid trouble.

Norman McDonald, the [petitioner's] Sunday School teacher, testified that he had known Kevin Burns for several years. According to McDonald, Burns was a "faithful" young man who had always attended church regularly. Mary Wilson, a Captain with the Shelby County Sheriff's Department, and Bennet Dean, a volunteer chaplain, both testified that Burns had actively participated in religious services while in custody for these offenses.

The prosecution relied on two aggravating circumstances to seek the death penalty for the felony murder convictions-that the [petitioner] knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder, and that the murder had been committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. Tenn. Code Ann. § 39-13-204(i)(3) and (6) (1997 & Supp. 1998). With regard to the felony murder of Damond Dawson, the jury imposed the death penalty after finding that the evidence supported the "great risk of death" aggravating circumstance and that this factor outweighed the evidence of mitigating factors beyond a reasonable doubt. With regard to the felony murder of Tracey Johnson, the jury imposed a sentence of life imprisonment.

Burns, 2005 WL 3504990, at **1-3 (quoting Burns, 979 S.W.2d at 278-79 (footnote omitted)).

II.  <u>PETITIONER'S FEDERAL HABEAS CLAIMS</u>

Burns raises the following issues:

1.  Ineffective assistance of counsel at the guilt stage, as follows:

    a.  Trial counsel failed to investigate and present available evidence (D.E. 8 at 15-17);

    b.  Trial counsel failed to cross-examine Eric Thomas, Mary Jones and Federal Bureau of Investigation ("FBI") agents involved in the creation of Burns' statement effectively (<u>id.</u> at 17-18);

    c.  Trial counsel failed to have Thomas' identification testimony suppressed (<u>id.</u> at 18-19); and

    d.  Trial counsel failed to have Burns' FBI statement suppressed (<u>id.</u> at 19);

2.  The state withheld material, exculpatory evidence (<u>id.</u> at 20-23);

3.  The state offered inconsistent statements about who shot and killed Dawson (<u>id.</u> at 23-24);

4.  The state knowingly presented Eric Thomas' false testimony (<u>id.</u> at 24-25);

5.  The state presented false testimony that a robbery occurred (<u>id.</u> at 25-26);

6.  The state presented identification testimony based on an unduly suggestive photographic array (<u>id.</u> at 26);

7.  The court entered Petitioner's statement into evidence (<u>id.</u> at 26-27);

8.  The state knowingly presented the false testimony of FBI agents who took Burns' statement (<u>id.</u> at 27-28);

9.  The trial judge provided unconstitutional jury instructions at the guilt stage (<u>id.</u> at 28-30);

10. Extraneous, improper influences affected the jury's

7

verdict (<u>id.</u> at 30-31);

11.   Ineffective assistance of counsel at the sentencing
      stage, as follows:

      a.   Counsel failed to challenge the aggravating
           circumstance (<u>id.</u> at 31-32);

      b.   Counsel failed to investigate and present
           mitigating evidence (<u>id.</u> at 32-44);

      c.   Counsel failed to present mental health
           evidence (<u>id.</u> at 44-45); and

      d.   Counsel failed to present evidence about
           Petitioner's relative culpability (<u>id.</u> at 45);

12.   The state presented victim impact testimony at the
      sentencing hearing (<u>id.</u> at 46);

13.   The trial judge's sentencing jury instructions
      violated the Sixth, Eighth, and Fourteenth
      Amendments to the United States Constitution (<u>id.</u> at
      46-47);

14.   The prosecution made improper remarks during closing
      arguments at the sentencing stage (<u>id.</u> at 47-48);

15.   The trial court did not answer questions that the
      jury asked during sentencing deliberations (<u>id.</u> at
      48);

16.   Burns was indicted by a grand jury from which women
      were systematically excluded as grand jury
      forepersons (<u>id.</u> at 48-50);

17.   The indictments did not allege aggravating
      circumstances (<u>id.</u> at 50);

18.   Burns' death sentence is unconstitutional (<u>id.</u> at
      50);

19.   Tennessee prosecutors do not have uniform standards
      for deciding whether to seek the death penalty and
      no standards governed the prosecutor in this case
      (<u>id.</u>);

20.   Burns' death sentence is arbitrary (<u>id.</u> at 51);

8

21.  Burns' conviction and death sentence violated the
     United States Constitution because the state
     disregarded the rights accorded him by international
     law (id. at 51-56);

22.  Burns is actually innocent (id. at 56);

23.  Burns is incompetent to be executed (id. at 56-57);

24.  Appellate counsel rendered ineffective assistance
     (id. at 57); and

25.  The cumulative effect of constitutional errors
     renders Burns' first-degree murder convictions and
     sentences unconstitutional (id.).

III.  <u>ANALYSIS OF THE MERITS</u>

      A.   <u>Waiver and Procedural Default</u>

      Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

      (1)  An application for a writ of habeas corpus on behalf
           of a person in custody pursuant to the judgment of
           a State court shall not be granted unless it appears
           that–

           (A)  the applicant has exhausted the remedies
                available in the courts of the State; or

           (B)  (i)  there is an absence of available State
                     corrective process; or

                (ii) circumstances exist that render such
                     process ineffective to protect the rights
                     of the applicant.

      (2)  An application for a writ of habeas corpus may be
           denied on the merits, notwithstanding the failure of
           the applicant to exhaust the remedies available in
           the courts of the State.

A habeas petitioner must first exhaust available state remedies

before requesting relief under § 2254. <u>See, e.g.</u>, <u>Granberry v.</u>

<u>Greer</u>, 481 U.S. 129, 133-34 (1987); <u>Rose v. Lundy</u>, 455 U.S. 509,

519 (1982). A petitioner has failed to exhaust his available state

remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254(c); <u>Preiser v. Rodriquez</u>, 411 U.S. 475, 477, 489-90 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. <u>Picard v. Connor</u>, 404 U.S. 270, 275-76 (1971); <u>Rust v. Zent</u>, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" <u>Id.</u> at 163 (quoting <u>Picard</u>, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." <u>Id.</u>

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." <u>Id.</u> When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842-45 (1999); <u>Pillette v. Foltz</u>, 824 F.2d

494, 496 (6th Cir. 1987). A petitioner has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. <u>Pillette</u>, 824 F.2d at 497-98. Each claim must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (citation omitted); <u>see also</u> <u>Duncan v. Henry</u>, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The state court decision must rest primarily on federal law. <u>Coleman v. Thompson</u>, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred by this procedural default from seeking federal habeas review. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87-88 (1977). However, the state-court decision need not explicitly address the federal claim; instead, it is enough that the petitioner's brief squarely presents the issue. <u>Smith v. Digmon</u>, 434 U.S. 332 (1978) (per curiam).

11

When a petitioner's claims have never been actually presented to the state courts, but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989); Wainwright, 433 U.S. at 87-88; Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and prejudice to obtain federal court review of his claim. Teague, 489 U.S. at 297-99; Wainwright, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. Coleman, 501 U.S. at 753; Murray v. Carrier, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a 'fundamental miscarriage of justice'." Coleman, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Schlup v. Delo, 513 U.S. 298, 327 (1995) (quoting Murray, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S.

12

at 327.

The conduct of Burns' postconviction proceedings was governed by the then-current version of Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122. That act specified types of procedural default that might bar a state court from reviewing the merits of a constitutional claim. A one-year statute of limitations governed the filing of petitions. Tenn. Code Ann. § 40-30-102. The statute also stated a standard by which state courts were to determine whether to consider the merits of post-conviction claims:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

Tenn. Code Ann. § 40-30-106(f).[3]

---

[3]    Section § 40-30-106 continued:

(g)    A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

   (1)    The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

   (2)    The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)    A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where

(continued...)

13

The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on postconviction relief. Hannah v. Conley, 49 F.3d 1193, 1195-97 (6th Cir. 1995) (construing pre-1995 statute and stating "the language of Tenn. Code Ann. § 40-30-102 is mandatory"). In this case, Burns' right to file any further state postconviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.

B.    Legal Standard for Merits Review

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[3]    (...continued)
the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must also determine whether the state court decision on each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[4] In (Terry) Williams v. Taylor, 529 U.S. 362, 404 (2000), the Supreme Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538 U.S. 634, 640 (2003) (same); Lockyer v. Andrade, 538 U.S. 63, 73

---

[4]    By contrast, there is little case law addressing the standards for applying § 2254(d)(2).

(2003) (same); <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002) (same).[5] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406; <u>see also</u> <u>id.</u> at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.") (emphasis in original).

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." <u>Cone</u>, 535 U.S. at 694; <u>see also</u> <u>Andrade</u>, 538 U.S. at 75 (same); <u>Williams</u>, 529 U.S. at 408-09 (same).[6] "[A]n unreasonable application of

---

[5]    The Supreme Court emphasized that this standard "does not require citation of our cases—indeed, it does not even require <u>awareness</u> of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

[6]    Although the Supreme Court in <u>Williams</u> recognized, <u>in</u> <u>dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," <u>id.</u> at 407-08. The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)." <u>Id.</u> at 408-09. In
(continued...)

federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410 (emphasis in original).[7] "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.[8]

Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." <u>Harris v. Stovall</u>, 212 F.3d

_____

[6]    (...continued)
<u>Yarbrough v. Alvarado</u>, 541 U.S. 652, 666 (2004), the Supreme Court stated:

> Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. Cf. <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.

[7]    <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).”); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

[8]    <u>See also</u> <u>Brown v. Payton</u>, 544 U.S. 133, 147 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

940, 944 (6th Cir. 2000). As the Sixth Circuit has explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). In determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

There is almost no case law about the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In a decision applying this standard, the Supreme Court observed that § 2254(d)(2) must be read in conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct

18

unless rebutted by clear and convincing evidence. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005).[9] It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1). <u>Rice v. Collins</u>, 546 U.S. 231, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). That is consistent with the approach taken by the Sixth Circuit, which has stated that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

<u>Young v. Hofbauer</u>, 52 F. App'x 234, 236 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1));[10] <u>see also</u> <u>Matthews v. Ishee</u>, 486 F.3d 883, 889 (6th Cir.), <u>cert. denied</u>, 552 U.S. 1023 (2007) (same); <u>Stanley v. Lazaroff</u>, 82 F. App'x 406, 416-17 (6th Cir. 2003) (same).

C.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show

---

[9]    <u>But cf.</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006) (recognizing that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable).

[10]    <u>See also</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

19

that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). As the Supreme Court has explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Under Fed. R. Civ. P. 56(e)(2), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." Anderson v.

20

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>id.</u> at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts") (footnote omitted). The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter. <u>Anderson</u>, 477 U.S. at 249-50. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 251-52.

IV.  <u>ANALYSIS OF PETITIONER'S CLAIMS</u>

    A.  <u>Procedural Default</u>

Burns has asserted multiple reasons why this Court should review his unexhausted habeas claims on the merits. (<u>See</u> D.E. 86 at 119-51.) To narrow the claims that must be addressed on the merits, the Court will summarily address some of Burns' arguments that his unexhausted claims are not procedurally defaulted.

    1.  Implicit Review

Burns argues that the Tennessee Supreme Court, pursuant to

Tenn. Code Ann. § 39-2-206(c)(1)(repealed)[11], considered the following Eighth Amendment claims on direct appeal to determine whether the death sentence was imposed in "*any* arbitrary fashion." (D.E. 86 at 124-25.)

•    Claim 7 - introduction of Burns' statement into evidence

•    Claim 8 - false testimony of FBI agents

•

•    Claims 9 & 13 - guilt and sentencing phase jury instructions

•    Claim 14 - prosecution's remarks at closing argument

•    Claim 15 - trial court's failure to answer jury's questions

(Id. at 125.)[12] Burns asserts that these claims were exhausted because the Tennessee Supreme Court acknowledged, consistent with Tenn. Code Ann. § 39-2-206(c)(1), that it "considered the *entire record* and conclude(d) that (Mr. Burns's) sentence of death was not imposed arbitrarily or capriciously . . . ." (Id. at 124.) See Burns, 979 S.W.2d at 286.

A petitioner does not "fairly present" a federal claim to a state court for exhaustion purposes if the court must look beyond a petition or brief to find material alerting it to the claim. Baldwin v. Reese, 541 U.S. 27, 30-32 (2004); see Hodges v. Bell, 548 F. Supp. 2d 485, 560 (M.D. Tenn. 2008) ("For those claims for

_____

[11]    The present statute is Tenn. Code Ann. § 39-13-206(c)(1), which states, "In reviewing the sentence of death for first degree murder, the reviewing courts shall determine whether . . . [t]he sentence of death was imposed in any arbitrary fashion." State v. Cauthern, 967 S.W.2d 726, 741 (Tenn. 1998).

[12]    Burns also argues that his Eighth Amendment claim related to the identification testimony of Eric Thomas falls into this category, but he incorrectly identifies this issue as Claim 8, instead of Claim 4. (See id.)

which Petitioner now relies upon constitutional amendments that were not cited and briefed in the state courts, the Court concludes that those claims were not fairly presented to the state courts and will be considered as unexhausted and defaulted"). "Exhaustion simply has not occurred where the state courts have not been provided a 'fair opportunity' to consider and decide the same claims of constitutional error presented to a federal habeas court." Miller v. Bell, 655 F. Supp. 2d 838, 869 (E.D. Tenn. 2009).

Implicit review theories based on the statutorily-mandated review that the Tennessee Supreme Court conducts pursuant to Tenn. Code Ann. § 39-13-206(c)(1) in capital cases have been rejected by the federal courts. Miller, 655 F. Supp. 2d 838, 869 (E.D. Tenn. 2009). The Sixth Circuit has indicated that the proposition that a claim has been exhausted because Tenn. Code Ann. § 39-2-205 requires the Tennessee Supreme Court to review significant errors is "too broad, as it would eliminate the entire doctrine of procedural bar in Tennessee in capital cases." Coe v. Bell, 161 F.3d 320, 336 (6th Cir. 1998). In Zagorski v. Bell, 326 F. App'x 336, 342 (6th Cir. 2009), the Sixth Circuit rejected a petitioner's implicit review argument that his claim was not procedurally defaulted because the Tennessee Supreme Court reviewed the record for "*all* possible claims" and found no reversible error. In Webb v. Mitchell, 586 F.3d 383, 400 (6th Cir. 2009), the Sixth Circuit noted that it had accepted an implicit review theory previously in

<u>Cone v. Bell</u>, 359 F.3d 785, 790-94 (6th Cir. 2004), but the holding
in <u>Cone</u> was limited to Eighth Amendment vagueness challenges. The
Court declines to extend Burns' implicit review theory to excuse
the procedural default of the above-referenced Eighth Amendment
claims.[13]

    2.   The Post-Conviction Process

Burns argues that Claims 1B as it relates to Agent Bakken, 1C,
1D, 2, 5, 10 as it relates to group prayer and the use of Bibles[14],
11A, and 24 are not procedurally defaulted because Burns' post-
conviction process was inadequate to air his federal claims. (D.E.
86 at 125-34.) Burns contends that the only discovery available to
him was that already provided pre-trial and that the inability to
conduct independent discovery rendered the post-conviction process
inadequate. (<u>Id.</u> at 130.) Burns has not identified any facts he
might have discovered before federal habeas review that would have
permitted him to exhaust these claims. Burns has not demonstrated
cause based on a lack of discovery procedures as it relates to the

---

    [13]   In addition to the implicit review argument, Burns asserts
ineffective assistance of counsel to excuse the procedural default of the Eighth
Amendment portion of Claim 7 and Claims 9, 13, 14, and 15. (<u>See</u> D.E. 86 at 139.)
He asserts state misconduct and ineffective assistance of post-conviction counsel
to excuse the procedural default of Claim 8. (<u>See</u> <u>id.</u> at 136-38, 143.)

    [14]   Respondent claims that "the factual basis for Petitioner's claim was
never properly established and the proof adduced in the post-conviction hearing
made no mention of 'group prayer' or the presence of any more than the foreman's
personal Bible in the jury room." (D.E. 58 at 10.) Respondent acknowledges that
Burns asserted this claim in his second amended post-conviction petition, but
claims that the "group prayer" issue was not preserved on appeal and is
procedurally defaulted. (<u>Id.</u>) Lloyd Davis, the jury foreman, testified at the
post-conviction hearing about a biblical passage that was read, but no evidence
was presented about group prayer. (D.E. 28, Add. 13, Vol. 4, pp. 405-19.)

failure to exhaust these claims. See Alley v. Bell, 101 F. Supp. 2d 588, 618 n.11 (W.D. Tenn. 2000) (holding that lack of discovery procedures in the post-conviction process was not external cause for procedural default).

Burns asserts that the post-conviction process was inadequate and judicially biased because the Chief Justice of the Tennessee Supreme Court denied Burns the continued expert services of Dr. Lee Norton, a mitigation specialist. (D.E. 86 at 131-32.) Initially, the Chief Justice approved Norton for $5,000 at $100 an hour; another fifty (50) hours of work was approved later. Burns, 2005 WL 3504990, at *25. On July 17, 2003, a request for pre-approval of $15,000 for services and $2,524.00 for travel expenses was denied. Id. (D.E. 28, Add. 14, p. 134.) The Chief Justice's reason for the denial was

> Funding for experts and services in post-conviction proceedings should be approved if facts alleged establish that the funding is necessary "to establish a ground for post-conviction relief, and that the petitioner is unable to establish that ground for post-conviction relief by other available evidence." Owens v. State, 908 S.W.2d 923, 929 (Tenn. 1995). The facts outlined in the order authorizing funding indicate that the information likely to be obtained from interviewing or re-interviewing Betty Douglas, Zettie Carter, Teresa Carter, Henry Clark, Steve Ball and the Dawson family is already available to counsel.

(Id.) The Chief Justice approved funding in the total amount of $4875 at the hourly rate of $65 for services, not including out-of-state travel. (Id.) Norton would not agree to work at the $65 rate, and Norton's work stopped. Burns, 2005 WL 3504990, at *25.

25

Burns filed an application for permission to appeal the curtailment of the trial court's grant of expert services to the Tennessee Court of Criminal Appeals. (Id. at 130-31.) That court held that it was without authority to review the Chief Justice's decision. (Id. at 131.)

The Tennessee Court of Criminal Appeals addressed the denial of additional funds in the appeal of the denial of post-conviction relief.

> We disagree with the petitioner's claim that he was denied sufficient funds for the preparation of proof at the evidentiary hearing. He was granted $5,000 for fifty hours of Dr. Norton's services, at $100 per hour. The post-conviction court then granted an additional $15,000 for 150 hours of Dr. Norton's services at $100 per hour. However, the Chief Justice reduced the amount of these additional funds to $4,875 for seventy-five hours, at $65 per hour, a rate which Dr. Norton found unacceptable. Thus, the "court" did not deny the petitioner funds for expert services. Rather, Dr. Norton refused to work for the hourly rate which had been authorized. The petitioner has failed to establish that he could not employ another mitigation specialist at the $65 hourly rate. We will not assign constitutional error to a "court" when funds were provided but rejected by the one expert selected. Thus, the petitioner has failed to establish that the "court's" denial of funds for Dr. Norton denied him a full and fair hearing.
>
> Moreover, Dr. Norton testified that the scope of her contract with the petitioner's counsel was limited to her assistance in conducting interviews, although she did perform some functions of the traditional mitigation specialist. She considered herself a "consultant" in this case. Dr. Norton acknowledged she was surprised at being subpoenaed to testify as an expert and, had she been aware this would occur, she would have prepared differently. With regard to Dr. Woods's evaluation, he clarified that when he referred to the investigation as "incomplete," he meant it was incomplete with regard to the way that "these things unfold" rather than incomplete

26

> due to a "lack of thoroughness." As such, there is no
> evidence to support a conclusion that Dr. Woods's opinion
> would have been different had Dr. Norton completed her
> interviewing process. This issue is without merit.

Burns, 2005 WL 3504990, at *37.

Respondent asserts and the Court agrees that the record does not support Burns' allegations of judicial bias based on Norton's funding. (See D.E. 94 at 77.) The record reveals that the Chief Justice's decision was based on a determination that the information sought was available to counsel.[15] Burns has not presented any evidence that the decision was motivated by judicial bias or indicated how the lack of continued funding at the initial level prevented him from exhausting the enumerated claims.

Burns also asserts that the post-conviction process was inadequate because the post-conviction trial court demonstrated judicial bias when it refused to consider mitigating facts about Obra Carter's violent treatment of Burns, the whipping or spanking of his siblings, and the effect of Carter's intermittent contact with Burns and his family. (D.E. 86 at 132-33.) Burns does not point to specific examples of bias in the record. The Tennessee Court of Criminal Appeals held that Burns' claim that he was denied a full and fair hearing because rulings and statements made by the post-conviction court demonstrated bias and because that court failed to consider and give effect to the mitigation evidence was

---

[15]    Norton interviewed Betty Douglas and Zettie (Carter) Thomas, two of the interviews for which additional funding was requested. See Burns, 2005 WL 3504990, at *24, 40.

without merit. <u>Burns</u>, 2005 WL 3504990, at **37-44.

Burns has presented no record evidence to indicate judicial bias. Burns has not established cause for the failure to exhaust Claims 1B as it relates to Agent Bakken, 1C, 1D, 2, 5, 10 as it relates to group prayer and the use of Bibles, 11A, and 24. Claim 24 is procedurally defaulted and DENIED.[16]

3.   Ineffective Assistance of Counsel as Cause

Burns takes the Court on an "admittedly obtuse journey" in which he asserts ineffective assistance of counsel as cause for the procedural default of the following claims that were not presented during trial and/or on direct appeal:

Claim 6 - unduly suggestive photo array

Claim 7 - Eighth Amendment claim about Burns' statement

Claim 9 - unconstitutional jury instructions at the guilt stage

Claim 13 - unconstitutional jury instructions at the sentencing stage

Claim 14 - prosecutorial misconduct during closing argument

Claim 15 - failure to answer the jury's questions during sentencing deliberation; and

Claim 16 - sex discrimination in the selection of the grand jury foreperson.

(D.E. 86 at 139.) Burns did not exhaust in state court the

---

[16]   In addition to his inadequate post-conviction process argument, Burns asserts ineffective assistance of post-conviction counsel as cause for the procedural default of claims 1, 2, 5, 10 as it relates to group prayer and the use of Bibles, and 11. (D.E. 86 at 143.) Burns asserts actual innocence as cause for claims 2, 5, and 11A. (<u>Id.</u> at 147-50.)

ineffective assistance of counsel issues he now asserts as cause for the above-enumerated claims. (Id. at 140.)[17] Burns asserts the violation of his Fourteenth Amendment right to effective representation in the post-conviction proceedings[18] as cause for his failure to exhaust the ineffective assistance of counsel claims arising from his trial and direct appeal. (Id. at 140.) Burns contends that "[b]ecause such an IAC claim was first available for review during the first post-conviction proceeding, this case presents the issue Coleman left open." (Id. at 141.)

There is no constitutional right to effective representation of counsel in post-conviction and collateral proceedings, whether under the Sixth or the Fourteenth Amendment. Coleman, 501 U.S. at 752-53; Wooten v. Norris, 578 F.3d 767, 778 (8th Cir. 2009) (same). "The right to appointed counsel extends to the first appeal of right, and no further." Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). The petitioner must "bear the risk of attorney error that results in a procedural default." Coleman, 501 U.S. at 752-53. This is true even when a claim can only be raised for the first-time in state post-conviction proceedings. Thompson v. Rone, Nos. 92-5839,

_____

[17]   Burns' ineffective assistance of counsel claims on appeal of the denial of post-conviction relief were limited to claims that counsel failed to investigate thoroughly and present evidence of Burns' lesser culpability; failed to select a jury competently; failed to object to the presentation of victim impact evidence; failed to use the services of experts for mitigation; failed to investigate thoroughly and present sufficient mitigation evidence; and failed to prepare defense witnesses to testify. Burns, 2005 WL 3504990, at *48.

[18]   Burns acknowledges that the Sixth Circuit does not recognize a Sixth Amendment claim for ineffective assistance of post-conviction counsel and as such the claim cannot serve as cause for procedural default. (Id. at 140 n.121.)

92-5840, 1994 WL 36864, at *4 (6th Cir. Feb. 8, 1994); see Bishop
v. Epps, No. 1:04CV319-MPM, 2007 WL 2363465, at *20 (N.D. Miss.
Aug. 16, 2007) (quoting Matchett v. Dretke, 380 F.3d 844, 849 (5th
Cir. 2004) ("Contrary to Matchett's suggestion, a state prisoner
may not cite the ineffective assistance of state habeas counsel as
'cause' for a procedural default even for 'cases involving
constitutional claims that can only be raised for the first time in
state post-conviction proceedings")). Because Burns has no
constitutional right to effective assistance of post-conviction
counsel, he cannot establish cause to prevent the procedural
default of his trial and direct appeal ineffective assistance of
counsel claims. Coleman, 501 U.S. at 752-55 (1991) (ineffective
assistance of counsel during state post-conviction proceedings
cannot serve as cause to excuse factual or procedural default); see
Stojetz v. Ishee, 389 F. Supp. 2d 858, 901 (S.D. Ohio 2005) (same).
Because the ineffective assistance claims on which Burns relies to
establish cause for claims 6, 7, 9, and 13-16, as enumerated above,
are themselves procedurally defaulted, the Eighth Amendment portion
of claim 7 and claims 6, 9, 13, 14, and 16 are procedurally
defaulted and DENIED.[19]

Burns also asserts ineffective assistance of post-conviction

---

[19]    Burns asserts that Claim 15 is not procedurally defaulted because the
state court's determination that he waived that claim was not based on an
adequate state law ground for the default. (D.E. 86 at 134-35.) Because the state
court addressed the claim on the merits, the Court will address the claim on the
merits later in this opinion, infra pp. 100-105.

counsel as cause for the procedural default of claims 1, 2, 5, 8, 10 about the use of the Bible and group prayer, and 11. (D.E. 86 at 143.) As stated <u>supra</u> pp. 29-30, ineffective assistance of post-conviction counsel does not establish cause for the failure to exhaust a claim. Claims 1B as it relates to Bakken and Harbaugh, 1C, 1D, and 10 about the use of the Bible and group prayer are procedurally defaulted and DENIED.[20]

B.   <u>Ineffective Assistance of Trial Counsel (Claim 1)</u>

Burns asserts in Claim 1A that trial counsel failed to investigate and present available evidence (D.E. 8 at 15-17) and in Claim 1B that trial counsel failed to cross-examine Eric Thomas and Mary Jones effectively (<u>id.</u> at 17-18).[21]

A claim of ineffective assistance of counsel under the Sixth Amendment is controlled by the standards in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the

---

[20]   Burns has asserted additional bases for the Court to address claims 2, 5, 8, and 11 on the merits, <u>supra</u> p. 24 n.13 & p. 28 n.16.

[21]   Claim 1B, as it relates to Bakken and Harbaugh, and claims 1C and 1D were procedurally defaulted, <u>supra</u> pp. 27-28, 31.

conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citation omitted); see also Coe, 161 F.3d at 342 (6th Cir. 1999) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the

competent trial attorney'"). The Court should "assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); see also Rogers v. Kohler, No. 86-1857, 1987 WL 37783, at *2 (6th Cir. June 23, 1987) ("The habeas lawyer is usually not the trial lawyer and it is very easy for one person's strategy to emerge years later as another person's error. Therefore, we evaluate on the total performance and the question of prejudice.")

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Additionally, however,

33

in analyzing prejudice,

> the right to the effective assistance of counsel is
> recognized not for its own sake, but because of the
> effect it has on the ability of the accused to receive a
> fair trial. Absent some effect of the challenged conduct
> on the reliability of the trial process, the Sixth
> Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (citing United

States v. Cronic, 466 U.S. 648, 658 (1984)); see Mickens v. Taylor,

535 U.S. 162, 165 (2002) (the Sixth Amendment right has been

accorded "because of the effect it has on the ability of the

accused to receive a fair trial. It follows from this that

assistance which is ineffective in preserving fairness does not

meet the constitutional mandate . . . and it also follows that

defects in assistance that have no probable effect upon the trial's

outcome do not establish a constitutional violation.") (citations

omitted); see also Williams, 529 U.S. at 391 ("[W]hile the

Strickland test provides sufficient guidance for resolving

virtually all ineffective-assistance-of-counsel claims, there are

situations in which the overriding focus on fundamental fairness

may affect the analysis. Thus, on the one hand, as Strickland

itself explained, there are a few situations in which prejudice may

be presumed. And, on the other hand, there are also situations in

which it would be unjust to characterize the likelihood of a

different outcome as legitimate 'prejudice'.") (citation omitted);

see also Strickland, 466 U.S. at 686 ("The benchmark for judging

any claim of ineffectiveness must be whether counsel's conduct so

34

undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." <u>Lockhart</u>, 506 U.S. at 369.

> 1.    Failure to investigate and present available evidence (Claim 1A)

Burns asserts that his trial counsel failed to investigate and present available evidence at the guilt stage in violation of his Sixth, Eighth, and Fourteenth Amendment rights. (D.E. 8 at 15.) Burns contends that trial counsel's investigation of the case was limited to visiting the crime scene, interviewing Burns, and meeting with Burns' parents. (<u>Id.</u> at 16.) Counsel did not interview available eyewitnesses and failed to use the limited discovery from the State and the transcripts from Derrick Garrin's and Carlito Adams' trials. (<u>Id.</u>) Burns claims that, had trial counsel recognized the significance of information in the documents that they possessed, counsel would have presented evidence that Burns did not have the intent to commit a robbery, that it was questionable whether a robbery occurred, that Burns did not shoot Dawson or anyone else, and that the authorities did not prosecute Kevin Shaw, Benny Buckner or

Richard Morris[22] in exchange for information and/or services. (Id. at
16-17.)

Burns addressed his counsel's alleged failure to investigate and
present a defense in his post-conviction petition (D.E. 28, Add. 14,
pp. 30-33) and on appeal of the denial of post-conviction relief (id.
at Add. 26, pp. 23-26). The Tennessee Court of Criminal Appeals held:

> The post-conviction court found that trial counsel had not
> been ineffective in their preparation for the guilt phase
> of the trial:
>
>> Petitioner alleges that counsel failed t[o]
>> interview witnesses to the crime. Both attorneys
>> testified that their investigator attempted to
>> locate and talked to witnesses. Tomm[ie]
>> Blackm[a]n refused to talk to them. He was
>> successful on some and not on others. [Senior
>> counsel] also testified that he and the
>> investigator canvassed the neighborhood door to
>> door for witnesses but to no avail. However, he
>> testified that his investigator had secured the
>> entire police department file and copies of all
>> of the witnesses' statements pre-trial. Further,
>> they were able to convince the State to try [the
>> petitioner] after defendants Garrin and Adams so
>> that they would have the testimony of the
>> witnesses as well. The Court feels the attorneys
>> were not ineffective for failing to interview
>> witnesses. It appears they were well prepared
>> for trial. This issue has no[ ] merit.
>>
>> Petitioner alleges that counsel failed to talk
>> to co-defendants, Garrin and Adams.... The
>> testimony at the evidentiary hearing was that
>> one co-defendant, name unknown, refused to talk
>> to the investigator and another named the
>> Petitioner as the "Trigger man".... There has
>> been no proof presented that ... [Garrin and/or
>> Adams] wanted to testify [for the petitioner at

_____

[22]    Morris' name is sometimes spelled "Morrise" in the pleadings. Richard
Morris is also referred to as "Marqueis". (D.E. 86-13 at 4.)

trial] or that the[ir] testimony would have been helpful to the Petitioner and they were available to testify at this hearing. This Court therefore concludes that this issue is without merit.

Petitioner alleges ineffectiveness for not interviewing all of the co-defendants. The attorneys testified that they had each co-defendant's statement, as well as the statements of those present but not charged.... [C]ounsel had reviewed the testimony of those who had been tried and those who had testified in the earlier trials. Adams described the Petitioner as a shooter and described him as wearing a 3/4 length black coat. Shaw gave the same description, Buckner, who was arrested and charged as a participant by order of the court after his testimony, said the [petitioner] was present when the proceeds of the robbery were divided, Garrin said the petitioner fired shots and may have been the one to take the jewelry. This court has not seen any testimony or a statement from Richard Morris other than a small portion of his testimony placing the Petitioner on the scene with a gun. This Court has not heard testimony from any of these co-participants or co-defendants, which would have been beneficial to Petitioner or would have affected the verdict of the jury. This Court sees nothing beneficial that would have been offered by any of those present and nothing has been presented to the Court to indicate that due to the failure of defense counsel to interview these parties the outcome of the trial would have been different. This issue has no merit.

As found by the post-conviction court, the testimony showed that trial counsel and their investigator attempted to interview witnesses to the crimes. Tommie Blackman refused to talk to them. Counsel also had the entire file of the prosecution and had the transcripts of the trials of Carlito Adams and Derrick Garrin. One codefendant specifically identified the petitioner as the "trigger man." Both Carlito Adams and Kevin Shaw described the shooter as wearing a black trench coat. Buckner and Garrin both stated that the petitioner shared in the proceeds of the robbery, and Garrin stated that the petitioner fired

37

shots. There is no proof that the petitioner provided trial counsel with the names of any of the numerous witnesses who could have testified that he had short hair. One witness identified the petitioner two days after the incident by photographic lineup in which the petitioner had a short hairstyle. Another witness described the petitioner as having a jheri curl. The petitioner refused to cooperate with counsel by changing his hairstyle or providing counsel with witnesses regarding his hairstyle or manner of dress. Further, he hampered any attempt to establish his lesser culpability by suddenly refusing to testify on his own behalf.

There was no proof presented that any of the participants other than the petitioner was wearing a trench coat during the shootings. The petitioner asserts that Kevin Shaw had a jheri curl at the time of the offenses. In support thereof, defense witness Rodney Weatherspoon identified Kevin Shaw as wearing longer hair with "the little curl." Notwithstanding, defense witness Kevin Whitaker testified that Kevin Shaw wore his hair in a "high-top fade." This conflicting evidence fails to identify Kevin Shaw as wearing a black trench coat or wearing a long jheri curl at the time of the offenses. The post-conviction court properly concluded that the petitioner failed to present evidence establishing that he was mistakenly identified as the shooter.

The conflicting testimony of the codefendants, the petitioner's refusal to cooperate with counsel, his statement to FBI agents, and his decision not to testify at trial hindered trial counsel's efforts to pursue a theory of lesser culpability. Even if, as the petitioner claims, trial counsel were deficient in not presenting witnesses to testify regarding the length of his hairstyle, it is clear that the identification of him as the shooter does not rest solely upon his hairstyle. The proof, including the petitioner's statement to the FBI, established, beyond a reasonable doubt, that he was guilty of the felony murders of the victims, Johnson and Dawson. Thus, he has failed to show that he was prejudiced by counsel's alleged failure to further investigate his lesser culpability and the alleged failure to present evidence of his lesser culpability.

Burns, 2005 WL 3504990, at **56-57.

    Burns argues that the state court's decision was an unreasonable

38

determination of the facts and an unreasonable application of federal
law. (D.E. 86 at 57, 61.) Burns claims that the Tennessee Supreme
Court's findings of fact on direct appeal, as cited by the Tennessee
Court of Criminal Appeals in the post-conviction proceedings, are
"belied by evidence that was presented to the post-conviction court
that Johnson and Wright admitted they had in their possession." (Id.
at 57.) Burns claims that the Tennessee Supreme Court's
misunderstanding of the facts is evidence of counsel's inadequate
representation and prejudice to Burns. (Id. at 57-59.) Burns asserts
that the Tennessee Supreme Court's conclusion that Burns approached
the car with Adams contradicted Adams', Buckner's, Shaw's, Garrin's,
and Burns' statements, all of which indicated that Shaw approached
the car with Adams and also that the Tennessee Supreme Court's
conclusion that Burns pulled a gun and walked around the car is
unsupported. (Id. at 59.)

Burns' focus is improperly placed on the Tennessee Supreme
Court's factual findings on direct appeal. The Court of Criminal
Appeals recited the Tennessee Supreme Court's factual findings in its
opinion. Burns, 2005 WL 3504990, at **1-3. However, the Tennessee
Court of Criminal Appeals relied heavily on testimony and evidence
presented in the post-conviction proceedings in making its findings.
See id. at **3-30. The Court of Criminal Appeals noted the testimony
of Attorney Glen Wright about the lack of consistency in evidence
about the various participants' roles in the incident and questions

39

about the identity of the "other perpetrator" that Eric Thomas described.

> At Garrin's trial, Thomas described codefendant Carlito Adams "as being five-seven or five-eight and 170 pounds" and the other perpetrator as "[f]ive-eight, slim build, dark complexion, curl-like fade." In counsel's opinion, the other perpetrator's description matched the petitioner. Counsel acknowledged there was not "one hundred percent consistency among the witnesses and victims as to each role each player position [sic] around the car. They were mostly consistent in that [the petitioner] was not generally considered to be one of the first two people to arrive at the car, but I read that to mean when he gave that description because it didn't fit the description of somebody else, that that's who he was talking about."

Burns, 2005 WL 3504990, at *6. (See D.E. 28, Add. 13, Vol. 2, at 96-98.) The Court of Criminal Appeals also noted Burns' counsel's testimony about Burns' culpability and that some co-defendants identified Burns as the trigger person.

> On cross-examination, senior counsel acknowledged that the petitioner's statements placing him at the scene eliminated any use of an alibi defense, the statement being "that he was there, and that he was shooting at one of the victims, but he didn't hit the victim." Counsel added that the codefendants, with the exception of Garrin, "said that [the petitioner] was the trigger person." Codefendant Garrin said he saw the petitioner take jewelry from one of the victims. . . . Counsel did not believe that the petitioner was less culpable because additional people were involved.

Id. at *8. The Court of Criminal Appeals acknowledged that there was inconsistency in the evidence about Burns' role in the incident in general and, in particular, on the issue of whether Burns shot Dawson. See id. at **34-35. The Court of Criminal Appeals' factual findings are based on a reasonable determination of the facts in

light of the evidence presented.

Burns presents several "plausible" scenarios about how this incident might have occurred. (D.E. 86 at 38.) However, the Tennessee Supreme Court found sufficient evidence to support the felony murder conviction. Burns, 979 S.W.2d 287-88; see infra pp. 54-56. Burns admitted that he was present and fired his gun. Burns, 2005 WL 3504990, at *2. Witnesses identified Burns as one of the individuals who took money and jewelry, and Burns' counsel testified that Burns told him he received jewelry from the incident. (D.E. 28, Add. 13, Vol. 1, p. 61.) Burns did not have to fire a fatal shot to be guilty of felony murder; his participation in the robbery was sufficient.

Burns contends that the Tennessee Court of Criminal Appeals' determination was a flawed application of law because that court examined the inconsistencies between the post-conviction and trial records and the conflicts in evidence and determined that counsel's performance was not deficient because Burns was the reason for any ineffectiveness. (D.E. 86 at 61-62.) A fair reading establishes, however, that the Court of Criminal Appeals focused on Burns' conduct to determine whether Burns was prejudiced by his counsel's performance, not to determine the reasonableness of counsel's performance. See Burns, 2005 WL 3504990, at *57.

The Tennessee Court of Criminal Appeals stated the correct legal standard from Strickland and applied that standard to the evidence. Burns, 2005 WL 3504990, at **48-57. The Court of Criminal Appeals'

decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent and was based on a reasonable determination of the facts in light of the evidence presented. Claim 1A is DENIED.

      2.   Failure to cross-examine Eric Thomas and Mary Jones effectively (Claim 1B)

      a.   Eric Thomas

Burns argues that his counsel should have used Eric Thomas' prior testimony at Garrin's trial that Garrin shot him (D.E. 8 at 18; D.E. 86 at 32) to cross-examine Thomas about his statement that Carlito Adams shot him (D.E. 8 at 18). Although Burns acknowledges that his counsel cross-examined Thomas about his identification of Adams as the shooter (D.E. 8 at 18; see also D.E. 28, Add. 2, Vol. 3, pp. 382-84), Burns contends that Thomas gave his statement the day after the incident when he was in stable condition and not in fear of dying. (D.E. 8 at 17-18.) Burns contends that cross-examination about the circumstances surrounding Thomas' statement could have cast doubt on his veracity. (D.E. 86 at 32-33.) Burns contends that his counsel did not use the available evidence to impeach Thomas' story or his credibility and that the falsehood of Thomas' "dying declaration" is plain. (Id. at 41, 59.)

Thomas made a tape-recorded victim's statement at the Regional Medical Center in Memphis on April 21, 1992. (D.E. 86-8 at 2.) He identified Adams as the person who shot him and described the three other men who came to the car with Adams. (Id. at 2-3.)

Q. Could you describe any of these other parties that was
with Carlito when he came to the car?

A. Yes, a young male, a little taller than Carlito, but a
little slimmer, very dark complection (sic) and maybe like
a curl fade haircut.

Q. Ok. And could you describe any of the other ones?

A. Yes, heavy build, one was bright with badly kind of
shaven with bumpy face from shaving, heavy set, and it was
another one that looked just like the first one, kind of
slim build, slim, dark complection (sic).

(Id. at 3.) Thomas stated that "about 4 males got out the car and

walked up to the driveway." (Id.) They took money and jewelry and

Thomas was shot once in the chest and once in the stomach. (Id.)

"They then fired another shot" hitting Thomas in the thigh. (Id.)

Thomas was shown photographs and was able to identify two people in

the photographs, Burns being one of them. (Id. at 4.)

    At Garrin's trial, Thomas testified that Adams and a guy,

"[a]pproximately 5'8", slim build, dark complexion, curl-like fade"

were the first two to come up to the car. (D.E. 85-6 at 9.) The slim

fellow positioned himself on the passenger's side (Johnson's side)

at the front door and pulled out his gun. (Id. at 10.) Three other

men then came from the hedgerow to the driver's side. (Id. at 11-14.)

Two men were at the door, and one was running back and forth from

both doors. (Id. at 14.) Thomas described these three men as follows:

    One of them was kind of a big fellow, heavy build with
    glasses. The other one was kind of dark complexion, slim
    build, short and another one was kind of bright, bumpy
    faced from shaving, that one had a hat, possibly a trench
    coat on.

43

(Id.) The guy with the trench coat came up the driveway shooting at Blackman. (Id. at 17-18.) Then, they came to Thomas' and Dawson's side of the car. (Id. at 18-20.) The tall slim fellow with the curl-like fade demanded Johnson's necklace. (Id. at 20.) Thomas testified that he got shot first, in the stomach, by the "big fellow with the glasses" who was leaning in Dawson's door and then in the chest. (Id. at 21.) After Thomas had been shot twice, he noticed Johnson and Dawson were being shot. (Id. at 22.) Thomas testified that the "slim build" person was shooting at Tracy, and the big fellow with glasses was shooting at Damon. (Id. at 22.) Thomas stated, "I don't know who hit Tracy, but the big fellow with glasses, I'm sure he hit Damon." (Id. at 22-23.) Thomas testified that he tried to play dead, but someone else came and shot him again. (Id. at 23.)

At Burns' trial, Thomas testified that he identified Burns' picture, No. 5 in the lineup, as the person who shot him, shot "somebody else", and took his money. (D.E. 28, Add. 2, Vol. 3, pp. 369-70.) On cross-examination, Thomas stated, "They told me to give 'em everything we had, . . .. And after we gave 'em everything we had, they opened fire." (Id. at 378.) Thomas stated that more than one person fired. (Id.)

Burns' counsel questioned Thomas about his ability to see the shooters when he was "playing dead." (Id. at 379-80.) Thomas said that he "could see anybody that walked up to the rear driver's or the front driver's door." (Id. at 380.) Thomas stated that two people

44

came back the second time and shot. (Id. at 381.)

At the post-conviction proceedings, Attorney William Johnson[23] testified that Thomas' statement at Garrin's trial that the "big fellow with the glasses" shot him was contrary to his testimony at Burns' trial. (D.E. 28, Add. 13, Vol. 3, p. 280.) Johnson stated,

> How (sic) look at that, to be quite frank with you that's strong evidence, but like I say, you take it all with a grain of salt because – and I'm operating from memory because and this – we tried to impeach Eric because Eric claimed he actually laid down in the backseat and didn't actually see the other person coming up and doing the shooting, and I do remember that, and like I say, we tried everything we could think of to try to impeach Eric Thomas' testimony because Eric Thomas and Ms. Jones were strong witnesses.

(Id. at 283.)

The Tennessee Court of Criminal Appeals noted trial counsel's testimony that he reviewed the transcripts of codefendant Garrin's trial before Burns' trial; that Thomas identified Garrin as the person who shot him and Dawson during Garrin's trial; that Thomas identified Burns as the person who shot him at Burns' trial; and that in counsel's opinion, "the other perpetrator's description matched the petitioner." Burns, 2005 WL 3504990, at **6, 10. The court determined that counsel had attempted to impeach Eric Thomas' identification by use of Thomas' statement to police identifying Carlito Adams as the shooter. Id. at *10. The court noted that counsel indicated that the discrepancies in identification testimony

---

[23]    Attorneys Glenn Wright and William Johnson represented Burns at trial. (D.E. 28, Add. 13, Vol.2, p. 40; id. at Vol. 3, p. 206.)

had been a focus of trial preparation and that witnesses confused Burns and Shaw. Id. The Court of Criminal Appeals agreed with the post-conviction court's finding that, without seeing the petitioner's theories of effective cross-examination tested on Thomas to clarify the apparent inconsistencies in testimony, the court could not conclude that questioning Thomas as Burns contends counsel should would have changed the outcome of the case. Id. at **34-35.

Burns contends that trial counsel's performance was objectively unreasonable and notes counsel's duty to investigate possible methods of impeaching a prosecution witness. (D.E. 86 at 49.) Burns cites cases where an attorney's failure to impeach a co-defendant or key prosecution witness was deemed deficient performance prejudicial to the petitioner. (Id. at 49-56.) He argues that counsel could have left the jury with

> (1) an eyewitness who had already testified that someone else robbed and shot him, had initially not identified Mr. Burns as his shooter, and testified falsely about the statement he gave to the police; (2) another eyewitness who gave a description of the shooter that could not have been Mr. Burns and named a different suspect who had been a ringleader and was the first person to pull a gun; (3) and a police investigation that yielded conflicting eyewitness accounts; suspects who gave self-servicing statements after conferring with one another; no positive, inculpatory identifications by a disinterested witness; and the premature release of admitted participants and evidence after barely 46 hours.

(Id. at 56-57.)

Burns disputes the Tennessee Court of Criminal Appeals' factual findings that Burns' counsel "attempted" to impeach Thomas at trial,

that most of the witnesses and participants said that Burns was the trigger man, and that Burns' counsel believed the description of the "other perpetrator" matched Burns. (D.E. 86 at 60-61.) The issue before the Court is not whether counsel attempted to impeach Thomas, but whether counsel was unreasonable in his cross-examination of Thomas. The Court of Criminal Appeals noted that the post-conviction court "would have liked to have heard from Mr. Thomas" and that it was "left to speculate" about what Thomas' testimony would have been if he had been cross-examined more thoroughly. Burns, 2005 WL 3504990, at *34. The post-conviction court suggests that counsel's cross-examination might have been insufficient, noting the "apparent in[]consistencies" in testimony. Id. The court determined, however, that there was no constitutional violation because it was unable to find prejudice. Id. The Court of Criminal Appeals' findings that most of the witnesses and participants said that Burns was the trigger man and that Burns' counsel believed the description of the "other perpetrator" matched Burns are not unreasonable based on the evidence presented. Still, these findings are less consequential to the determination of guilt because Burns admitted to a role in the incident that resulted in felony murder. Burns cannot establish prejudice.

Burns asserts that the Tennessee Court of Criminal Appeals applied a standard that was "contrary to" and an unreasonable application of Supreme Court precedent when it decided Burns had

47

failed to prove that questioning Thomas further based on his previous testimony "would have changed the outcome of the trial." (Id. at 63-64.) Burns asserts that the Court of Criminal Appeals used a standard other than that established in Strickland, namely whether Burns had demonstrated a "reasonable probability that . . . the result of the proceeding would have been different." (D.E. 86 at 63). The Court of Criminal Appeals cited the Strickland standard, see Burns, 2005 WL 35094990, at **49-50, and concluded that the evidence would have to change the outcome of the trial. See Burns, 2005 WL 3504990, at **34-35. Given Burns' admitted involvement in the incident, he has not demonstrated that further cross-examination would have met Strickland's prejudice standard: that there is a reasonable probability that the result of the proceeding would have been different. Strickland, 466 U.S. at 694. Burns' ineffective assistance of counsel claim about the cross-examination of Eric Thomas is without merit.

> b.  Mary Jones

Burns contends that trial counsel failed to cross-examine Mary Jones based on the asserted fact that Burns did not have enough hair for a jheri curl at the time of the murder. (D.E. 8 at 18.) Burns contends there was available evidence that Shaw stated Burns had a "low fade hairstyle" and that Benny Brown said Burns did not have a

48

jheri curl when Brown drove him to Chicago[24]. (D.E. 86 at 33.) Burns

raised this issue in his post-conviction petition (D.E. 28, Add. 14,

p. 32) and addressed it at the evidentiary hearing (id. at Add. 13,

Vol. 2, pp. 33-37). The Tennessee Court of Criminal Appeals held:

> At the post-conviction hearing, the petitioner presented
> the testimony of various witnesses who said that he did
> not have a jheri curl at the time of the offenses. Kevin
> Whitaker testified that, in 1992, Kevin Shaw wore his hair
> "kind of like a high top, kind of like a high-top fade
> type of deal" and often wore a trench coat. Whitaker said
> that the petitioner wore his hair "low on the scalp."
> Samuel G. Brooks testified that he could not recall the
> petitioner wearing a "jheri curl," but the last time he
> saw the petitioner was in March 1992. Rodney Weatherspoon
> testified that Kevin Shaw "sometimes" wore a trench coat,
> adding that the people from West Memphis wore their hair
> in fades, while those from Memphis had "chemical
> processes" in their hair. He described Kevin Shaw as
> having "bushy hair," "longer hair" with "the little curl."
> Weatherspoon stated that he never saw the petitioner with
> long hair or a jheri curl. The petitioner's mother, Leslie
> Burns, who testified at the petitioner's trial, said that
> the petitioner wore his hair short at the time of the
> incident and did not start growing his hair long until
> after his arrest. She said she saw no reason for her son
> to change his hairstyle for trial. Renita Burns said that
> the petitioner never wore his hair long or used chemicals
> in his hair. Steve Carter said that the petitioner "always
> kept short hair." George Michael Hissong said that the
> petitioner wore his hair short.

Burns, 2005 WL 3504990, at *55. The post-conviction court noted that,

although Burns presented proof at his evidentiary hearing that he had

short hair at the time of the incident, there was no proof that the

names of the persons with this evidence were given to Burns' counsel

before trial. (Id. at *35.) The Tennessee Court of Criminal Appeals

---

[24]    (See D.E. 86-30.)

stated,

> Counsel acknowledged that the petitioner had told him that
> he did not have a jheri curl at the time of the crime but,
> instead, had a "regular hair cut." However, the petitioner
> was unable to provide counsel with any witnesses to verify
> that he had "a normal haircut at the time that this
> incident occurred." Counsel said that not even the
> petitioner's parents would testify that the petitioner had
> a short haircut at the time of the incident. Moreover, the
> eyewitness (Mary Jones) could not identify the petitioner
> from a mugshot in which he had short hair, although she
> identified him at trial while he had a longer hairstyle.
> While the petitioner did provide counsel with a photograph
> of himself "with short hair, or a nonjheri curl hair, ...
> that photograph appeared to be of a much younger Kevin
> Burns and not Kevin Burns at the time of this incident ."

Id. at **6; see id. at **55. The court held that, "Even if, as the
petitioner claims, trial counsel were deficient in not presenting
witnesses to testify regarding the length of his hairstyle, it is
clear that the identification of him as the shooter does not rest
solely upon his hairstyle". Thus, the court concluded that Burns had
failed to demonstrate prejudice. Id. at *57.

Burns asserts that counsel's performance was objectively
unreasonable based on counsel's duty "to bring to bear such skill and
knowledge *as will render the trial a reliable adversarial testing
process*" and "to investigate possible methods for impeaching a
prosecution witness." (D.E. 86 at 49.) The Tennessee Court of
Criminal Appeals applied the correct legal standard to the evidence
presented. Burns, 2005 WL 3504990, at **56-57. At trial, Burns'
counsel cross-examined Jones about her inability to identify anyone
from the photo line-up, her reference to Burns as Kevin Shaw, and the

50

distance from which she viewed the incident. (D.E. 28, Add. 2, Vol. 4, pp. 465-468.) Jones testified, "I may have his name mixed up, but I know his face, and I know how he looked – he had Gheri (sic) curl. And that's him. I know his face." (Id. at 466.) On re-direct examination, Jones confirmed that Burns was the one who shot Dawson, stating that she was looking right at him. (Id. at 470-71.) At the post-conviction hearing, Jones testified that she saw Burns, wearing a shoulder length jheri curl and a black trench coat, shoot Dawson. (D.E. 28, Add. 13, Vol. 2, pp. 34-36.) See Burns, 2005 WL 3504990, at *35.

Burns relies on the purported fact that he had a short haircut at the time of the incident. Even with the additional evidence presented at the post-conviction hearing about Burns' hair, Burns' post-conviction counsel did not demonstrate that Jones' identification of Burns as Dawson's shooter was inaccurate. Therefore, this Court cannot determine that a more thorough cross-examination of Jones at trial would have resulted in a determination that Burns was not Dawson's shooter.

The determination of Burns' hair length does not establish his guilt or innocence. Burns cannot demonstrate prejudice because Burns was guilty of felony murder by his own admission. The conclusion of the Tennessee Court of Criminal Appeals was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a

reasonable determination of the facts in light of the evidence presented. Claim 1B is DENIED.

C.    Brady Violation (Claim 2)

Burns alleges that, in violation of the Sixth, Eighth, and Fourteenth Amendments, the State withheld documents containing material, exculpatory information including, but not limited to, the following:

1.    The April 2, 2002 statement of Tyrone Jones;

2.    The April 20, 1992 statement of Eric D. Jones;

3.    The May 1, 1992 statement of Mary Lee Jones;

4.    The April 20, 1992 statement of Tommie Blackman;

5.    The April 21, 1992 statement of Benny Buckner;

6.    The April 22, 1992 statement of Kevin Shaw;

7.    The April 24, 1992 statement of Richard Morris;

8.    A May 23, 1991 Memphis Police Department Firearms Release Form;

9.    A May 5, 1994 pre-sentence report on Derrick Garrin; and

10.   The March 21, 1995 indictments charging Benny Buckner with Dawson and Johnson's murders.

(D.E. 8 at 20-22.) Burns also alleges that the State withheld the following information:

1.    No robbery occurred at 1550 David;

2.    Any robbery that did occur was the result of Kevin Shaw's spur of the moment decision;

3.    Burns did not intend for a robbery to occur;

4.   Burns did not fire any weapon he had at the scene;

5.   Burns did not shoot Dawson or anyone else;

6.   Derrick Garrin shot Dawson;

7.   Kevin Shaw shot Dawson;

8.   Carlito Adams shot Dawson;

9.   Adams, Shaw, Buckner, Garrin, and/or Morris fired weapons at the scene;

10.  Prior to any shots being fired, Dawson reached for a handgun tucked in the waistband of his pants;

11.  In exchange for information and/or service, authorities did not charge or prosecute Shaw, Buckner, and Morris, and, indeed returned to Shaw's father handguns that Shaw and Buckner brandished during the incident;

12.  F.B.I. Agents took the Burns Statement before advising Burns of his Fifth Amendment rights; and

13.  Burns did not make the statements the Burns Statement attributes to him.

(D.E. 8 at 22-23.) Burns argues that, if the State had not withheld this evidence, there is a reasonable probability that the jury would not have convicted him on two counts of first degree murder and/or sentenced him to death. (Id. at 23.)

Respondent contends that this claim is procedurally defaulted. (D.E. 58 at 7-8.) Burns argues that procedural default should be excused[25] because the portions of his Brady claim related to Burns' intent to commit the robbery are tied to a colorable showing of

---

[25]   The Court has previously addressed Burns' argument that his failure to exhaust this claim should be excused because of the inadequacy of the post-conviction process and ineffective assistance of post-conviction counsel, see supra pp. 27, 30.

actual innocence based on Kuhlmann v. Wilson, 477 U.S. 436, 454
(1986). (D.E. 86 at 147-48.) Burns argues that he intended to settle
a personal dispute, not to commit a robbery. (Id. at 148.) He
contends that the State presented the false testimonies of Eric
Thomas and Eric Jones that money and jewelry were demanded and taken
before Dawson and Johnson were shot. (Id.) To demonstrate a colorable
showing of actual innocence, Burns relies on statements from
Blackman, Buckner, Shaw, and Morris that the group went to David
Street because of an altercation between Adams and Blackman at a
basketball game; Garrin's pre-sentence report stating, "This was not
a robbery attempt"; and the eyewitness statements of Tyrone and Mary
Jones that they did not see anything but shooting. (Id. at 148-50.)

     Burns ignores the substantial evidence that a robbery did occur,
that he participated in the robbery, and that he shared in the
proceeds. The Tennessee Supreme Court, in addressing the sufficiency
of the evidence related to the perpetration of the robbery and
whether Burns was criminally responsible for Dawson's and Johnson's
murders, stated:

> The record establishes that Johnson, Dawson and Thomas
> were robbed as they sat in Dawson's car, and that they
> were all shot as soon as the robbery was complete. Thomas
> testified that Carlito Adams and several other individuals
> had surrounded the car, "[p]ulled out their pistols, had
> their pistols aimed at us. Took money from me; took
> jewelry from [Johnson]; took jewelry from [Dawson]." Upon
> being asked what happened next, he testified, "they opened
> fire, and they started shooting us." Shortly after the
> shootings, Thomas identified one of the assailants from a
> photo spread. He testified at trial that this had been the
> man who had taken his property and then shot him. Although

54

Thomas did not make an in-court identification of the
defendant, this photo spread was provided to the jury
members and they were able to determine with their own
eyes whether or not the photo was of the defendant.
Moreover, agent Harbaugh testified that the photo appeared
to be of the defendant. Thus, the jury could properly have
concluded from Thomas' testimony alone that the defendant
participated in the robbery and shot at the car's
occupants. However, the jury also had before it Mary
Jones' testimony that she had seen the defendant shoot
Dawson, that she had been "looking right at him" and that
"[a]s [the defendant] was running down the driveway, after
he finished shooting [Dawson], that's when I got a real
good look in his face." And Eric Jones' testimony
corroborated Thomas' testimony that Thomas, Johnson and
Dawson had all been robbed and then fired upon. Johnson's
mother testified that she had seen her son wearing a
jewelry chain the morning of his murder. When he was found
by the police, immediately after the shooting occurred,
there was no jewelry.

Taken in the light most favorable to the State, this proof
was more than sufficient to establish beyond a reasonable
doubt that the defendant had participated in a robbery of
Thomas, Johnson and Dawson and that, immediately following
the robbery, he shot and killed Dawson. And although there
was no direct proof that the defendant shot at and killed
Johnson, the evidence established that Johnson had been
shot while in the car following the robbery in which the
defendant participated. Thus, although one or more of the
other men surrounding the car and robbing its occupants
may have actually fired the bullet that killed Johnson,
the defendant remains responsible for Johnson's murder:

The Tennessee offense [of felony murder during the
perpetration of a robbery] extends both to the killer and
his accomplices. A defendant who is a willing and active
participant in a robbery becomes accountable for all of
the consequences flowing from the robbery and may be
convicted of first-degree murder where a co-perpetrator of
the felony is the actual killer.

State v. Middlebrooks, 840 S.W.2d 317, 336 (Tenn. 1992).

The felony murder statute dealt with in *Middlebrooks* was
slightly different from the one at issue in this case,
providing, "Every murder ... committed in the perpetration
of, or attempt to perpetrate, any murder in the first

degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb, is murder in the first degree." T.C.A. § 39-2-202(a) (1982). In 1989, the statute was amended to provide that the killing in the perpetration of the enumerated felonies be "reckless." T.C.A. § 39-13-202(a)(2) (1989 Supp). "Reckless" in turn refers to a person who, although aware of a substantial and unjustifiable risk that a person or persons will be killed as a result of his conduct, nevertheless consciously disregards that risk and engages in the conduct. *See* T.C.A. § 39-11-106(31) (1991 Repl). This Court has previously held that this addition of the word "reckless" to the felony murder statute "does not alter the principle that an accomplice to the underlying felony may also be guilty of felony murder even though the killing has been committed by a co-felon. The jury need only find that the defendant was a participant in the perpetration of the underlying felony and that his conduct as to the killing was 'reckless.'" <u>State v. Timothy D. Harris</u>, C.C.A. No. 02C01-9211-CR-00258, Shelby County, 1994 WL 123647 (Tenn. Crim. App. filed April 13, 1994, at Jackson), *rev'd on other grounds* (1996). And, as our Supreme Court noted in *Middlebrooks*, "one who purposely undertakes a felony that results in a death, almost always can be found reckless." 840 S.W.2d at 345.

In this case, the strongest legitimate view of the proof in favor of the State is that the defendant approached Dawson's car with a loaded pistol, participated in a robbery in which other armed individuals were also participating, and then shot several times into the car. The defendant's actions satisfy the statutory definition of "reckless." Accordingly, the proof at trial was sufficient to prove beyond a reasonable doubt that the defendant murdered Dawson in the perpetration of a robbery, and that he was criminally responsible for Johnson's murder in the perpetration of the same robbery. Both convictions are supported by the evidence and this issue is therefore without merit.

<u>Burns</u>, 979 S.W.2d at 287-88.

Burns has not made a colorable showing of actual innocence to excuse his failure to exhaust the portions of his <u>Brady</u> claim related to the robbery. Burns failed to exhaust the claims in his post-

conviction petition that the State withheld evidence. Burns has not established cause and prejudice or that a miscarriage of justice would result from the Court's failure to review this claim. Claim 2 is procedurally defaulted and DENIED.

D.    Inconsistent Testimony About the Shooter (Claims 3 & 4)

Burns alleges that the State, in violation of his Sixth, Eighth, and Fourteenth Amendment rights, asserted inconsistent theories about who shot and killed Dawson at Burns' and Garrin's trials and knowingly presented Eric Thomas' false testimony that Burns shot Thomas and Dawson at Burns' trial. (D.E. 8 at 23-25; D.E. 86 at 64-65.) The Tennessee Court of Criminal Appeals considered these arguments:

> The petitioner argues that the State denied him a fair trial by "the use of conflicting theories between the [petitioner's trial and codefendant Garrin's trial] and the knowing use of perjured testimony." To support this claim, he inserted in his appellate brief charts containing excerpts from the testimony of Eric Thomas in the trials of the petitioner and of Derrick Garrin, asking that we "review" this testimony and conclude that it proves his claim.
>
> In our consideration, we first note that the petitioner was convicted of two counts of felony murder for the shooting deaths of Damond Dawson and Tracey Johnson, but his convictions for the attempted murders of Eric Thomas and Tommie Blackman were reversed, this court finding that attempted felony murder is not a criminal offense. Thus, it is unclear as to how the issue of inconsistent theories as to who shot Eric Thomas is relevant to the petitioner's convictions for the first degree murders of Damond Dawson and Tracey Johnson. The petitioner attempts to make this connection by arguing that "[t]he State wanted to show that the person on trial was the most culpable, and, therefore, the most deserving of the death penalty." However, he makes no references to the record to support

this theory.

In codefendant Garrin's trial, according to the petitioner's chart, Eric Thomas testified that he was shot by "[t]he big fellow with the glasses," the petitioner asserting that "[t]he record in the case is clear that [sic] big fellow with glasses is Derrick Garrin." However, he does not identify where in the appellate record, which consists of transcripts of testimony in two boxes, the information establishing this clarity can be located. Further, he asserts that "[t]he record is clear, including from the statements of Adams and Shaw to the police, PC Exhibits 7 and 8, that Kevin Shaw was with Adams when Adams first approached the car." He does not explain how we can make this determination solely from the confusing statements of these witnesses. He makes no references to the record as to questioning trial counsel or any other witnesses as to why Eric Thomas was not cross-examined in the way he believes should have occurred.

Additionally, the petitioner claims on appeal that the Shelby County District Attorney's Office suborned the perjured testimony of Eric Thomas:

> This is the intentional use of perjured testimony. There can be no question that Eric Thomas' alternative descriptions of the person who shot him involved perjury. Nor can there be any question that the State's attorneys were aware of the perjury.

We disagree with the petitioner's claims that he has shown the State suborned perjury by Eric Thomas or even established that Thomas perjured himself. Again, we note that it is difficult for this court to review issues where, as here, we are referred broadly to documents and not to the specific portion which, he claims, supports his accusations of subornation of perjury. The statement of Kevin Shaw consists of six pages and, by our reading, does not support the petitioner's claims. As we understand the statement, Shaw said that, upon hearing two shots, without identifying who fired them, he turned and ran, as "Kevin and Derrick" apparently ran up to the car. Shaw said, "I ran down the street. I heard a whole lot of shots after that as I was running down the street." In his statement, Carlito Adams said that he and Shaw approached the driver's side of the vehicle occupied by the victims and both began running as shots were fired, the first shot

being fired by the man wearing "the big black nylon 3/4 jacket."

The post-conviction court found that no proof had been presented as to the petitioner's conflicting theories claim and, thus, it was without merit:

> The next allegation by Petitioner is that the State's action denied him a fair trial and appeal. He first argues that the State had alternative theories of prosecution in the three separate trials. No proof has been presented as to contradictory theories by the [S]tate in the trial of the co-defendants. The petitioner admitted he was present on the scene armed with a gun and that he fired his gun. The testimony presented was that 5 or 6 people participated in this killing. At least 4 or 5 of them were armed. Several were identified as firing shots into the car containing the victims. The petitioner was identified by several witnesses as being "a shooter." No alternative theories were offered by the State as to Petitioner's role based upon what proof was presented to this Court. Since no proof has been presented regarding alternative theories [,] this issue has no merit.

In his appellate brief, the petitioner has neither acknowledged nor addressed this specific finding, nor has he made any references to the transcript of the evidentiary hearing as to whether his trial counsel, or any other witnesses, agreed with his claim that the State pursued differing theories in the two prosecutions. We conclude that the record supports the findings of the post-conviction court.

Burns, 2005 WL 3504990, at **47-48.

Respondent contends that the evidence taken as a whole supports the allegation that Burns fired into the car from the driver's side. (D.E. 94 at 24.) Respondent notes that Thomas was never called by Burns to explain the inconsistency in this testimony and that the post-conviction court suggests Thomas may have believed he was shot

59

by both Garrin and Burns. (Id. at 24-25.) See Burns, 2005 WL 3504990, at *34 (Thomas described Garrin as one of the people who shot him and then said someone else shot him).

A conviction obtained by the knowing use of perjured testimony must be set aside if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . ." Giglio v. United States, 405 U.S. 150, 154 (1972) (internal quotation marks omitted); United States v. Agurs, 427 U.S. 97, 103 (1976) (same).[26] A false-testimony claim is cognizable on habeas review because the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." Abdus-Samad v. Bell, 420 F.3d 614, 625 (6th Cir. 2005) (quoting Giglio, 405 U.S. 150 at 153). To prevail, Burns must show (1) that the prosecution presented false testimony; (2) that the prosecution knew the testimony was false; and (3) that the testimony was material. Akrawi v. Booker, 572 F.3d 252, 265 (6th Cir. 2009); Rosencrantz v. Lafler, 568 F.3d 577, 583-84 (6th Cir. 2009). The subject testimony must be "indisputably false" rather than "merely misleading." Akrawi, 572 F.3d at 265; see Coe v. Bell, 161 F.3d 320, 343 (6th Cir. 1998), cert. denied, 528 U.S. 842 (1999) ("'The burden is on the defendant[] to show that the testimony was actually perjured, and mere inconsistences in testimony by government

---

[26]    A Brady violation can arise from the prosecution's knowing use at trial of perjured testimony. Kyles v. Whitley, 514 U.S. 419, 433 (1995) (citing Agurs, 427 U.S. at 103-04); Agurs, 427 U.S. at 103 (the knowing use of perjured testimony is one of three situations where Brady applies).

witnesses do not establish knowing use of false testimony,'" (quoting United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989)).

Burns has not established that Thomas' testimony, although inconsistent and worthy of further clarification, was patently false. The Tennessee Court of Criminal Appeals' determination was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of the facts in light of the evidence presented. Claims 3 and 4 are DENIED.

E.   False Testimony About the Robbery (Claim 5)

Burns alleges that the State knowingly presented the false testimony of Eric Thomas and Eric Jones that "persons outside Dawson's car demanded and/or took from them money and jewelry." (D.E. 8 at 25.) Respondent contends that this claim is procedurally defaulted. (D.E. 58 at 8.) Burns argues that the procedural default of this claim should be excused[27] because his "robbery false testimony" claim is tied to a colorable showing of actual innocence based on Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986). (D.E. 86 at 147.) For the reasons stated, supra pp. 54-56, Burns has not made a colorable showing of actual innocence.

Burns argues that the state's misconduct in knowingly presenting the false testimony of Eric Thomas and Eric Jones establishes cause

_____

[27]    The Court has addressed Burns' argument that his failure to exhaust this claim should be excused because of the inadequacy of the post-conviction process, supra pp. 27-28.

for the procedural default of this claim. (D.E. 86 at 136.) Burns has
not demonstrated that Thomas and Jones' testimony was perjured, and
substantial evidence indicates that a robbery occurred. Claim 5 is
procedurally defaulted, without merit, and DENIED.

> F.    Trial Court's Failure to Suppress Burns' Statement (Claim
>        7)

On direct appeal, the Tennessee Supreme Court addressed Burns'
Fifth and Sixth Amendment claims about the trial court's denial of
Burns' motion to suppress his statement to the FBI and affirmed the
trial court's resolution of the motion.[28]

### SUPPRESSION OF DEFENDANT'S STATEMENT

The defendant next complains that the trial court erred
when it denied his motion to suppress his statement. The
defendant was apprehended in Chicago by FBI agents. He
testified at the suppression hearing that he had been read
his rights when he was first arrested and handcuffed. He
also testified that he had understood his rights before
making his statement, that he had not been promised
anything in return for his statement, and that he had not
been threatened into making his statement. However, when
asked at the suppression hearing, "you knew you didn't
have to talk to [the agent]?", the defendant responded, "I
didn't really understand, but I did because he was asking
me questions." This is the crux of the defendant's
contention that he did not waive his constitutional rights
freely and voluntarily.

It is the duty of the trial judge to determine the
voluntariness and the admissibility of a defendant's
pretrial statement. State v. Pursley, 550 S.W.2d 949, 952
(Tenn. 1977). Moreover, the trial court's determination
that a confession was given knowingly and voluntarily is
binding on the appellate courts unless the appellant can
show that the evidence preponderates against the trial

---

[28]    The Eighth Amendment portion of claim 7 is procedurally defaulted,
supra p. 30.

court's ruling. <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). In the instant case, the defendant has failed to demonstrate how the evidence preponderates against the trial court's ruling.

At the conclusion of the testimony at the suppression hearing, the trial court stated the following:

The defendant says the person that handcuffed him gave him his rights on the scene-he didn't read them from a card, but he said them to him. He said he understood his rights. He doesn't remember all of them, but he knows that he was advised, 'You have a right to remain silent and anything you say can and will be used against you.'

He doesn't recall the one about right to counsel, as is complained of in the motion; but he, too, does not deny that he was not [sic] told this. He admits, freely, that he was advised of his rights when he was initially handcuffed. Through his own statement, he was advised of his rights; he understood them; he's a high-school graduate; he was not coerced; he was not pressured; he was not threatened; nobody promised him anything.

. . . .

But from what the court has . . . seen here, it would appear that, on all fours, the defendant freely and voluntarily, understandingly, knowingly, advisedly, and intelligently waived his rights free from any coercion, threats, pressures of any kind that would have induced him or caused him to have abandoned his rights.

He claims he understood them, and from his testimony, the court would have to find that even if his recall is more accurate than that of Agent Landman, through his own evidence, the statement that is purportedly given by the defendant to Agent Landman would be admissible into evidence. The motion to suppress, respectfully, will be denied.

This ruling by the trial court was proper. Although he claims in his brief that he "did not understand his rights," the defendant admitted during the suppression hearing that he had understood the waiver form and that he had freely and voluntarily talked to the agents. There is nothing before this Court which preponderates against the trial court's findings. Accordingly, this issue is without

merit.

Burns, 979 S.W.2d at 288-89.

Burns argues that the evidence showed that he was not advised of his rights before the FBI agents questioned him and that he did not knowingly waive his rights. (D.E. 86 at 75.) In support, he points to alleged contradictions in Landman's testimony at the suppression hearing and Bakken's testimony about who drove Burns to the FBI office, stops that were made, and whether the incident was discussed during the ride. (Id.) Burns emphasizes his own testimony at the suppression hearing that Landman spoke to him during the entire car ride to the FBI office and that he "didn't really understand that [I didn't have to talk to Landman], but I did because [he] was asking me questions." (Id.) Burns contends that his rights, as stated in Miranda v. Arizona, 384 U.S. 436, 445 (1966), were violated. (Id. at 76.)

Burns' allegations do not give the full picture of the evidence before the trial court at the hearing on the motion to suppress.[29] Landman testified that the FBI obtained the names and addresses of Burns' brother and sister, whose apartments were about seventy five (75) yards apart in the same complex. (D.E. 28, Add. 1, Vol. 2, pp. 4-5.) Two arrest teams of about four people each searched both locations simultaneously. (Id. at 5.) Landman testified that the

---

[29] Burns previously asserted that he did not know who was involved in his arrest, reading his rights, and what rights were supposedly read. (D.E. 43 at 6.) Burns was denied discovery on this claim for failure to demonstrate good cause. (D.E. 51 at 7-9.)

other arrest team found Burns at his sister's apartment and took him into custody. (<u>Id.</u> at 6.) Landman testified that Burns was placed in Landman's car and that Agent Harbaugh rode with them downtown. (<u>Id.</u> at 7.) Landman testified that they did not speak to Burns during the ride. (<u>Id.</u>) Landman did not recall whether Burns talked to them. (<u>Id.</u>) Landman testified that once Burns was placed in the interview room, they began the advice of rights form. (<u>Id.</u> at 9.) Landman testified that the advice of rights was read to Burns and provided to him for his reflection. (<u>Id.</u> at 12.) According to Landman, Burns had no questions and signed the advice of rights freely and voluntarily, without coercion, promises, or threats. (<u>Id.</u> at 12-14.) Landman testified that Burns was calm and cooperative and did not ask for a lawyer. (<u>Id.</u> at 14-15.)

The interview was reduced to a typewritten statement. (<u>Id.</u> at 15.) Landman stated that if Burns had talked to them while in the car, he would have reflected that information in the statement. (<u>Id.</u> at 19.) Landman testified that Burns was not in his custody when the statement was transcribed and that Burns did not have a chance to look at the transcript. (<u>Id.</u> at 23.)

Burns testified that when he was first arrested and handcuffed, "they read me my rights" inside the apartment. (<u>Id.</u> at 29.) He only remembered "you have a right to remain silent, and anything you say can be held against you in court." (<u>Id.</u> at 29-30.) "The whole trip – the whole trip we conversated (sic)." (<u>Id.</u> at 28.) Burns claimed

that Landman initiated the conversation when Landman asked Burns
questions about what happened in Memphis. (Id. at 29.) When they got
to FBI headquarters and placed Burns in the interview room, Landman
read him his rights from a sheet. (Id. at 30-31.) Burns had the
opportunity to review the sheet and sign it. (Id. at 31.) Burns
testified that he understood what his rights were. (Id.) Burns
testified that the statements he made in the car were basically what
was transcribed, that he was not threatened, and no promises were
made in exchange for the statement. (Id. at 35.) Burns testified that
he knowingly, voluntarily, and intelligently talked to Landman and
Harbaugh. (Id. at 36, 38.) After Burns admitted that his statements
were voluntary, knowing, and intelligent, Burns claimed that he
answered the agents' questions because he was asked, and he didn't
really understand that he didn't have to talk to the agents. (Id. at
39.)

    The Sixth Circuit has summarized the law governing custodial
interrogations as follows:

> The Fifth Amendment provides that a defendant cannot
> be "compelled in any criminal case to be a witness against
> himself." Consistent with this right against self
> incrimination, the Supreme Court's decision in Miranda v.
> Arizona, 384 U.S. 436, 478-479 . . . (1966), ruled that
> suspects cannot be subjected to a custodial interrogation
> until they have been advised of their rights. In order to
> encourage compliance with this rule, incriminating
> statements elicited from suspects in custody cannot be
> admitted at trial unless the suspect was first advised of
> his or her Miranda rights. Stansbury v. California, 511
> U.S. 318, 322 . . . (1994).

United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). To be

66

effective, a <u>Miranda</u> waiver must be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). To determine whether a <u>Miranda</u> waiver was knowing and intelligent, courts apply a totality of the circumstances test. <u>Smith v. Mitchell</u>, 567 F.3d 246, 257 (6th Cir. 2009); <u>see United States v. Adams</u>, 583 F.3d 457, 467 (6th Cir. 2009) ("Only if the 'totality of the circumstances surrounding the investigation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived."). The Sixth Circuit has held that a <u>Miranda</u> "waiver may be clearly inferred . . . when a defendant after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights" and speaks. <u>Adams</u>, 583 F.3d 457, 467 (6th Cir. 2009) (quoting <u>United States v. Nichols</u>, 512 F.3d 789, 798-99 (6th Cir. 2008)). A waiver of <u>Miranda</u> rights need not be in writing or expressly made, and an implied waiver may be inferred from the actions and words of the persons being interrogated. <u>Id.</u> at 467.

Despite Burns' contentions that Landman's and Bakken's testimony about who drove Burns to FBI headquarters is contradictory, nothing in the agents' testimony or Burns' indicates that Burns' statement was not knowingly, voluntarily, and intelligently made. Burns testified that he was read his rights before being transported and was again given an advice of rights once he reached headquarters.

The decision of the Tennessee Supreme Court is not an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). The "contrary to" clause is inapplicable because the state court relied on the correct rule of law from <u>Miranda</u> and its progeny, the relevant Supreme Court precedent governing claims of trial error in deciding whether to suppress a defendant's statement. The Tennessee Supreme Court applied that clearly established precedent correctly and in an objectively reasonable manner. <u>See</u> <u>Burns</u>, 979 S.W.2d at 288-89. Based on this Court's review of the transcript of testimony at the suppression hearing and during the trial, including Burns' testimony, the decision of the Tennessee Supreme Court was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Claim 7 is DENIED.

G.    <u>False Testimony of FBI Agents (Claim 8)</u>[30]

Burns alleges that the State knowingly presented the false testimony of FBI Agents Landman, Bakken, and Harbaugh. (D.E. 8 at 27-28.) Burns contends that Landman falsely testified that: Burns was placed in a car that Landman was driving after Burns' arrest, Harbaugh rode with Burns and Landman to the downtown headquarters, Harbaugh and Landman did not speak to Burns during the drive to headquarters, Harbaugh and Landman took Burns into an interrogation

---

[30]    The Court has declined to accept Burns' implicit review theory to excuse the procedural default of the Eighth Amendment portion of Claim 8, <u>supra</u> pp. 21-23.

room and for the first time advised Burns of his Fifth Amendment
rights, Burns then gave his statement, and the written statement
accurately reflects statements that Burns made. (<u>Id.</u>) Burns contends
that Bakken falsely testified that: after Burns' arrest he was placed
in a car Bakken was driving, Bakken drove Burns to a scene where
Bakken made another arrest, and Bakken then drove Burns to
headquarters where he turned Burns over to Landman and Harbaugh. (<u>Id.</u>
at 28.) Burns asserts that Harbaugh falsely testified that: Harbaugh
spoke with Burns when he was brought to headquarters, Burns was
advised of his Fifth Amendment rights, and Burns then gave a
statement. (<u>Id.</u>)

Respondent argues that the claim was not exhausted in state
court and is procedurally barred. (D.E. 58 at 9.) Burns asserts that
the false testimony claims "contain a concomitant withheld evidence"
or <u>Brady</u> claim, that Burns was entitled to believe that that the
state's witnesses were truthful, and that the state's misconduct is
cause for the procedural default of this false testimony claim. (D.E.
86 at 136-38.)

A petitioner who has procedurally defaulted a <u>Brady</u> claim
satisfies the "cause and prejudice" test for overcoming the default
by satisfying the second and third prongs of the <u>Brady</u> test; that is,
by showing that "the reason for his failure to develop facts in
state-court proceedings was the State's suppression of the relevant
evidence," and that "the suppressed evidence is 'material' for <u>Brady</u>

69

purposes." <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>Strickler v. Greene</u>, 527 U.S. 263, 282 (1999). In the instant case, the testimony being compared is the testimony from the suppression hearing and the trial testimony. Burns became aware of any contradiction in testimony at trial. Burns could have made his false testimony claim on direct appeal or in the post-conviction proceedings. Burns cannot satisfy the second prong of <u>Brady</u>, that the reason for his failure to develop this claim was the State's suppression of evidence. <u>See</u> <u>Henley v. Bell</u>, 487 F.3d 379, 388 (6th Cir. 2007) (to demonstrate cause "some external impediment over which he (the petitioner) had no control" must have prevented him from developing the claim in state court). Burns has not established that the Court's failure to review this claim would result in a fundamental miscarriage of justice. Claim 8 is procedurally defaulted and DENIED.

> H.    <u>Extraneous Influence on Jury/ Improper Use of the Bible During Jury Deliberations (Claim 10)</u>

Burns asserts that his Sixth, Eighth, and Fourteenth Amendment rights were violated because extraneous, improper influences affected the jury's verdict. (D.E. 8 at 30.) Burns alleges that one juror held out at the guilt stage of the proceedings and that the jury foreman read from the Bible to that juror, "My thoughts are not your thoughts and my ways are not your ways" until the holdout juror relented and voted guilty. (<u>Id.</u> at 30-31.)[31] Burns contends that the use of the

---

[31]    Burns asserts that there were two or three Bibles in the jury room and that jurors read them and quoted passages from them during deliberations at
(continued...)

Bible passage to bring unanimity among the jurors violated his rights. (D.E. 86 at 85.) Burns argues the Court should grant relief because the Bible reading violated the principle in <u>Turner v. Louisiana</u>, 379 U.S. 466, 472-73 (1965), that

> trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

(<u>Id.</u>)

The Tennessee Court of Criminal Appeals considered this issue:

> The petitioner contends his right to a fair trial was violated by jury misconduct because the jury foreman recited a Bible verse during deliberations and the jury considered the potential sentencing during the guilt/innocence phase of deliberations. We will review these claims.

> The petitioner alleges "the jurors in his case consulted extrajudicial materials-a Bible," explaining that the jury foreman brought a Bible into deliberations and "used" a Bible verse to ease "another juror's concern that if she voted to convict [the petitioner], and thereby sentence him to death, God would never forgive her." . . .

> In our review, we first will set out the post-conviction hearing testimony of jury foreman Lloyd Davis. He said that at the trial he had a Bible with him and during deliberations "recited" a verse to another juror:

> Q [Did] you have that Bible with you in the jury room during the jury deliberations?

> A Every day.

---

[31]    (...continued)
both the guilt and sentencing stages. (<u>Id.</u> at 31.) The Court has previously determined that these claims about group prayer and the use of Bibles are procedurally defaulted. <u>See</u> <u>supra</u> pp. 24-28.

Q And at some point during the jury deliberations did you
have occasion to cite certain Bible verses to the jury?

A Yes, I did.

Q Do you recall what Bible verses were cited, Mr. Davis?

A I don't believe I recited but one.... That was in
Isaiah.... I wouldn't know the verse, the chapter or the
verse. I just know what it says.

Q Do you remember the contents of the verse?

A Yes, it was about God was telling that his thoughts were
not our thoughts, and his ways were not our ways.
Something like that.

Davis then explained that he recited the verse to the
juror because she had expressed religious concerns about
deciding guilt or innocence: "[S]he just stated something
about God wouldn't want her to ... make a certain decision
... [and] wouldn't allow her to make her decision to give
somebody the death penalty...." The State then objected to
further testimony about the jurors' "internal
communications," asserting that "the rules of evidence are
very clear that jurors cannot testify about what they do
in the jury room...." The court sustained the objection
but allowed the petitioner's counsel to continue
questioning to preserve the issue for appeal. It is the
testimony of Mr. Davis during this proffer upon which the
petitioner bases his claim that the jury improperly
considered punishment during the guilt/innocence phase.

In issuing its order denying relief, the post-conviction
court found that the "reciting" of a Bible verse was not
prejudicial to the petitioner:

> This court does not believe that asking for
> divine intervention and comfort from God during
> the deliberation process is what was meant or
> intended as outside influence. We ask jurors to
> make life and death decisions and many jurors
> look to God for guidance in their everyday life
> and the daily decisions, which they face. This
> Court fails to see how asking God to help a
> juror make the right decision violates [the
> petitioner's] right to a fair trial. Frankly,
> this Court takes great comfort in the fact that

72

before a jury would make such a monumental
decision that they would seek guidance from God.

Tennessee Rule of Evidence 606(b) limits the circumstances
under which jurors may be questioned about their
deliberations:

> (b) Inquiry Into Validity of Verdict or
> Indictment. Upon an inquiry into the validity of
> a verdict or indictment, a juror may not testify
> as to any matter or statement occurring during
> the course of the jury's deliberations or to the
> effect of anything upon any juror's mind or
> emotions as influencing that juror to assent to
> or dissent from the verdict or indictment or
> concerning the juror's mental processes, except
> that a juror may testify on the question of
> whether extraneous prejudicial information was
> improperly brought to the jury's attention,
> whether any outside influence was improperly
> brought to bear upon any juror, or whether the
> jurors agreed in advance to be bound by a
> quotient or gambling verdict without further
> discussion; nor may a juror's affidavit or
> evidence of any statement by the juror
> concerning a matter about which the juror would
> be precluded from testifying be received for
> these purposes.

The commentary to this rule sets out the circumstances to
which this subsection is applicable:

> After verdict, part (b) would come into play. A
> juror may testify or submit an affidavit in
> connection with a motion for new trial, but only
> in the limited circumstances of:

(1) "extraneous prejudicial information" finding its way
into the jury room,

(2) improper outside pressure on a juror, or

(3) a quotient or gambling verdict.

In sum, the pertinent part of Tennessee Rule of Evidence
606(b) provides that a juror may not testify "to the
effect of anything upon any juror's mind or emotions as
influencing that juror to assent to or dissent from the

verdict," but is allowed to testify "whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror...." Tenn. R. Evid. 606(b). In Walsh, 166 S.W.3d at 646-47, the Tennessee Supreme Court addressed the application of Rule 606 in a case where a juror testified about the mental and emotional effects of a deputy's statement to the juror during deliberations that she "had to" make a decision. The court concluded that Rule "606(b) permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative processes is inadmissible." Id. at 649.

Additionally, according to Walsh, once the petitioner proves "a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." Id. at 647 (citing State v. Blackwell, 664 S.W.2d 686, 689 (Tenn. 1984)).

As we will explain, we conclude, as did the post-conviction court, that the petitioner failed to establish that the jury at his trial was exposed to extraneous prejudicial information. While Davis responded "[e]very day," when asked if he had a Bible with him in the jury room during deliberations, he was not asked if he displayed the Bible to the other jurors or whether they even were aware that he possessed it. Likewise, although he said that he "believe[d] [he] recited" only one Bible verse, he described it as "[t]hat was in Isaiah ... I wouldn't know the verse, chapter or the verse. I just know what it says," and was not asked if his knowledge of the verse was more precise at the time of the jury deliberations. Additionally, although saying that he "recited" the verse, he was not asked whether he had read the verse from his Bible, quoted it verbatim, paraphrased it, simply gave the gist of it, or whether he even had identified the verse as being from the Bible. Thus, we conclude that the petitioner has failed to make an initial showing that, in the language of Rule 606(b), "extraneous prejudicial information was improperly brought to the jury's attention" so as to create a rebuttable presumption of prejudice and shift the burden to the State "to explain the conduct or demonstrate that it was harmless." See

74

Walsh, 166 S.W.3d at 647. Accordingly, the additional
questions asked Davis, which the petitioner claims show
that the jury improperly considered the verdict during the
guilt phase of the trial, were properly disallowed by the
court as not being permitted by Rule 606(b).

Burns, 2005 WL 3504990, at **44-46 (footnote omitted).

The Sixth and Fourteenth Amendments to the Constitution
guarantee a criminal defendant the right to an impartial jury. Morgan
v. Illinois, 504 U.S. 719, 726 (1992).

In a criminal case, any private communication, contact, or
tampering directly or indirectly, with a juror during a
trial about the matter pending before the jury is, for
obvious reasons, deemed presumptively prejudicial, if not
made in pursuance of known rules of the court and the
instructions and directions of the court made during the
trial, with full knowledge of the parties.

Remmer v. United States, 347 U.S. 227, 229 (1954). The Supreme Court
in Remmer prohibited jurors from being subjected to "private
communication, contact, or tampering" and considered any such
external influences presumptively prejudicial. Id.; Turner, 379 U.S.
at 472-73 (same). Whether an influence is "external" or "internal"
depends on the facts of each case, but at its core the distinction
amounts to an examination of the "nature of the allegation" of an
improper influence on the jury. Oliver v. Quarterman, 541 F.3d 329,
335-36 (6th Cir. 2008) (citing Tanner v. United States, 483 U.S. 107,
117 (1987)).

The right to due process does not require a new trial in every
instance in which a juror potentially is biased. Smith v. Phillips,
455 U.S. 209, 217 (1982) ("it is virtually impossible to shield
jurors from every contact or influence that might theoretically

affect their vote"). A defendant who alleges implied juror bias is entitled to a hearing in which he has "the opportunity to prove actual bias." Id. at 215. The burden rests on the government to establish, after notice and a hearing, that such contact with the juror was harmless to the defendant. Remmer, 347 U.S. at 229.

The post-conviction court conducted a hearing at which Burns had an opportunity to establish actual juror bias. The Tennessee Court of Criminal Appeals, like the post-conviction court, concluded that Burns failed to establish that the jury was exposed to "extraneous prejudicial information." Burns, 2005 WL 3504990, at *46.

Supreme Court precedent related to external and internal influences on the jury informs the analysis of whether Bible references, reading, or study in the jury room constitutes extraneous prejudicial information that requires habeas relief. Several circuits have determined that the presence of the Bible in the jury room is an external influence on the jury. Oliver, 541 F.3d at 336-340; United States v. Lara-Ramirez, 519 F.3d 76, 88 (1st Cir. 2008) (the district court erred in "treat[ing] the Bible in the jury room as qualitatively different from other types of extraneous materials or information that may taint a jury's deliberation"); see Fields v. Brown, 503 F.3d 755, 781-82 (9th Cir. 2007) (en banc) (juror's notes for and against the death penalty based on the Bible had no "substantial and injurious effect or influence in determining the jury's verdict"); see also Robinson v. Polk, 438 F.3d 350, 364 (4th Cir. 2006) (holding that "reading the Bible is analogous to the

76

situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence"). The mere presence of the Bible or a reading of a Bible passage does not necessarily entitle a petitioner to habeas relief if the State can overcome the presumption of prejudice. McNair v. Campbell, 416 F.3d 1291, 1307-08 (11th Cir. 2005); see Coe, 161 F.3d at 351 (implying, in dicta, that the presence of the Bible in the jury room might prejudice deliberations). In Oliver, the Fifth Circuit made a distinction between Bible passages that addressed the juror's understanding of religious law and morality or "generally inform a juror's moral understanding of the world" and passages stating that a particular act required that a person be put to death. 541 F.3d at 339-40.

In McNair, the jury foreman, a Christian minister, brought the Bible into the jury room during deliberations, read it aloud, and led the jurors in prayer. 416 F.3d at 1301. The two Bible verses read

were Psalm 121[32] and Luke 6:37[33]. Id. at 1307-08. The court held that it was undisputed that the jurors considered extrinsic evidence during the guilt phase deliberations and focused its analysis on whether the State had rebutted the presumption of prejudice. Id. at 1308. The court held that there was no evidence that the "innocuous" Bible passages in question had the effect of influencing the jury's decision. Id. at 1309. The Eleventh Circuit noted that the two passages the foreman read did not contain "material which would encourage jurors to find a defendant guilty or to recommend the death penalty." Id. at 1308.

The Sixth Circuit in Arnett v. Jackson, 393 F.3d 681 (6th Cir. 2005), a case involving the rape of a child, addressed whether the state trial judge's reference to a Biblical passage during sentencing

---

[32]     Psalm 121 (King James Version) states,

I will lift up mine eyes unto the hills,
        from whence cometh my help.
My help cometh from the LORD,
        which made heaven and earth.
He will not suffer thy foot to be moved:
        he that keepeth thee will not slumber.
Behold, he that keepeth Israel
        shall neither slumber nor sleep.

The LORD is thy keeper:
        the LORD is thy shade upon thy right hand.
The sun shall not smite thee by day,
        nor the moon by night.
The LORD shall preserve thee from all evil:
        he shall preserve thy soul.
The LORD shall preserve thy going out and thy coming in
        from this time forth, and even for evermore.

[33]     Luke 6:37 states,

Judge not, and ye shall not be judged; condemn not and ye shall not
be condemned; forgive, and ye shall be forgiven . . . .

Id. at 1308 n.16.

violated Arnett's right to due process. At the sentencing hearing, the trial judge stated,

> And in looking at the final part of my struggle with you,
> I finally answered my question late at night when I turned
> to one additional source to help me. . . . And that
> passage where I had the opportunity to look is Matthew
> 18:5, 6. "And whoso shall receive one such little child in
> my name, receiveth me. But, whoso shall offend of these
> little ones which believe in me, it were better for him
> that a milestone were hanged about his neck, and he were
> drowned in the depth of the sea."

Id. at 684. The Sixth Circuit noted that there must be clearly established Supreme Court precedent prohibiting a judge from citing a religious text during a sentencing hearing to allow habeas relief. Id. at 686. Although the court noted that the right to a fair trial in a fair tribunal is a basic requirement of due process, it emphasized that the Supreme Court had never specifically decided this issue. Id. The Sixth Circuit's inquiry then focused on whether the state court unreasonably refused to extend a legal principle from Supreme Court precedent to a new context where it should apply. Id. The court found that the Bible was not the "final source of authority" for the judge's decision, and given the totality of the circumstances at the sentencing hearing and the fact that the Biblical principle of not harming children was consistent with Ohio's sentencing consideration, the state trial court's Biblical reference during sentencing did not entitle Arnett to habeas relief. Id. at 688.

The Tennessee Court of Criminal Appeals' finding that the Bible quotation was not extraneous prejudicial information is entitled to

a presumption of correctness because Burns has not demonstrated by clear and convincing evidence that this finding is erroneous. 28 U.S.C. § 2254(e)(1). There is no clear Supreme Court precedent addressing this issue. The Court recognizes Burns' right to a fair trial, but the facts presented do not show that Burns was prejudiced by the jury foreman's reading of one innocuous Biblical passage to the alleged holdout juror. The passage did not address Burns' criminal conduct, did not suggest what the penalty for that conduct should be, and related to a general understanding of religious law and morality. At the guilt/innocence phase of the proceeding, substantial evidence was presented to establish Burns' guilt, further demonstrating the improbability that this passage prejudiced Burns' right to a fair trial. The Tennessee Court of Criminal Appeals' decision was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of the facts in light of the evidence presented. Claim 10 is DENIED.

I.    Ineffective Assistance of Counsel at Sentencing
      (Claim 11)

Burns alleges that his counsel at sentencing failed to challenge the sole aggravating circumstance, failed to investigate and present mitigating evidence, and failed to present evidence of Burns' relative culpability. (D.E. 8 at 31-45.)

1.    "Great Risk of Death" Aggravating Circumstance (Claim 11A)

Burns asserts that his counsel rendered ineffective assistance in the investigation and presentation of evidence about the facts and circumstances of the crime and failed to present evidence that Burns was not responsible for the threat of harm to persons other than Dawson and/or Johnson during the incident. (D.E. 8 at 32.) Burns contends that, if counsel had not rendered ineffective assistance at the sentencing stage, the jury would not have found the sole aggravating circumstance. (D.E. 86 at 151.)

Respondent contends that counsel's failure to challenge the application of the "great risk of death" aggravator was not exhausted in state court and is procedurally defaulted. (D.E. 58 at 11.)[34] Burns asserts that his claim of ineffective assistance at sentencing as it relates to counsel's failure to challenge the sole aggravating circumstance is tied to a colorable showing that he is actually

---

[34]    Respondent failed to assert procedural default as a defense in his answer to the amended petition. (See D.E. 33 at 37-38.) Procedural default is a defense that may be waived if not asserted. See Johnson v. Mitchell, 585 F.3d 923, 936 (6th Cir. 2009). However, district courts are permitted to raise this issue *sua sponte* if the petitioner has been afforded the opportunity to respond. See Palmer v. Bagley, 330 F. App'x 92, 105 (6th Cir. 2009)

innocent of the death penalty. (D.E. 86 at 150-51.)[35]

To determine whether Burns can demonstrate that he was actually innocent of the death penalty, the Court looks to whether the aggravating factor was proven. The Tennessee Court of Criminal Appeals addressed the "great risk of death" aggravator based on the sufficiency of the evidence.

> Regarding the penalty phase, the proof established, under the testimony of Thomas and Jones, that the petitioner shot into a vehicle, creating a great risk of death. According to the petitioner's FBI statement, he shot at Blackman, admitting that three children were in his line of fire. This statement also supports application of the factor of creating a great risk of death to two or more persons other than the victim. Under either theory, the aggravating circumstance is still established. The petitioner cannot establish that his sentence would have been different. The record supports the determination of the post-conviction court that this claim is without merit.

Burns, 2005 WL 3504990, at *58.

Respondent is correct (see D.E. 94 at 35-36) that Burns' admission in his FBI statement that he shot at Blackman, together with the additional evidence that four boys were playing basketball in the direction Blackman was running, is sufficient to establish the sole aggravating factor. Burns has not demonstrated actual innocence as it relates to this aggravating circumstance and has not demonstrated that a miscarriage of justice would result from the Court's failure to review this claim. Burns' claim of ineffective

---

[35]    The Court has previously decided that Burns' arguments that the claim is not procedurally defaulted because the post-conviction process was inadequate and post-conviction counsel was ineffective fail, supra pp. 27-28, 30.

assistance of counsel as it relates to this aggravating factor is procedurally defaulted. Burns' claim fails on the merits because the reasons that prevent Burns from demonstrating actual innocence also prevent him from establishing prejudice on his guilt phase ineffective assistance of counsel claim. Claim 11A is DENIED.

> 2.   Failure to investigate and present mitigating evidence (Claim 11B)

Burns asserts this claim in the following subparts: (a) failure to investigate and present evidence relevant to the facts and circumstances of the crime; (b) failure to investigate and present evidence relevant to Burns' background and character; and (c) failure to present mental health evidence.

> a.   Failure to investigate and present evidence relevant to the facts and circumstances of the crime[36]

Burns argues that he was sentenced to life for Johnson's murder because the jury determined that he did not shoot Johnson and to death for Dawson's murder because the jury determined that he shot Dawson. (D.E. 8 at 32; D.E. 85 at 1.) Burns asserts that his counsel did not investigate and present evidence demonstrating that he did not shoot Dawson. (D.E. 8 at 32.) Burns contends that the only evidence that he shot Dawson came from the testimony of Eric Thomas and Mary Jones, both of whom he asserts his counsel failed to cross-examine effectively. (Id.) Burns states that there was a strong

---

[36]    Burns addressed this issue in his motion for partial summary judgment and supporting memorandum. (D.E. 84 & 85.)

inference that Kevin Shaw actually shot Dawson. (D.E. 86 at 86.)
Burns contends that, if his counsel had effectively impeached the
State's witnesses, there would have been a legitimate and substantial
basis to argue that Burns was not in the category of offenders who
deserve death. (Id. at 87.) Burns argues that his counsel failed to
argue and present evidence relevant to the facts and circumstances
of the crime, specifically that residual doubt about who shot Dawson
makes the death penalty an inappropriate punishment. (Id. at 86.)

Respondent asserts that, to the extent this claim is related to
claim one of ineffective assistance at the guilt stage based on
counsel's alleged failure to properly investigate and present
evidence, this claim should be denied for the same reasons. (D.E. 58
at 32.) Respondent distinguishes the cases Burns cites and argues
that he has not established prejudice because Thomas' testimony was
not "entirely inconsistent" at the two trials, the evidence revealed
that "both men (Garrin and Burns) shot into the car and . . . bullets
were recovered showing that two different weapons were used", Burns'
identification was established by multiple sources, and "his presence
and participation" were irrefutable. (D.E. 91 at 6-11.).

When a defendant alleges that counsel provided ineffective
assistance during the penalty phase of a capital trial, the question
is whether there is a "reasonable probability that, absent the
errors, the sentencer . . . would have concluded that the balance of
aggravating and mitigating circumstances did not warrant death."
Strickland, 466 U.S. at 695. There is an insufficient showing of

prejudice where "one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different." Slaughter v. Parker, 450 F.3d 224, 234 (6th Cir. 2006) (quoting Baze v. Parker, 371 F.3d 310, 322 (6th Cir. 2004)). There is no prejudice if the newly available evidence is merely cumulative or not substantially different from the evidence presented during the penalty phase. Beuke v. Houk, 537 F.3d 618, 645 (6th Cir. 2008).

Counsel's performance related to the investigation of the crime, supra pp. 35-41, and counsel's cross-examination of Thomas and Jones, supra pp. 41-51, have been addressed by the Court.[37] The Court can only speculate about what further cross-examination of Eric Thomas and Mary Jones would have revealed. Further cross-examination would not negate the fact of Burns' presence and participation, nor would it negate Thomas' and other witnesses' testimony that more than one person fired a weapon[38] (see D.E. 28, Add. 2, Vol. 3, p. 378). Burns has not demonstrated prejudice where the Court can only speculate about the effect of additional testimony that might have been presented through further cross-examination of Thomas and Jones. See Poindexter v. Mitchell, 454 F.3d 564, 571-73 (6th Cir. 2006) (no ineffective assistance of counsel because regardless of the witness' inconsistent testimony, there is an insufficient showing of prejudice

---

[37]    The Court has determined that counsel's performance did not prejudice Burns' guilt determination, supra p. 51.

[38]    At Garrin's trial, an expert examining the projectiles recovered from Dawson's body determined that Dawson was shot once with a revolver and four times with a semi-automatic pistol. Garrin, 1996 WL 275034, at *2.

where the facts still demonstrate an attempt on the victim's life).

The Tennessee Court of Criminal Appeals' determination was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of the facts in light of the evidence presented. Claim 11B is DENIED.[39]

> b.    Failure to present evidence of Burns' background and character

Burns alleges that his trial counsel failed to create a working relationship with his mother Leslie Burns, treated her with "subservient disdain", and met with her only a handful of times; met with his father once immediately before trial; failed to investigate Burns' neighborhood; did not interview or present evidence from available witnesses; and did not obtain relevant documents, such as social service, welfare, school, medical, family, and criminal records. (D.E. 8 at 32-33.) Burns asserts that counsel could have presented mitigating evidence about the extreme poverty and abusive relationships that his mother endured, including the dysfunctional and abusive relationship she had with Burns' father Reverend Obra Carter; the fact that Burns' father had two families; the manner in which Carter treated Leslie Burns and her children; the condition of Burns' home and the surrounding community; Burns' character at school, home and work; and the mental condition of Burns and his family members. (_Id._ at 34-35.) Burns contends that his counsel were

---

[39]    Petitioner's motion for partial summary judgment is DENIED.

ineffective because they did not try to discover mitigation evidence, acquiesced in Burns' mother's decision to excuse mitigation witnesses, did not meet his father until just before the trial, and conducted no mitigation interviews other than with his mother. (D.E. 86 at 100.)

The Tennessee Court of Criminal Appeals addressed counsel's performance during the penalty phase of the trial and Burns' assertion that his counsel failed to present significant mitigation evidence.

> The petitioner asserts that trial counsel "failed to present significant mitigation evidence." This mitigation proof included testimony that he was a decent person; that his father, Obra Carter, abused the women in his life and his children; and that his mother, Leslie Burns, had significant deficiencies as a parent due to the number of children in her household, the presence of a severely handicapped child, and the sum of problems she had leading to bouts with depression. He further argues that no evidence was presented regarding the nature of the neighborhood in which the petitioner was raised. In addition to lay testimony, he asserts, further, that trial counsel failed to adequately utilize the services of experts in investigating and presenting a mitigation defense, specifically, that not employing a mitigation specialist and a neuropsychologist resulted in counsel's performance falling below the expected standards for counsel in a capital proceeding.

> In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987); Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998). The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing

phase, however, is constitutionally distinct from the question of whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative, however, that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. *See* Goad v. State, 938 S.W.2d 363, 369-70 (Tenn. 1996).

. . .

The post-conviction court concluded that the petitioner failed to offer any better insight at the evidentiary hearing into why this crime occurred or why the petitioner chose to act the way he did on the day of the double homicide.

"While '[i]t should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness' it is unclear how detailed an investigation is necessary" under *Strickland* to ensure effective counsel. White v. Singletary, 972 F.2d 1218, 1224 (11th Cir. 1992) (internal citation omitted). The right to present and have a sentencer consider any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence or fails to present a case in mitigation at the capital sentencing hearing. Thus, although "no absolute duty exists to investigate particular facts or a certain line of defense," *see* Chandler v. United States, 218 F.3d 1305, 1317 (11th Cir. 2000), counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674. In determining whether counsel breached this duty, "we must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from

88

counsel's perspective at the time." <u>Wiggins</u>, 539 U.S. at 523, 123 S.Ct. at 2536 (internal citation and quotation marks omitted). It is also necessary to be mindful that defense counsel is not required to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing" or "to present mitigating evidence at sentencing in every case." <u>Id.</u> at 533, 123 S.Ct. at 2540. Moreover, counsel does not have the duty to interview every conceivable witness. <u>Hendricks v. Calderon</u>, 70 F.3d 1032, 1040 (9th Cir. 1995). In sum, counsel's investigation will not be found deficient for failing to unveil all mitigating evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. <em>See</em> <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1174 (9th Cir. 1998).

The petitioner presented witnesses at the post-conviction evidentiary hearing who arguably could have provided mitigation evidence had they been called to testify. However, the fact that additional witnesses such as these might have been available or that other testimony might have been elicited from those who testified does not establish ineffective assistance of counsel. <u>Waters v. Thomas</u>, 46 F.3d 1506, 1513-14 (11th Cir. 1995).

The post-conviction court found that the mitigation evidence presented by trial counsel "showed that this was a well-adjusted young man who committed a crime that was out of character for him." Additionally, the court concluded that "[t]he bulk of the mitigation proof dealt with the petitioner's father" but "offered [no] better insight into why this crime occurred or why the petitioner chose to act the way he did on the day in question." Thus, the post-conviction court found that, although the petitioner established that additional witnesses were available, the "bulk" of them testified about his father and did not offer any explanation as to why he had committed the crimes. Thus, the court concluded that the petitioner failed to show that he was prejudiced by the fact these witnesses had not testified at the trial. The record supports these conclusions.

<u>Burns</u>, 2005 WL 3504990, at **62-66.

Burns relies on American Bar Association ("ABA") Guidelines to establish a standard for reasonable performance in the penalty phase.

89

(D.E. 86 at 91.) Burns argues that, according to ABA Guidelines, counsel should take account of witnesses familiar and evidence relating to the client's life and development, demonstrative evidence that humanize the client or portray him positively, and circumstances that may have caused or explained the charged conduct. (Id. at 91-92.) Burns emphasizes that it is imperative that counsel make "reasonable investigations" related to the mitigation case. (Id.)

Johnson testified that his preparation for the mitigation phase was "[j]ust talking to his mother and father." (D.E. 28, Add. 13, Vol. 3, p. 285.) Johnson said that Burns' "mother kind of cut us off from anything that we could get from West Memphis." (Id.) However, Johnson also testified that he never did any investigating in West Memphis or attempted to get anyone else to investigate there. (Id. at 285-86.)[40]

> The mother was the key. We didn't need anybody to go to West Memphis to interview the mother. The mother was cooperative with me in regards she would always come in, and she would always talk. So I didn't need an investigator to go to West Memphis to talk to her. She was the key to get the other people in West Memphis to be able to talk to the investigator to give us the information that we needed.

(Id. at 286.)

Although there were communication issues with Burns' mother,

_____

[40]    Similarly, Wright testified that he did not investigate the culture of West Memphis; that there was no investigation into the neighborhood other than talking to Burns, his parents, and a neighbor; and that he was not aware that Burns' home was directly behind project housing, that Burns had lived in the projects himself, or that shots had been fired into Burns' home. (D.E. 28, Add. 13, Vol. 2, pp. 115-16, 147-48.) Wright was under the mistaken belief that Leslie Burns and Obra Carter were divorced and indicated no real knowledge of the Burns' family situation. (Id. at 116-18.)

Johnson indicated that he never had problems communicating with Burns. (Id.) Burns gave Johnson a list of people from the community to interview, but those people were not interviewed. (Id. at 304.) Johnson testified that Burns' mother told counsel that they had decided they did not want to participate. (Id.)[41] Johnson testified that he met with Burns' father only once "right before trial." (Id. at 300.)

Leslie Burns testified that she first learned she was going to testify during the mitigation phase when she was called at the trial; her testimony had not been discussed previously. (Id. at Vol. 5, pp. 80-81.) Ms. Burns disagreed with counsel's testimony and said she did not tell potential mitigation witnesses they did not have to testify or not to cooperate with her son's attorneys. (Id. at 83.)

Counsel's investigation of Burns' family and background was minimal. Counsel relied on a mitigation theme that Burns' behavior was out of character.

> During the sentencing portion of the petitioner's trial, counsel presented the testimony of six witnesses. See Burns, 979 S.W.2d at 279. Leslie Burns, the petitioner's mother, testified that he was twenty-six years of age, had twelve brothers and sisters, had graduated from high school, and had presented no disciplinary problems while in school. Id. His father, Obra Carter, testified that his son had always been obedient and well-mannered. Id. Phillip Carter, the petitioner's half-brother, testified that the petitioner had been active in church and had always tried to avoid trouble. Id. Norman McDonald, the petitioner's Sunday School teacher, testified that the petitioner was a "faithful" young man who attended church

---

[41]    Johnson did not subpoena any of these individuals to testify. (Id. at 314.)

regularly. Id. Mary Wilson, a captain with the Shelby
County Sheriff's Department, and Bennett Dean, a volunteer
chaplain, both testified that the petitioner had actively
participated in religious services while in custody for
these offenses. Id.

Burns, 2005 WL 3504990, at *63. Counsel stated that certain

mitigation witnesses were not used because their testimony was

cumulative, and counsel did not want to open the door to Burns' prior

criminal record. Id. at *64.

The evidence presented in the post-conviction proceedings does

not demonstrate that there is a reasonable probability that a jury,

having been given additional evidence about the family situation,

poverty, abuse suffered by Burns' mother, and the strict/abusive

nature of Obra Carter's treatment of his children, would have given

Burns a life sentence. Despite any lack of information presented in

mitigation at trial, Burns was not prejudiced by counsel's failure

to search deeper into Burns' development and family background. The

Tennessee Court of Criminal Appeals' determination is neither

contrary to nor an unreasonable application of clearly established

federal law as determined by the United States Supreme Court and was

based on a reasonable determination of the facts in light of the

evidence presented.

c.    Failure to present mental health evidence

Burns asserts that, after Midtown Mental Health Center made a

determination that he was competent to stand trial and that an

insanity defense could not be supported, counsel did not investigate

further to determine whether Burns had a mental impairment. (D.E. 8

at 44.) Burns contends that counsel would have discovered that he demonstrates a "defensive denial that could contribute to difficulty understanding the implications of his circumstances and behavior"; has trouble processing new information quickly; fails to grasp the implications of his behavior when under stress; and fails to gather all the necessary information before making a decision. (<u>Id.</u> at 45.) Burns contends that counsel would have discovered that he has the psychological profile of a follower and does not recognize individuals' motivations and intentions. (<u>Id.</u>) Burns also asserts that he and his family suffer mood disorders, like bipolar disorder and depression, and he has a biologically driven deficit that interferes with his ability to exercise reflection and judgment. (<u>Id.</u>)

The Tennessee Court of Criminal Appeals considered this issue:

The petitioner also criticizes trial counsel's decision not to retain a mental health expert. As before, we must determine whether counsel's decision in this regard constituted ineffective assistance. The evidence at the post-conviction hearing revealed that trial counsel, upon their initial appointment in this matter, filed motions requesting the assistance of several experts, including a psychologist. The petitioner's first senior counsel appointed explained that the motions were filed in anticipation of presenting proof at the penalty phase, saying that he interviewed the petitioner regarding his medical history, school activities, drug or alcohol use, and prior criminal history. The petitioner never spoke of a drug or alcohol problem. The first junior counsel appointed testified that a mental evaluation of the petitioner was requested out of an abundance of caution, and the evaluation concluded that he was competent and that an insanity plea could not be supported. This information was provided to successor counsel who actually represented the petitioner at trial. After reviewing the petitioner's background, childhood problems, and school

and family history, senior counsel concluded that nothing indicated that a further check into the petitioner's mental status was necessary and nothing caused them to believe that the petitioner did not understand the various plea offers. Senior counsel said that had anything been discovered to question the petitioner's mental condition, counsel would have made further inquiry. Junior counsel confirmed that there was no indication that the petitioner suffered from any mental or personality defects.

Trial counsel's being unfamiliar with much of the information presented at the evidentiary hearing as to the petitioner's alleged family history of mental illness and the petitioner's "impaired judgment" was not unreasonable. Counsel and their investigator spoke with the petitioner, his family members, and others who might have had such information, and none of them suggested there was any history of mental illness in the petitioner's family or that he suffered from any mental defect. Other courts have held that "counsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence." Matthews v. Evatt, 105 F.3d 907, 920 (4th Cir. 1997). This comports with the principle that a lawyer may make reasonable decisions that render particular investigations unnecessary. The absence of any information from the petitioner, his family members, or others indicating any mental defect/illness in conjunction with a mental evaluation of the petitioner which did not provide any indication of a potential mental illness supports counsel's decision that further investigation with a mental health expert was not necessary. See Babbitt, 151 F.3d at 1174.

A review of the record indicates that trial counsel's decisions not to employ either a mitigation specialist or a mental health expert were reasonable considering the information amassed by counsel through their investigation. Accordingly, counsel were not deficient in their investigation in this matter.

Burns, 2005 WL 3504990, at *68.

After considering the overwhelming proof related to the aggravating circumstance and the "cumulative and corroborative" nature of the mitigation evidence presented at the post-conviction

94

hearing, the Tennessee Court of Criminal Appeals could not "conclude that this evidence would have persuaded the jury not to impose the death penalty." Id.

Dr. Woods, a psychiatrist, testified on behalf of Burns at the post-conviction evidentiary hearing. Id. at **27-30. Dr. Woods was unable to make a psychiatric diagnosis, but he opined that Burns suffered symptoms of defensive denial, bizarre thinking, unusual religious experience, poor coping skills, and impaired judgment and that there are "real questions about mood disorders in this family." (D.E. 28, Add. 13, Vol. 8, p. 597-99, 604, 627.) When questioned about the role that these symptoms played in the offense committed, Dr. Woods responded that the offense was an anomaly in Burns' history and that the consistency as it relates to the offense was that Burns' judgment was impaired while making an effort to do something for a friend. (Id. at 630.) Burns, 2005 WL 3504990, at *30. This testimony is consistent with the defense theory that Burns' actions were out of character.

Burns contends that the Tennessee Court of Criminal Appeals used a standard to analyze prejudice, namely that "[t]he petitioner cannot establish that his sentence would have been different", that directly contradicted or was contrary to Supreme Court precedent. (D.E. 86 at 100-101.) See id. at *58. To the contrary, the Court of Criminal Appeals cited and was clearly aware of the appropriate standard for prejudice from Strickland, that "there must be a reasonable

probability that, but for counsel's error, the result of the
proceeding would have been different." Id. at **61-62. The evidence
presented at the post-conviction hearing, although showing a more
complete picture of Burns' life than that presented at trial,
provides little information that mitigates his case and does not
establish that there is a reasonable probability that Burns' sentence
would have been different. Claim 11 is DENIED.

    J.   <u>Victim Impact Evidence (Claim 12)</u>

    Burns alleges that the State, in violation of his Sixth, Eighth,
and Fourteenth Amendment rights, presented victim impact testimony
from Dawson's and Johnson's mothers that improperly influenced the
jury to vote for the death penalty. (D.E. 8 at 46.) This issue was
addressed on direct appeal by the Tennessee Supreme Court.

<b>VICTIM IMPACT EVIDENCE</b>

    The defendant argues that the trial court erred in
admitting testimony of the victims' mothers during the
penalty phase of the trial and by allowing the prosecutor
to emphasize this evidence during its closing argument.
The defendant contends that so-called "victim impact"
evidence and argument is inflammatory, irrelevant to the
sentencing determination in a capital proceeding,
inadmissible under our death penalty statutes, and
violative of Article I, §§ 8 and 16 of the Tennessee
Constitution and the Eighth and Fourteenth Amendments to
the United States Constitution. The State maintains that
the evidence is relevant and admissible in the penalty
phase of a capital trial.

    In <u>State v. Nesbit</u>, 978 S.W.2d 872 (Tenn. 1998), we
recently held that victim impact evidence and argument is
not <i>per se</i> improper under either statutory or
constitutional law. Our analysis of the sentencing
statutes began with Tenn. Code Ann. § 39-13-204(c), which
states:

96

In the sentencing proceeding, evidence may be presented as
to any matter that the court deems relevant to the
punishment and may include, but not be limited to, *the
nature and circumstances of the crime*; the defendant's
character, background history, and physical condition; any
evidence tending to establish or rebut the aggravating
circumstances enumerated in subsection (i); and any
evidence tending to establish or rebut any mitigating
factors. Any such evidence which the court deems to have
probative value on the issue of punishment may be received
regardless of its admissibility under the rules of
evidence; provided, that the defendant is accorded a fair
opportunity to rebut any hearsay statements so admitted.
However, this subsection shall not be construed to
authorize the introduction of any evidence secured in
violation of the constitution of the United States or the
constitution of Tennessee.

(emphasis added).

This statute delineates a procedure which enables the
sentencing jury to be informed about the presence of
statutory aggravating circumstances, the presence of
mitigating circumstances, and the nature and circumstances
of the crime. As we said in Nesbit, "the impact of the
crime on the victim's immediate family is one of those
myriad factors encompassed within the statutory language
'nature and circumstances of the crime.'" 978 S.W.2d at
889. The statute, therefore, allows the sentencing jury to
be reminded that "just as the murderer should be
considered as an individual, so too the victim is an
individual whose death represents a unique loss to society
and in particular to his family." Payne v. Tennessee, 501
U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720
(1991).

We also, in Nesbit, recognized that the United States
Supreme Court has held that Eighth Amendment to the United
States Constitution does not constitute a *per se* bar to
the admission of victim impact evidence and argument:

We are now of the view that a State may properly conclude
that for the jury to assess meaningfully the defendant's
moral culpability and blameworthiness, it should have
before it at the sentencing phase evidence of the specific
harm caused by the defendant.

Nesbit, 978 S.W.2d at 889 (quoting Payne, 501 U.S. at 825,

111 S.Ct. at 2608). Our recent decisions have followed <u>Payne</u> and have held that victim impact evidence and argument is likewise not precluded by the Tennessee Constitution. *E.g.,* <u>Nesbit</u>, 978 S.W.2d at 889.

Not all victim impact evidence and argument, however, is appropriate. It should be limited to "information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's family." *Id.* at 891 (citing, <u>Payne</u>, 501 U.S. at 822, 111 S.Ct. at 2607) (footnote omitted).

Moreover, any evidence that threatens to render the trial fundamentally unfair or poses a risk of unfair prejudice may violate the due process provisions of the United States and Tennessee Constitutions and must be excluded. *Id.* The trial court should also exclude any evidence where its probative value is substantially outweighed by its unfair prejudice. Tenn. R. Evid. 403. Finally, the prosecutor and the trial court should ensure that the prosecution's argument is restrained and reasoned, fairly based on the evidence, and not merely an appeal to the bias or emotional responses of the jury. <u>Nesbit</u>, 978 S.W.2d at 891.

Here, the victims' mothers testified during the penalty phase. Each related a few details about their deceased sons. Ms. Dawson testified that the shootings had a negative effect on her own life: she had divorced, moved to another house, and no longer knew what it was like to feel happy. Johnson's mother, Ms. Hudson, testified that "it had been hard to let go" of the killings, and she cried every day. She also testified that the killing affected her other two children, her father, and the victim's young daughter.

Although evidence regarding the emotional impact of the murder "should be most closely scrutinized," <u>Nesbit</u>, 978 S.W.2d at 891, nearly all of this evidence was limited in scope to a glimpse into the lives of Dawson and Johnson and the effects of the killings on their immediate families. This testimony was reserved in nature and not inflammatory, and its admission was not barred by the capital sentencing statutes or the Constitutions of the

United States and Tennessee. Moreover, the prosecutor did not extensively discuss or emphasize this evidence in summation. Accordingly, neither the admission of this evidence nor the prosecution's argument was improper.

Ms. Dawson also testified, however, that the killings had adversely affected the entire community-for instance, people were afraid and kept their doors locked. The prosecutor emphasized this testimony during closing: . . . .

This evidence and argument went beyond "information designed to show those unique characteristics which provide a glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon member's of the victim's family." Nesbit, 978 S.W.2d at 891 (footnote omitted)(emphasis added). The testimony was not objected to by the defendant, however, and the prosecutor's argument was based on this evidence. Although beyond the scope of Nesbit, neither the evidence nor the argument was inflammatory, and it did not render the proceedings fundamentally unfair or unduly prejudicial to the defendant. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Thus, we conclude the defendant is not entitled to relief on this issue.

Burns, 979 S.W.2d at 281-83.

The Supreme Court in Payne v. Tennessee, 501 U.S. 808, 825 (1991), held, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime" and serves entirely legitimate purposes.[42]

We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the

---

[42]     The Supreme Court overruled its prior decision in Booth v. Maryland, 482 U.S. 496 (1987), which held that victim impact evidence leads to the arbitrary imposition of the death penalty.

> murder on the victim's family is relevant to the jury's
> decision as to whether or not the death penalty should be
> imposed. There is no reason to treat such evidence
> differently than other relevant evidence is treated.

Payne, 501 U.S. at 827. However, the Supreme Court recognized that

relief under the Due Process Clause would be appropriate if victim

impact evidence introduced in the sentencing phase of a criminal case

"is so unduly prejudicial that it renders the trial fundamentally

unfair." Id. at 825.

The Tennessee Supreme Court determined that the victims'

mothers' testimony was limited to a glimpse into Dawson and Johnson's

lives and the effects of the murders on their families and the

community, reserved in nature, and not inflammatory. Burns, 979

S.W.2d at 282. The record does not support Burns' claim that his

rights were violated by the victim impact evidence presented in this

case. The Tennessee Supreme Court's decision was neither contrary to

nor an unreasonable application of clearly established federal law

as determined by the United States Supreme Court and was based on a

reasonable determination of the facts in light of the evidence

presented. Claim 12 is DENIED.

K.    Trial Court's Failure to Give Direction to the Jury (Claim
      15)[43]

Burns alleges that the trial court violated his Sixth, Eighth,

and Fourteenth Amendment rights when it refused to answer questions

---

[43]    The Court has refused to accept Burns' implicit review theory to
excuse the procedural default of the Eighth Amendment portion of Claim 15, supra
pp. 21-23.

that the jury asked during deliberations. (D.E. 8 at 48.) Burns states that the result of the judge's failure to respond to the jury's questions and clarify the jury instructions was that the jury chose death because they were uncertain about what lesser options were available. (D.E. 86 at 106.) Burns cites <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990), for the proposition that a defendant is denied due process where there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (<u>Id.</u>)

Respondent asserts that no objection was made at trial when the trial court directed the jury to the written instructions or when the trial court failed to clarify the instructions for the jury. (D.E. 58 at 12.) Respondent acknowledges that Burns raised this issue on appeal (<u>id.</u> at 12-13), but he contends that the claim was waived and that it lacks merit (D.E. 94 at 45-47).

Both the Tennessee Court of Criminal Appeals and the Tennessee Supreme Court held that the issue had been waived and that it lacked merit. <u>Burns</u>, 1997 WL 418492, at *15; <u>Burns</u>, 979 S.W.2d at 295-96. The Tennessee Supreme Court stated,

### TRIAL COURT'S RESPONSE TO JUROR QUESTIONS

In his next issue, the defendant asserts that the trial court erred in its response to the jury when the jury asked certain questions during its deliberations in the penalty phase of the trial. Those questions propounded by the jury to the trial court were as follows:

(1) How many years for life?

(2) What does 'life sentence' mean?

(3) Can we ask for life without parole? Can we stipulate life plus so many years?

(4) Can we ask for consecutive life sentences?

(5) What does it mean if you're sentenced to death and life?

In response to these questions, the trial court stated, "All right. You're directed to refer to the charges and instructions that are contained in the jacket. Thank you. You may retire to continue your deliberations." The defendant contends that the questions posed indicated that the jury was considering improper matters, and that the trial court "should have directed the jury that the questions posed were not proper considerations in the determination of the sentence." The defendant concedes that there is no authority for the requirement that the trial court give this direction prior to referring the jury to the charge and instructions given initially. The State responds, first, that this issue is waived because the defendant did not object to the trial court's response to the jury's questions at the time it was given, and second, that the trial court's response was proper and that this issue is therefore without merit even if we should consider it.

. . .

Even if the defendant had not waived this "error," however, this issue has no merit. As the defendant acknowledges, the trial court followed the proper method of fielding the jury's questions. *See* <u>State v. Mays</u>, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984) ("The proper method of fielding questions propounded by the jury during deliberations is to recall the jury, counsel, the defendant(s), and the court reporter back into open court and to take the matter up on the record.") Additionally, contrary to the defendant's contention, the trial court responded properly to the jury's inquiry. *See, e.g.,* <u>State v. Johnson</u>, 698 S.W.2d 631 (Tenn. 1985). In *Johnson*, a capital case, our Supreme Court addressed a situation in which one of the jurors had asked questions regarding parole during voir dire. The Court stated, "the preferable response to a juror's inquiry about parole is to instruct the jury to limit their deliberations to the instructions given them at the close of the evidence." <u>Id.</u> at 633. That

102

is exactly what the trial court did in this case. In *State v. Smith*, 857 S.W.2d 1 (Tenn. 1993), another capital case, our Supreme Court again addressed the proper response to jury inquiries about sentencing and parole. The trial court had refused to supplement its original instructions. The defendant argued that information about parole eligibility might operate as mitigating evidence and the trial court's refusal to give additional instructions "somehow create[d] a non-statutory aggravating factor of future dangerousness." 857 S.W.2d at 11. The Court rejected this argument, opining "that to provide a jury with the sort of information requested by defendant could result in sentences of death based on sheer speculation and on factors other than those enumerated in T.C.A. § 39-2-203 and sanctioned under either [the Tennessee or United States] Constitution." Id. The trial court did not err in its response to the jury's questions in this case, and this issue is therefore without merit.

Burns, 979 S.W.2d at 295-96.

The scope of review on a habeas petitioner's claim that he was deprived of a fair trial by errors in the charge to the jury is very narrow. Estelle v. McGuire, 502 U.S. 62, 73 (1991). The Supreme Court in United States v. Bayer, 331 U.S. 532, 537-38 (1947), addressed when it becomes necessary for the court to amplify what was stated in a jury charge:

> Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion. The trial judge, in the light of the whole trial and with the jury before him, may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse. How far any charge of technical questions of law is really understood by those of lay background would be difficult to ascertain, but it is certainly more evident in the living scene than in a cold record.

The determination of the appropriate answer to a jury question rests within the discretion of the trial court, so long as the answer does

103

not deprive the defendant of a constitutional right. McShall v. Henderson, 526 F. Supp. 158, 161 (S.D.N.Y. 1981); see Emerson v. Shaw, 575 F.3d 680, 685 (7th Cir. 2009) (judges are within their discretion to refer a jury back to the original instructions when the jury evinces possible confusion as long as the original instructions accurately and understandably state the law).[44]

In Weeks v. Angelone, 528 U.S. 225, 227 (2000), the Supreme Court held that the Constitution is not violated when a trial judge directs a capital jury's attention to a specific paragraph of a constitutionally sufficient instruction in response to a question about the proper consideration of mitigating circumstances. In Weeks, the jury asked,

> Whether, if they believed Weeks guilty of at least one of the aggravating circumstances, it was their duty to issue the death penalty or whether they must decide whether to issue the death penalty or a life sentence.

Id. at 225. The judge directed the jury to an instruction stating,

> If you find from the evidence that the Commonwealth has proved, beyond a reasonable doubt, either of the two [aggravating circumstances], and as to that alternative, you are unanimous, then you may fix the punishment . . . at death, or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment at [life] imprisonment.

Id.

Burns does not contend that the original jury charge was incorrect. He has not demonstrated that the trial court's decision

---

[44]    Jury instructions come from pattern instructions that have withstood appellate analysis and deviating from these instructions creates a risk of reversible error. Id.

to direct the jury back to the original charge prejudiced him or deprived him of a constitutional right. The Tennessee Supreme Court's determination is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of the facts in light of the evidence presented. Claim 15 is DENIED.

L.    <u>Systematic Exclusion of Women as Jury Forepersons (Claim 16)</u>

Burns alleges that the foreperson for his grand jury in May 1992 was male, that Tenn. R. Crim. P. 6 gave the judge the discretion to personally select the grand jury foreperson, that such discretion was susceptible to abuse, that women were under-represented as grand jury forepersons, and that women were systematically excluded from the grand jury that indicted him. (D.E. 8 at 48-49.) Respondent asserts that the claim was not exhausted in the state court and is procedurally defaulted. (D.E. 58 at 13.)

Burns raised the issue in a motion to reopen the post-conviction proceedings. (D.E. 54 at 2-3; D.E. 86 at 123.) The state court relied on <u>State v. Bondurant</u>, 4 S.W.3d 662 (Tenn. 1991)[45], and denied Burns' motion to reopen. (D.E. 54 at 8.) The court stated that it "need not even reach the merits of such an argument because it finds

_____

[45]    The Tennessee Supreme Court in <u>Bondurant</u> disagreed with the United States Supreme Court's determination, stated in <u>Rose v. Mitchell</u>, 443 U.S. 545 (1979), and <u>Hobby v. United States</u>, 468 U.S. 339 (1984), that the foreperson in Tennessee performs more than ministerial duties and asserts that the Supreme Court's interpretation of the role and power of the grand jury foreperson in Tennessee is the result of a misperception. 4 S.W.3d at 674.

petitioner's contention that this court's rejection of *Bondurant* in favor of a return to the *Rose/Hobby* interpretation of the grand jury forepersons powers would result in the establishment of an new constitutional right as contemplated by Tenn. Code Ann. § 40-30-117 (a)(1) to be without merit." (D.E. 54 at 5-6.) The court noted that Tenn. Code Ann. § 40-30-117(a)(1) requires a "final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial" to sustain a motion to reopen the post-conviction proceeding. (Id. at 5.) The court decided that "a holding by this court reinterpreting State law in favor of a previously rejected proposition does not constitute a 'final ruling of an appellate court'" and that Burns sought to make an "end run" around the statutory requirements for reopening a post-conviction proceeding. (Id. at 6.) Burns filed an application for permission to appeal, which was also denied. (D.E. 86-37.)[46] A procedural rule barred the court from consideration of this claim on the merits. Claim 16 is procedurally defaulted and DENIED.

M.    Failure of Indictment to Allege Aggravating Circumstances (Claim 17)

Burns alleges that his indictment did not allege aggravating circumstances in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (D.E. 8 at 50.) Respondent contends that the

---

[46]    Respondent notes Burns claims that discrimination in the selection of the grand jury foreperson entitles him to habeas relief, without asserting any specific prejudice from having been indicted by a grand jury whose foreperson was a man or that he would have been treated more fairly or favorably if the foreperson had been a woman. (D.E. 86 at 47.)

United States Supreme Court has never announced a federal constitutional requirement that States charge the aggravating factors to be relied on for sentencing in an indictment. (D.E. 58 at 39.) Burns fails to address this contention in his response to Respondent's motion for summary judgment.

Burns initially raised this issue as a due process violation under the Fifth and Eighth Amendments in his post-conviction proceedings, relying on Apprendi v. New Jersey, 530 U.S. 466 (2000)[47], and Ring v. Arizona, 536 U.S. 584 (2002)[48]. (D.E. 28, Add. 26, pp. 131-35.)[49] Burns asserted that the aggravating factor had to be presented in the indictment to raise the offense to the level of a capital offense. (Id. at 134-35.) The Tennessee Court of Criminal Appeals held:

### B. Failure to Charge Aggravating Circumstance in Indictment Violates Due Process

The petitioner next asserts that his being sentenced to

---

[47]    In Apprendi, the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

[48]    In Ring, the trial judge imposed a capital sentence under the then-existing Arizona sentencing statute, which assigned to the trial judge, rather than to the jury, the task of determining the presence of aggravating factors that made a defendant eligible for the death penalty. 536 U.S. 584. The Supreme Court in Ring held Apprendi required that the existence of an aggravating factor be proven to a jury, rather than a judge. Id. at 603-09.

[49]    Respondent contends that, to the extent Burns alleges any constitutional basis other than due process for his claim, his constitutional claim is procedurally barred. (D.E. 33 at 50-51; D.E. 58 at 40.) Burns fails to offer any argument in response to Respondent's assertion of procedural default. To the extent Petitioner attempts to assert any claim other than the due process claim presented in the post-conviction proceedings, that claim is procedurally defaulted.

death violates the Due Process Clause, Article I, § 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. Relying upon <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), he argues that his indictment was flawed because the aggravating circumstances which made him eligible for the death penalty were not submitted to the grand jury nor returned in the indictment.

The petitioner's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Thus, he alleges that to satisfy the requirements of *Apprendi*, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. This argument has recently been rejected by our supreme court in <u>State v. Holton</u>, 126 S.W.3d 845 (Tenn. 2004); *see also* <u>State v. Berry</u>, 141 S.W.3d 549, 558-562 (Tenn. 2004) (concluding also that the Supreme Court's decision in <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), does not alter the court's analysis on whether statutory aggravating circumstances must be pled in the indictment). The petitioner is not entitled to relief on this issue.

<u>Burns</u>, 2005 WL 3504990, at *70.

The federal right to presentment or indictment by a grand jury does not extend to the States through the Fourteenth Amendment. <u>Hurtado v. California</u>, 110 U.S. 516, 520-21 (1884). <u>See</u> <u>Branzburg v. Hayes,</u> 408 U.S. 665, 688 n. 25 (1972) ("indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"). A conclusion that <u>Apprendi</u> requires state prosecutions to employ indictments listing all elements of a crime runs afoul of the repeated holdings of the Supreme Court that the Fifth Amendment grand jury right does not apply to state prosecutions. <u>Williams v. Haviland</u>, 467 F.3d 527, 531-33 (6th Cir. 2006). A state court decision denying relief in a death

penalty case for failure to allege aggravating factors in an indictment is not "contrary to" or an "unreasonable application" of relevant Supreme Court precedent. <u>Hall v. Bell</u>, No. 2:06-CV-56, 2010 WL 908933, at **42-43 (E.D. Tenn. Mar. 12, 2010). The Tennessee Court of Criminal Appeals' determination is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Claim 17 is DENIED.

N.    <u>Death Sentence Violated Fundamental Right to Life and Due Process (Claim 18)</u>

Burns alleges that his fundamental right to life was violated and that the State demonstrated that it had a less restrictive means to punish Burns for Dawson's death when it offered Burns a life sentence. (D.E. 8 at 50.) Burns alleges that his right to trial was unconstitutionally burdened when the State sought a death sentence because he chose to go to trial. (<u>Id.</u>; D.E. 86 at 112-15.)

Although Respondent asserts that Burns failed to raise this claim on direct appeal and that the claim is waived pursuant to Tenn. Code Ann. § 40-30-102(g), Respondent acknowledges that the Tennessee Court of Criminal Appeals reviewed the issue on the merits as part of Burns' allegation of ineffective assistance of appellate counsel and found that the issue lacked merit. (D.E. 58 at 40-41.) The Court of Criminal Appeals held:

> The petitioner contends that his sentence of death should be set aside because it infringes upon his fundamental right to life. In support of this position, he asserts that the punishment of death is not necessary to promote any compelling state interest in punishing him and that

the State has not shown there are no less restrictive
means of punishing him. The petitioner's complaint that
his death sentence must be reversed because it violates
his "fundamental right to life" is contrary to settled
precedent as reflected in <u>Cauthern</u>, 145 S.W.3d at 629
(citing <u>Nichols</u>, 90 S.W.3d at 604; <u>State v. Mann</u>, 959
S.W.2d 503, 536 (Tenn. 1997) (Appendix); <u>State v. Bush</u>,
942 S.W.2d 489, 523 (Tenn. 1997)). Accordingly, this
argument is without merit.

<u>Burns</u>, 2005 WL 3504990, at *70.

The Tennessee Court of Criminal Appeals addressed this issue

when Burns filed an application for permission to appeal the denial

of his motion to reopen the post-conviction proceedings.

Petitioner Burns next argues that the death sentence
imposed is invalid under the Sixth, Eighth, and Fourteenth
Amendments, because the prosecution offered Burns a life
sentence prior to trial but sought and obtained the death
sentence at trial, thereby burdening the exercise of his
right to a jury and the right to not plead guilty, and
resulting in an arbitrary death sentence which, by
definition, is not necessary to promote any compelling
state interest and/or the least restrictive means of
achieving any state interest in punishing him. The
Petitioner explains that, "once the prosecution
acknowledged that life was the appropriate sentence here,
the only conceivable reason for seeking the death penalty
at trial was to penalize Burns for the exercise of his
constitutional rights." Petitioner Burns contends that his
sentence of death was imposed in direct violation of
*United States v. Jackson,* 390 U.S. 570, 88 S. Ct. 1209
(1968). He asserts that, under *Jackson,* it is
unconstitutional for the government to employ a death-
penalty regime which "permit[s] imposition of the death
sentence only upon a jury's recommendation and thereby
ma[kes] the risk of death the price of a jury trial."

In *State v. Mann*, the capital defendant challenged
the jury's imposition of the death sentence after he
rejected a plea offer of a life sentence. 959 S.W.2d 503
(Tenn. 1997). In support of his argument, the defendant
relied upon the United States Supreme Court holding in
*United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209
(1968). In *Jackson,* the high court reviewed a federal

110

kidnapping statute. Under the statute at issue, a convicted defendant could be sentenced to death if he had requested a jury trial, but could be sentenced to no more than a life sentence if he had either pleaded guilty or pleaded not guilty and waived his right to a jury trial. Under the statute, only those who insisted upon a jury trial faced a sentence of death. The United States Supreme Court, however, recognized that, unlike the statute at issue in *Jackson,* "Tennessee law does not reserve the maximum punishment for murder for those who insist on a jury trial." *Mann,* 959 S.W.2d at 511. The Tennessee court noted that the State is free to seek the death penalty following entry of a guilty plea. *Id*. The Petitioner claims that the holding in *Mann* should not be applied to his case because "the death penalty *was* in fact reserved for Burns only if he sought a trial, because the prosecution did not seek death following a plea." (Emphasis in original).

The Petitioner again asks this Court to grant relief by first acknowledging the existence of rights not previously recognized by Tennessee and not recognized at the time of Burns' trial. The Petitioner asserts that he has met the standard of section 40-30-117(a), Tennessee Code Annotated, because "the Tennessee courts have yet to apply the settled federal law governing his claims (having to this point erroneously failed to apply governing precedent from the United States Supreme Court)." The Petitioner maintains that, "[b]y properly applying the United States Supreme Court precedent . . . this Court will establish rights not recognized at the time of Burns' trial, though fully retroactive because they involve settled principles of federal law which were clearly dictated at the time Burns' case became final on direct appeal." The Petitioner states that, "to date, notwithstanding the Supreme Court's decision in *United States v. Jackson,* Tennessee has yet to apply *Jackson* to invalidate any death sentence imposed in violation of *Jackson* under the circumstances presented here." Similarly, the petitioner adds that "the Tennessee courts (like the trial court) [has never] acknowledged that under principle[s] of substantive due process and equal protection, the fundamental right to life can only be taken when necessary to promote a compelling state interest and the least restrictive means of achieving any state interest."

The Petitioner essentially asks this Court to

111

disregard the holding of our supreme court in *State v. Mann*; we decline to do so. . . . . We decline to do so, noting that, even if this Court accepted the Petitioner's argument and rejected the holding in *Mann*, our ruling would not constitute a **"final ruling."**

The case law relied upon by the Petitioner was established in 1968 (*United State (sic) v. Jackson*) and 1976 (*Gregg v. Georgia*), respectively. Our supreme court distinguished its holding in *Mann*, upholding a death sentence after the rejection of an offer of a sentence of life, from the United States Supreme Court's invalidation of a federal kidnapping statute in *United States v. Jackson*. The Petitioner could have made the same challenge as Defendant Mann raised in his original trial and appeal. Moreover, the Petitioner could have again made the challenge within his post-conviction petition. The Petitioner failed to raise the issue at these times.

(D.E. 86-37 at 6-8.)

The State is not required to demonstrate that it has a compelling state interest which cannot be satisfied by less restrictive means. In Gregg v. Georgia, 428 U.S. 153, 174-75 (1976), the Supreme Court stated,

(W)hile we have an obligation to insure the Constitutional bounds are not overreached, we may not act as judges as we might as legislators.... Therefore, in assessing a punishment selected by a democratically elected Legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

Claims that the state's death penalty scheme encourage capital defendants to plead guilty and imposes an impermissible risk of death on defendants who choose to exercise their right to trial have been rejected as without merit. Landrum v. Anderson, No. 1:96-CV-641, 2005

112

WL 3965399, *88 (S.D. Ohio Nov. 1, 2005); see Williams v. Bagley, 380 F.3d 932, 966 (6th Cir. 2004) (same); see also Greer v. Mitchell, 264 F.3d 663, 690 (6th Cir. 2001) (denying petitioner's claim that the death penalty was neither the least restrictive punishment nor an effective means of deterrence).

The Tennessee Court of Criminal Appeals' decision is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Claim 18 is DENIED.

O.    Absence of Uniform Standards to Guide Prosecutors in Determining the Propriety of Seeking the Death Penalty (Claim 19)

Burns alleges that Tennessee does not have statewide standards to guide prosecutors in deciding whether to seek the death penalty against a person charged with murder. (D.E. 8 at 50.)

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals stated:

The petitioner contends that the imposition of the death penalty violates both the state and federal constitutions because the statute grants absolute discretion to each individual district attorney general to indiscriminately seek the death penalty. The petitioner concedes that this issue was raised and rejected on direct appeal as part of a general challenge to the Tennessee death penalty statute. *See* Burns, 979 S.W.2d at 297. Our supreme court has not altered its opinion and has continued to reject this claim since the petitioner's direct appeal. *See, e.g.,* State v. Thomas, 158 S.W.3d 361, 407 (Tenn. 2005). Notwithstanding, the petitioner asserts that the issue should be reconsidered in light of the principles set forth in Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The petitioner asserts that the prosecutorial function is analogous to a state court's

113

issuance of a remedy and implies a duty to ensure that prosecution of crimes is implemented fairly.

The petitioner's claim fails for numerous reasons. First, the opinion in *Bush* was not released until 2000, two years after our supreme court's affirmance of the petitioner's convictions and death sentence. Thus, *Bush* is inapplicable to the petitioner's case unless the holding established a new rule of law which is to be applied retroactively.

In *Bush*, the United States Supreme Court held that when a state court orders a remedy, such as a recount of votes, there must be some assurance the implementation of the remedy will comport with "the rudimentary requirements of equal treatment and fundamental fairness...." Id. at 109, 121 S.Ct. at 532. The potential sweep of the Supreme Court's holding is limited by the opinion's own words: "Our consideration is limited to the present circumstances...." Id. Thus, we decline the invitation to conclude that *Bush* established a new rule of constitutional criminal procedure. *Bush*, a voting rights case, does not apply to this criminal prosecution. *See generally* Black v. Bell, 181 F. Supp. 2d 832, 879 (M.D. Tenn. 2001). Moreover, the petitioner's claim, on its merits, has been rejected on numerous occasions. The United States Supreme Court has refused to strike down various death penalty statutes on the ground that those statutes grant prosecutors discretion in determining whether to the seek the death penalty. Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (The petitioner's argument "that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense" does not indicate that system is unconstitutional.); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (same). Applying the United States Supreme Court decision in Gregg, 428 U.S. at 198-99, 96 S.Ct. at 2937, the Tennessee Supreme Court has held that:

> opportunities for discretionary action occurring during the processing of a murder case, including the authority of the state prosecutor to select those persons for whom he wishes to seek capital punishment do not render the death penalty unconstitutional on the theory that the opportunities for discretionary action render imposition of the death penalty arbitrary or freakish.

114

> State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); *see also*
> State v. Brimmer, 876 S.W.2d 75, 86 (Tenn. 1994); State v.
> Hall, 958 S.W.2d 679, 716 (Tenn. 1997). Moreover, in *Hall*,
> our supreme court expressly rejected the assertion that
> prosecutorial discretion to seek the death penalty
> violated the separation of powers doctrine found in
> Article II, § 2 of the Tennessee Constitution. 958 S.W.2d
> at 716-17. Accordingly, we conclude that the decision in
> *Bush*, a case involving the method of counting ballots for
> a presidential election, does not invalidate the
> discretion of the prosecutor in determining whether to
> seek the death penalty. This claim is without merit.

Burns, 2005 WL 3504990, at **71-72.

The United States Supreme Court has refused to strike down various death penalty statutes on the ground that those laws grant prosecutors discretion in determining whether to seek the death penalty. See Proffitt v. Florida, 428 U.S. 242, 254 (1976) (rejecting argument that arbitrariness is inherent in the Florida criminal justice system because it allows discretion at each stage of a criminal proceeding); Gregg, 428 U.S. 153, 199 (1976) ("that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense" does not indicate that the system is unconstitutional); Campbell v. Kincheloe, 829 F.2d 1453, 1465 (9th Cir. 1987) (Supreme Court has rejected argument that death penalty statute is unconstitutional because it vests unbridled discretion in prosecutor to decide when to seek the death penalty), cert. denied, 488 U.S. 948 (1988). The decision in Bush, a case considering the method of counting ballots cast in a presidential election, does not require a different result. See Chi v. Quarterman, 223 F. App'x 435, 439 (5th Cir. 2007) (discussing the Bush case's

115

"utter lack of implication in the criminal procedure context"), <u>cert. denied</u>, 551 U.S. 1193 (2007); <u>see also</u> <u>Wyatt v. Dretke</u>, 165 F. App'x 335, 339-40 (5th Cir. 2006) (the <u>Bush</u> holding is "limited to the facts at issue there -- the 2000 presidential election"), <u>cert. denied sub nom.</u> <u>Wyatt v. Quarterman</u>, 548 U.S. 932 (2006); <u>Black v. Bell</u>, 181 F. Supp. 2d 832, 879 (M.D. Tenn. 2001) (rejecting petitioner's due process and equal protection claims that <u>Bush</u> establishes a new rule of law, to be applied retroactively, that would require Tennessee prosecutors to be guided by "hard and fast standards in determining whether to seek the death penalty").

The Tennessee Court of Criminal Appeals' decision is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Claim 19 is DENIED.

P.    <u>Burns' Death Sentence is Arbitrary (Claim 20)</u>

Burns alleges that his death sentence is arbitrary and violates the Eighth and Fourteenth Amendments because Burns was subjected to the death penalty, unlike Kevin Shaw, Richard Morris, Benny Buckner, Derrick Garrin, and Carlito Adams. (D.E. 8 at 50-51.) Respondent characterizes this issue as "another version of the attack on the discretion of prosecutors to seek the death penalty" addressed in Claim 19. (D.E. 58 at 44.) For the same reasons Claim 19 has been denied, <u>supra</u> pp. 113-16, this claim is without merit.

In response to the motion for summary judgment, Burns argues

116

that, by offering life pretrial and seeking death at trial, the
prosecution violated the Eighth Amendment proscription against the
arbitrary imposition of the death penalty in violation of both <u>Furman</u>
and <u>Gregg</u>. (D.E. 86 at 115-16.) This issue has been addressed in
discussing Claim 18, <u>supra</u> p. 112, and is without merit. For the same
reasons, Burns' argument supporting Claim 20 is without merit. Claim
20 is DENIED.

    Q.   <u>Burns' Conviction and Sentence Violate International
Law (Claim 21)</u>

Burns alleges that his rights under various treaties ratified
by the United States, entered into and signed by the President of the
United States, and his rights under customary international law have
been violated. (D.E. 8 at 51-56.)

The Tennessee Court of Criminal Appeals held:

> The petitioner asserts that Tennessee's imposition of the
> death penalty violates United States treaties as well as
> the Supremacy Clause of the United States Constitution. It
> appears that he argues that the Supremacy Clause was
> violated when his rights under treaties and customary
> international law to which the United States is bound were
> disregarded. Arguments that the death penalty is
> unconstitutional under international laws and treaties
> have systematically been rejected by the courts. *See* <u>State
> v. Odom</u>, 137 S.W.3d 572, 600 (Tenn. 2004). This claim is
> without merit.

<u>Burns</u>, 2005 WL 3504990, at *72.

The United States Supreme Court has not decided this question.
In a near-treatise on the subject, the Sixth Circuit dismissed a
similar challenge to the death penalty and held that the body of
customary international law to which the petitioner refers does not

117

render the death penalty unconstitutional. <u>Buell v. Mitchell</u>, 274 F.3d 337, 370-76 (6th Cir. 2001) ("To the extent that the [ICCPR[50]] ban[s] cruel and unusual punishment, the United States has included express reservations preserving the right to impose the death penalty within the limits of the United States Constitution."). The Tennessee Court of Criminal Appeals' determination is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Claim 21 is DENIED.

R.    <u>Actual Innocence (Claim 22)</u>

Burns alleges that he is actually innocent of felony-murder because he did not have the requisite intent to support the underlying felony of robbery. (D.E. 8 at 56.) He asserts that he is actually innocent of the death penalty because only one aggravating circumstance supports his death sentence and because he was not responsible for whatever harm threatened persons other than Dawson and/or Johnson during the incident. (<u>Id.</u>; D.E. 86 at 117.) Burns does not rely on newly discovered evidence to demonstrate his innocence. (D.E. 86 at 117.)

Respondent argues that Petitioner's claim is "a confused misstatement of his 'actual' position". (D.E. 58 at 46.) Respondent asserts that Burns' guilt is a matter determined by the state courts based on credible evidence and that Burns is attempting to "shoe-horn" his argument that he is unworthy of the death penalty into an

---

[50]     International Covenant on Civil and Political Rights ("ICCPR").

argument of innocence. (Id. at 46.)

The Tennessee Court of Criminal Appeals[51] addressed the issue of Burns' conviction and sentence based on sufficiency of the evidence. See Burns, 1997 WL 418492, at **6-7. It cited Jackson v. Virginia, in which the Supreme Court held that,

> in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 —- if the settled procedural prerequisites for such a claim have otherwise been satisfied -— the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt.

Jackson, 443 U.S. 307, 324 (1979). This standard requires a federal district court to examine the evidence in the light most favorable to the State. Id. at 324, 326 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume —- even if it does not affirmatively appear in the record —- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

The Tennessee Court of Criminal Appeals, expressly referring to Jackson, reviewed the evidence presented at trial and applied that clearly established precedent correctly and in an objectively reasonable manner. Burns, 1997 WL 418492, at **5-7. Viewed in the light most favorable to the prosecution, a rational juror could find Burns guilty of first degree murder beyond a reasonable doubt. The

---

[51]    The Tennessee Supreme Court did not specifically address the issue of the sufficiency of the evidence for Burns' conviction and sentence, but affirmed the Court of Criminal Appeals' decision. Burns, 979 S.W.2d at 286-88.

jury heard the testimony of all the witnesses. Any conflicts in that testimony were resolved against Burns. The testimony and evidence, including evidence identifying Burns as a participant in the robbery, identifying Burns as one of the shooters, and Burns' admission that he fired his gun three times, support the conviction of felony murder. The evidence that four young boys were playing basketball in the area where the shooting occurred established the aggravating circumstance allowing imposition of the death penalty. The Tennessee Court of Criminal Appeals' decision about the sufficiency of the evidence is neither contrary nor an unreasonable application of Supreme Court precedent and is based on a reasonable determination of the facts.

The Court must also determine the extent to which Burns may have a viable claim of actual innocence. "A claim of actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993). The actual innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. Bouseley v. United States, 523 U.S. 614, 623 (1998) ("It is important to note . . . that 'actual innocence' means factual innocence, not mere legal insufficiency."). The Herrera court noted that "a truly persuasive demonstration of 'actual innocence' made after a trial would render the execution of a defendant

120

unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417; <u>Wright v. Stegall</u>, 247 F. App'x 709, 711-12 (6th Cir. 2007). The threshold showing for such a right would "necessarily be extraordinarily high." <u>Id.</u> at 712. In <u>House v. Bell</u>, 547 U.S. 518, 554-55 (2006), the Supreme Court declined to decide whether freestanding innocence claims in death penalty cases are possible.

Burns contends that his claim is not barred under <u>Herrera</u> because it is not based on new evidence. (D.E. 86 at 117.) Burns asserts that his claim falls within the narrow exception to <u>Herrera</u> where a persuasive demonstration of actual innocence made after trial would render the petitioner's execution unconstitutional. (<u>Id.</u> at 117.) Because there was sufficient evidence to support Burns' conviction and sentence, the Court is not persuaded that Burns has demonstrated factual innocence. Claim 22 is DENIED.

S.    <u>Burns is Incompetent to Be Executed (Claim 23)</u>

Burns asserts that he will not comprehend the punishment he is to receive or the reason for it at the time of his execution. (D.E. 8 at 56-57.) In <u>Panetti v. Quarterman</u>, 551 U.S. 930, 947 (2007), the Supreme Court held that a petitioner's claim of incompetency to be executed because of his mental condition, based on <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986), is not a claim that must be brought in an initial habeas petition on pain of being treated as a second or successive petition. <u>See</u> <u>Tompkins v. Sect'y, Dept. of Corr.</u>, 557

121

F.3d 1257, 1258 (11th Cir. 2009). The setting of an execution date, which causes a <u>Ford</u> incompetency claim to become ripe, has not occurred in this case. <u>Panetti</u>, 551 U.S. at 942-43. The parties agree that this claim is not ripe for consideration. (D.E. 58 at 47; D.E. 86 at 151.) Claim 23 is not ripe for habeas relief and is DENIED.

      T.   <u>Cumulative Error (Claim 25)</u>

Burns alleges that "[t]o the extent this Court finds two or more constitutional errors, yet determines that those errors are individually harmless, the cumulative effect of those errors renders Burns' conviction and or death sentence unconstitutional." (D.E. 8 at 57.) Respondent contends that this claim was not properly exhausted in the state courts, is procedurally defaulted, and is without merit. (D.E. 58 at 15.) The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. <u>Lorraine v. Coyle</u>, 291 F.3d 416, 447 (6th Cir. 2002); <u>Moore v. Parker</u>, 425 F.3d 250, 256 (6th Cir. 2005); <u>Williams v. Anderson</u>, 460 F.3d 789, 816 (6th Cir. 2006)[52]. Claim 25 is DENIED.

V.   <u>CONCLUSION</u>

Because Burns' claims are noncognizable, devoid of substantive merit, or procedurally barred, disposition of this petition without an evidentiary hearing is proper. Rule 8(a), Section 2254 Rules.

---

[52]    The Sixth Circuit in <u>Williams</u> notes that the Supreme Court has repeatedly stated that fundamentally unfair trials violate due process and notes that "common sense dictates that cumulative errors can render trial fundamentally unfair." <u>Id.</u> The Court further states, "Nonetheless, the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue. No matter how misguided this case law may be, it binds us." <u>Id.</u> (citations omitted).

Respondent's motion for summary judgment is GRANTED. The petition is DENIED in its entirety and DISMISSED.

VI.    <u>APPELLATE ISSUES</u>

The Court must also determine whether to issue a certificate of appealability ("COA"). Twenty-eight U.S.C. § 2253(a) requires a district court to evaluate the appealability of its decision dismissing a § 2254 habeas petition and to issue a certificate of appealability ("COA") only if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); <u>see also</u> Fed. R. App. P. 22(b); <u>Lyons v. Ohio Adult Parole Auth.</u>, 105 F.3d 1063, 1073 (6th Cir. 1997)(district judges may issue certificates of appealability). No § 2254 petitioner may appeal without this certificate.

In <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" <u>Slack</u>, 529 U.S. at 484 (quoting <u>Barefoot</u>, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of certificates of appealability:

> [O]ur opinion in <u>Slack</u> held that a COA does not require a showing that the appeal will succeed. Accordingly, a court

of appeals should not decline the application of a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "'has already failed in that endeavor.'"

Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (quoting Barefoot, 463 U.S. at 893). Thus,

[a] prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. . . . We do not require petitioners to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also id. at 342 (cautioning courts against conflating their analysis of the merits with the decision of whether to issue a COA; "The question is the debatability of the underlying constitutional claim, not the resolution of that debate.").[53]

In this case, reasonable jurists could differ about the issue of ineffective assistance of counsel at sentencing. The Court GRANTS a limited certificate of appealability on that issue. Reasonable jurists could not disagree about the remaining issues. The Court

---

[53]    The Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." Id. at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." Id.

DENIES a certificate of appealability on the remaining issues in the petition.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2254 petitions. Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal in forma pauperis in a § 2254 case, and thereby avoid the $455 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, Petitioner must seek permission from the district court under Federal Rule of Appellate Procedure 24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, Petitioner must file his motion to proceed in forma pauperis in the appellate court. See Fed. R. App. P. 24(a)(4)-(5).

The Court CERTIFIES, pursuant to Fed. R. App. P. 24(a), that an appeal in this matter would be taken in good faith to the extent the appeal addresses the issue of ineffective assistance of counsel at sentencing. An appeal that does not address the issue of ineffective assistance of counsel at sentencing is not certified as taken in good faith, and Burns should follow the procedures of Fed. R. App. P. 24(a)(5) to obtain in forma pauperis status.

IT IS SO ORDERED this 22nd day of September, 2010.


<u>s/Samuel H. Mays, Jr.</u>
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE