# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  April 13, 2022

Mr. Nicholas White Spangler
Office of the Attorney General of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207

Mr. Richard L. Tennent
Federal Public Defender's Office
810 Broadway, Suite 200
Nashville, TN 37203

Re:  Case Nos. 11-5214/14-6089, *Kevin Burns v. Tony Mays*
Originating Case No. : 06-02311

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Thomas M. Gould

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

KEVIN B. BURNS,

                  *Petitioner-Appellant,*

    *v.*

TONY MAYS, Warden,

                  *Respondent-Appellee.*

Nos. 11-5214/14-6089

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 06-02311—Samuel H. Mays, Jr., District Judge.

Argued: February 5, 2020

Decided and Filed: April 13, 2022

Before: BATCHELDER, COOK, and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Richard Lewis Tennent, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellant. Nicholas W. Spangler, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Richard Lewis Tennent, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellant. Nicholas W. Spangler, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

      BATCHELDER, J., delivered the opinion of the court in which COOK, J., joined. STRANCH, J. (pp. 12–29), delivered a separate dissenting opinion.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge.    Kevin Burns, with five accomplices, approached a car in which Damond Dawson, Tracy Johnson, Eric Thomas, and Tommie Blackman were drinking gin and smoking marijuana.    Looking for a fight due to some earlier slight, Burns and his accomplices robbed the four occupants of the car, and then began shooting them, killing two.    Blackman escaped with a minor gunshot wound.    Thomas, despite having been shot several times, managed to survive and his testimony played an instrumental role in the trials of Burns and his accomplices.    Burns was convicted on two counts of felony murder, receiving a death sentence for the murder of Dawson and a life sentence for the murder of Johnson.    In this capital habeas appeal, Burns claims that he received ineffective assistance of counsel at the sentencing stage, and that the State of Tennessee wrongfully relied on inconsistent testimony and knowingly presented false testimony at the guilt stage.    We AFFIRM the judgment of the district court.

## I.

On federal habeas review, "[t]he state court's factual findings enjoy a presumption of correctness, and will only be disturbed upon clear and convincing evidence to the contrary." *England v. Hart*, 970 F.3d 698, 706 (6th Cir. 2020).    On direct appeal, the Tennessee Supreme Court made the following findings of fact:

> On April 20, 1992, four young men, Damond Dawson, Tracey Johnson, Eric Thomas, and Tommie Blackman, were sitting in a car in Dawson's driveway in Memphis.    Dawson was in the driver's seat, Johnson was in the front passenger seat, Thomas was in the back seat behind Dawson, and Blackman was in the back seat behind Johnson.
>
> The defendant, Kevin Burns, and Carlito Adams, who knew Blackman, walked up to the passenger side of the car.    Adams pulled out a handgun and told Blackman to get out of the car.    When Blackman refused, Burns pulled out a handgun and went around to the driver's side of the car.    Blackman got out of the car and fled. Adams said "get him," and three or four more men appeared from behind hedges and fired at Blackman.

Eric Jones, age fourteen, was playing basketball at Dawson's house with three friends. Jones saw the men in the car removing jewelry and pulling money from their pockets. Seconds later, Jones saw Blackman running toward him. Amidst gunshots, Jones and Blackman escaped to the back of the house; Jones' three friends ran to an adjacent yard. Once inside the house, Jones heard seven or eight more gunshots.

Mary Jones, Eric Jones' mother, lived across the street from the Dawsons. She saw Adams shoot Johnson once in the chest. She saw Kevin Burns shoot Dawson several times, walk to the front of the car, and then shoot Dawson again. Ms. Jones unequivocally identified Burns and stated that she got "a real good look in his face" as he ran toward her after the shootings.

Tracey Johnson died at the scene. Damond Dawson, who suffered five gunshots to his arm, buttocks, chest, and hip was alive when police arrived but died after being transported to the hospital. Eric Thomas, who sustained gunshots to his chest and stomach, survived and made a photo identification of Kevin Burns two days after the incident. Thomas testified that Burns and the others had "opened fire" after robbing him and his friends of their jewelry and money. Thomas said that he initially told police he had been shot by Adams, but explained that he believed he was going to die and gave police the only name he knew, which was Adams.

On June 23, 1992, Burns was found in Chicago and arrested. After being advised of his rights and signing a waiver, the defendant gave a statement in which he admitted his role in the killings. [Burns] said that he had received a telephone call from Kevin Shaw, who told him that four men had "jumped" Shaw's cousin. Burns, Shaw, and four others intended to fight the four men, and Shaw gave Burns a .32 caliber handgun. As the others approached a car with four men sitting in it, Burns stayed behind. He heard a shot, saw a man running across the yard, and fired three shots. He then left the scene with the other men.

*State v. Burns*, 979 S.W.2d 276, 278 (Tenn. 1998).

The Tennessee jury convicted Burns of two counts of felony murder and two counts of attempted felony murder. *Id*. at 277. "The jury imposed the death penalty for one of the felony murder convictions after finding that evidence of an aggravating factor—that the defendant knowingly created a great risk of death to two or more persons other than the victim murdered— outweighed the evidence of mitigating factors beyond a reasonable doubt." *Id*. The jury imposed a life sentence for the other felony-murder conviction. The Tennessee Court of Criminal Appeals affirmed the two felony-murder convictions and corresponding sentences but reversed the attempted-felony-murder convictions. *Id*. The Tennessee Supreme Court affirmed

the judgment of the Court of Criminal Appeals, *id*. at 278, noting, among other things, that the reversal of the attempted felony murder convictions was correct because in Tennessee, as in most jurisdictions, "the offense of attempted felony murder does not exist," *id*. at 280, but that reversal of the conviction on those counts "does not affect the jury's finding regarding the aggravating circumstance," *id.* at 281.

In 2006, Burns filed his petition for a writ of habeas corpus, under 28 U.S.C § 2254, alleging roughly two dozen grounds for relief. In 2010, the district court dismissed the petition as meritless, but granted a certificate of appealability ("COA") for only the issue of ineffective assistance of counsel at sentencing. On February 3, 2013, we granted a COA for additional issues: "(1) whether the State improperly relied on inconsistent statements from a witness concerning who shot him; (2) whether the State knowingly presented false testimony; (3) whether women were improperly under-represented in being appointed as the foreperson for Shelby County, Tennessee grand juries; and (4) whether ineffective assistance by counsel in state post-conviction proceedings can constitute cause to excuse Burns's procedural default of a claim." On July 18, 2013, we remanded Burns's case for further consideration in light of two recent Supreme Court decisions, *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). On August 6, 2014, the district court concluded that neither *Martinez* nor *Trevino* provided a basis for granting Burns habeas relief and again denied his § 2254 petition. The district court denied Burns's motion to expand the COA, and we likewise denied him a COA to appeal the denial of relief based on *Martinez* and *Trevino*. In a subsequent motion, Burns sought a COA for several additional issues, and we denied that motion.

In this capital habeas appeal, Burns pursues only two of his claims: (1) that he received ineffective assistance of counsel at the sentencing stage, and (2) that the State of Tennessee wrongfully relied on inconsistent testimony and presented false testimony. Burns waived two other issues that were available on appeal: whether there was an underrepresentation of women in Shelby County, Tennessee, grand juries and whether his receiving ineffective assistance of counsel can constitute cause to excuse his procedural default of a claim.

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), governs habeas petitions.  Section 2254(d) states that we may grant a habeas petition filed by a state prisoner with respect to "any claim that was adjudicated on the merits in State court proceedings," only if: (1) the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) the state court decision was "based on an unreasonable determination of the facts" in light of the record before it. § 2254(d)(1)–(2).  AEDPA imposes on federal courts a highly deferential standard of review of state court judgments.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[AEDPA] is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" (citations omitted)).

"We review the district court's factual findings for clear error, and its legal conclusions de novo."  *Hart*, 970 F.3d at 706.  "The state court's factual findings enjoy a presumption of correctness, and will only be disturbed upon clear and convincing evidence to the contrary."  *Id*.

## III.  Ineffective Assistance of Counsel

Burns claims that he received ineffective assistance of counsel during the sentencing phase of his trial.  The state trial court, the Tennessee Court of Criminal Appeals, and the district court each concluded that this claim was meritless.  Burns makes two arguments on appeal: (1) that trial counsel failed to present evidence at sentencing that Burns did not shoot one of the victims, namely Dawson, and (2) that trial counsel's performance was unreasonable and deficient because counsel failed to further cross-examine some witnesses, to call other witnesses, and to accurately portray Burns's upbringing and background.

### A.  "Residual Doubt" Evidence at Sentencing

Burns argues that his trial counsel could have introduced evidence that Burns did not actually fire a shot that hit Dawson.  This would support his contention that, had that been presented (or available) at sentencing, it would have made the jury less likely to sentence him to death, rather than to life in prison.  The State responds that this issue was not included in the

COA and thus is not reviewable in this appeal. Burns's brief on appeal, which is no model of clarity, allows two possible constructions. Under one, Burns points to his counsel's failure to present evidence during the guilt phase that Burns's shot did not hit Dawson (notwithstanding the felony murder convictions) and attributes to that failure (i.e., that absence of evidence) his sentencing counsel's inability to argue a lesser culpability theory at sentencing. That is not a claim of ineffective assistance during the sentencing phase, and it is not within the COA.

Under the other construction, Burns claims that his counsel should have introduced evidence at sentencing (despite its absence from the guilt phase) that, contrary to the jury's verdict, Burns did not actually shoot Dawson. This is commonly referred to as "residual doubt" evidence and this claim necessarily fails because Burns has no constitutional right to present residual doubt evidence at sentencing. *Oregon v. Guzek*, 546 U.S. 517, 525 (2006).

It is true that a state's death penalty statute must permit the defendant to introduce mitigating factors, including "consideration of a defendant's comparatively minor role in the offense[] or age." *Lockett v. Ohio*, 438 U.S. 586, 608 (1978). But the Supreme Court has also made it clear that it "ha[s] *not* interpreted the Eighth Amendment as providing a capital defendant the right to introduce at sentencing evidence designed to cast 'residual doubt' on his guilt of the basic crime of conviction." *Guzek*, 546 U.S. at 525.

The antecedent question, therefore, is whether this evidence—had his counsel attempted to introduce it at sentencing—would have been residual-doubt evidence. Clearly, it would have been. Burns himself, in his briefing here, frames his argument as one that addresses his guilt rather than a mitigating factor: "It was an unreasonable application of clearly established law to conclude that, had Burns's attorneys cast doubt on whether he killed Dawson and shot Thomas, this would not have influenced the jury's sentencing decision."

Evidence offered to undermine the prosecution's case, which led to the conviction, is the essence of residual-doubt evidence and the Court has never established that a capital defendant such as Burns has a constitutional right to introduce such evidence at sentencing. *Guzek*, 546 U.S. at 525. Because the Court has never established such a right, counsel did not err by failing to pursue the introduction of that residual-doubt evidence at sentencing, and Burns cannot

demonstrate ineffective assistance of counsel in this respect. *See Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984) (defining ineffective assistance of counsel as a showing that "counsel's representation fell below an objective standard of reasonableness" and that the "deficiencies in counsel's performance [were] prejudicial to the defense").

### B. Cross Examination and Background Evidence at Sentencing

Burns's other claims of ineffective assistance are that his counsel, at sentencing, failed to appropriately cross-examine certain witnesses, failed to call certain other witnesses, and failed to present evidence that accurately showed Burns's background. Burns's specific arguments regarding the witnesses are that his counsel: (1) should have impeached Thomas's identification of Burns as one of the shooters; (2) should not have questioned Mary Jones, a witness to the murders, in a way that led her to identify Burns, but once she made that identification, should have impeached her testimony; and (3) should have called additional witnesses to rebut Jones's identification of Burns as the shooter. As we have already explained, if these accusations are directed to counsel's conduct during the guilt phase, then they are not included in the COA. And if these accusations are directed at counsel's conduct during sentencing, the substance of that conduct clearly goes to guilt rather than mitigation and is therefore residual-doubt evidence, which the capital defendant has no constitutional right to present at sentencing.

Burns's last claim of ineffective assistance does sound in mitigation: that his sentencing counsel failed to adequately investigate his background or present an accurate portrayal of him to the jury, including the many hardships he suffered and overcame. But the record reflects that counsel did investigate and was told by Burns's parents that Burns had a normal childhood. Also, some witnesses whom counsel wanted to call were told by Burns's mother not to testify. Therefore, the information relayed to counsel from Burns's parents told a different story from the one Burns presents today.

A fair reading of the record shows that Burns's sentencing counsel did "a fair amount of investigation in preparation for the mitigation phase." *West v. Bell*, 550 F.3d 542, 555 (6th Cir. 2008). Counsel met with Burns's mother and father on several occasions and talked to Burns's parents about his background, his family history, any problems he had as a child, and his

education.[1]  Counsel hired a private investigator to find supporting witnesses, evaluate them, and persuade them to testify on behalf of Burns.  And, after Burns's mother prevented other family members from assisting counsel's investigation, counsel procured mitigation witnesses from the jail where Burns was held.

The result was that counsel's investigation did not uncover anything that "should have prompted further investigation."  *Jackson v. Warden, Chillicothe Corr. Inst.*, 622 F. App'x 457, 464 (6th Cir. 2015).  Burns's parents did not say anything to counsel that suggested a traumatic childhood or that problems during Burns's childhood influenced his actions.  In fact, the evidence obtained suggested the opposite: Burns was an honor roll student; he was involved in church; and the mental health report revealed no mental health issues.[2]

To be sure, during post-conviction proceedings, it was revealed that Burns's father had a second family.  But sentencing counsel already knew that Burns's father had a second family and counsel did not think that fact required further investigation because Burns's mother exercised more influence and control over Burns than did his father, who, according to sentencing counsel, had little influence over Burns.  Under *Strickland*, we defer to informed decisions such as the one sentencing counsel made here.  466 U.S. at 691.

Burns's counsel was also concerned about opening the door for the State to introduce evidence about Burns's criminal history.[3]  This limited the background information that counsel

---

[1]At the post-conviction hearing, Burns's mother testified that she met with counsel on several occasions, but she could not recall whether they discussed Burns's family history or background.

[2]At the post-conviction hearing, Burns's counsel testified that in capital cases, mental health reports typically include an accompanying letter that indicates whether the defendant suffers from a mental illness.  If it is determined that the defendant suffers from a mental illness, the letter will indicate that, even if the mental health report finds the defendant competent to stand trial.  Here, the mental health report found Burns competent to stand trial, and the accompanying letter did not indicate that Burns suffered from mental illness caused by past trauma.

[3]Counsel's concern proved prescient.  During the sentencing phase, counsel called Phillip Carter, Burns's brother, as a character witness who testified regarding his relationship with Burns, Burns's religious devotion, and his general character.  The State approached the bench, asking to introduce evidence about Burns's criminal history to impeach Carter's credibility.  After deliberations with the judge outside the jury's presence, Burns's counsel, to avoid opening the door for the State to present damaging evidence of Burns's criminal history to the jury, agreed not to present further testimony about Burns's general good character.

could introduce without risking the State's providing character witnesses who could be harmful to Burns's case. Burns's counsel instead adopted a strategy of focusing on Burns's religious background and other signs of good character. *Burns*, 979 S.W.2d at 279.

In conducting this assessment, with "a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691, we must recognize that Burns's criminal history was not meager—it included multiple arrests for burglary and illegal gun possession, multiple charges for burglary and theft, and a theft conviction, all of which occurred after Burns turned 18. Counsel's deliberate decision not to pursue further investigation to prevent introduction of this damaging evidence is a legitimate, reasonable, and well-recognized strategy. *See Darden v. Wainwright*, 477 U.S. 168, 186–87 (1986); *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (counsel need not "mount an all-out investigation into petitioner's background" if supported "by reasonable professional judgment").

Hence, a difference of opinion regarding which approach would have been the better strategy at sentencing is not sufficient to support an ineffective-assistance-of-counsel claim. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681. Moreover, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* at 691.

Finally, Burns argues that sentencing counsel should have completed a more thorough investigation to develop mitigation evidence. But this ignores the fact that Burns's mother limited the extent of counsel's investigation by preventing family members and friends from assisting that investigation. In fact, she made herself such an obstacle to the investigation that counsel had to resort to procuring mitigation witnesses from the jail where Burns was held. Counsel was far from unreasonable—and, in fact, was commendably diligent—considering Burn's mother's interference with the investigation.

All told, Burns's sentencing counsel was not objectively unreasonable in how they conducted the mitigation investigation or in their strategic decision not to pursue a narrative that

risked opening the door to character evidence that counsel believed could have harmed Burns in the eyes of the jury. Therefore, Burns cannot demonstrate ineffective assistance of sentencing counsel.

### IV. Due Process Claims

Burns claims that the State violated the Due Process Clause when it used inconsistent testimony and when it relied upon false testimony. Both claims rest on whether the government could rely on testimony of a witness who allegedly contradicted that witness's testimony in the earlier trial of Derrick Garrin, one of Burns's accomplices. The State disputes whether the statements are, in fact, inconsistent, and if so, whether that inconsistency violates the Due Process Clause. Because the record reveals that Burns has the facts wrong, and our analysis concludes that he has the law wrong, we must reject both his inconsistent-testimony and false-testimony claims.

Factually, it is debatable whether the witness's testimony is inconsistent or false. At Garrin's trial, Eric Thomas (one of the two surviving victims) testified that the "big fellow in glasses" shot him and Dawson, and the prosecution argued that Garrin was the "big fellow." At Burns's trial, Thomas identified "Picture No. 5" as the individual who shot him and Dawson, and the prosecution later showed that Burns was the individual in "Picture No. 5." The Tennessee Court of Criminal Appeals held that the State had not suborned perjury nor was it clear that Thomas had even perjured himself. *Burns*, 2005 WL 3504990, at *47. Burns argues that it is impossible to reconcile the claim that Garrin was the "big fellow" who shot Thomas and Dawson as the government argued at Garrin's trial, with the claim that Burns shot Thomas and Dawson as the government argued at Burns's trial. The government argues that the statements Thomas gave at the two trials are not necessarily irreconcilable: it is possible that more than one person— not only the "big fellow with glasses"—shot Dawson and Thomas. Moreover, even if the statements were irreconcilable, it is not clear which statement would be false; it is possible Thomas's testimony at the Garrin trial, as opposed to his testimony at the Burns trial, was false, in which case Burns would not be prejudiced and would have no grounds to challenge the former testimony.

Legally, the government may use different strategies in different trials. *Bradshaw v. Stumpf*, 545 U.S. 175, 186–87 (2005) (finding that the "Court of Appeals was also wrong to hold that prosecutorial inconsistencies between the Stumpf and [his accomplice] cases required voiding Stumpf's guilty plea," though the Court expressed "no opinion on whether the prosecutor's actions amounted to a due process violation" affecting Stumpf's sentence); *Stumpf v. Robinson*, 722 F.3d 739, 750 (6th Cir. 2013) (en banc) ("The mere fact that the State argued for different inferences in different cases does not make either argument so unfair that it violates the Due Process Clause."); *Blalock v. Wilson*, 320 F. App'x 396, 417–18, 418 n.26 (6th Cir. 2009) (finding that "the prosecutor took unconstitutionally inconsistent positions in two separate trials," but holding that there was no "'clearly established' Supreme Court or Sixth Circuit precedent, including *Bradshaw*, showing that such a prosecutorial strategy would violate a defendant's due process rights"); *see also Fotopoulos v. Sec., Dep't of Corr.*, 516 F.3d 1229, 1235 (11th Cir. 2008) (finding that "the *Bradshaw* Court did not hold that the use of inconsistent theories in the prosecution of two defendants violates the right to due process"). Even if Thomas's statements in the Garrin trial and the Burns trial were inconsistent, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989). And this is not a situation where the State is seeking to convict two defendants for an offense that only one person could commit. *See In re Sakarias*, 106 P.3d 931, 944 (Cal. 2005).

In short, Burns fails to establish (1) that the testimony was actually inconsistent or false, (2) that even if the statements were inconsistent, that it was the testimony in Burns's trial (as opposed to Garrin's trial) that was false, (3) that the government knew that the testimony was false, (4) that the government's taking inconsistent positions at different trials is a due-process violation, or (5), even if there were clearly established federal law supporting Burns's claim, that the state court was unreasonable in rejecting that claim. On the whole, Burns cannot demonstrate a due process violation on this basis.

## V. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

### DISSENT

---

JANE B. STRANCH, Circuit Judge, dissenting.  Investigation is at the heart of the Sixth Amendment right to counsel.  In a capital trial it may be the difference between life or death. The Supreme Court has held—time and again—that investigation must precede and inform trial strategy, and that trial counsel has a duty to pursue promising leads.  *E.g.*, *Strickland v. Washington*, 466 U.S. 668 (1984).  At issue here is trial counsel's constitutional duty to investigate, prepare for, and present a mitigation case at the penalty phase of Kevin Burns's capital trial.  In Burns's capital trial, the penalty-phase strategy, if one existed at all, was an afterthought—assembled in the few hours between the guilty verdict and the start of the penalty phase.  Despite readily available evidence that Burns suffered abuse and neglect as a child, counsel presented none of this evidence to the sentencing jury.  Instead, counsel called six lay witnesses to testify to Burns's good character, amounting to only 14 pages of transcript.  Had trial counsel investigated and presented an accurate narrative of Burns's traumatic family history, there is a reasonable probability that at least one juror would have voted for life instead of death. The conclusion of the Tennessee Court of Criminal Appeals ("TCCA") to the contrary rests on an unreasonable determination of the facts in the record, and significant errors of constitutional law regarding counsel's duty to investigate, entitling Burns to resentencing.  The majority fails to engage with the substantial mitigation evidence presented during Burns's postconviction proceedings but never presented at trial.  Like the TCCA, the majority ignores the record and fails to apply binding Supreme Court precedent.  I respectfully dissent because I would remand to the state court for a new penalty-phase trial.

To prevail on his *Strickland* claim, Burns "must show that counsel's performance was deficient[.]"  *Strickland*, 466 U.S. at 687.  In other words, he must show that it "fell below an objective standard of reasonableness."  *Id.* at 688.  Under *Strickland*, "counsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary."  *Id.* at 691.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations

on investigation." *Id.* at 690–91. The record belies the majority's conclusion that Burns's counsel made an informed, strategic decision to present only evidence of Burns's religious background and previous reputation as a "good guy," and to omit all evidence of his disturbing and troubled family history. Counsel's investigation in preparation for the mitigation case was wholly inadequate and prejudiced Burns.

## A. DEFICIENT PERFORMANCE

### 1.  Counsel Failed to Timely or Adequately Prepare for the Penalty Phase of Trial

The totality of trial counsel's mitigation investigation and preparation amounted to subpoenaing a dozen lay witnesses—primarily friends, family members and acquaintances gathered by Burns's mother—to the courthouse after the conclusion of the guilt-phase trial. Although the subpoenas were served by an investigator before trial, counsel did not recall interviewing any mitigation witnesses prior to the start of the penalty phase, nor preparing any penalty-phase witnesses to testify. While counsel had previously spoken with Burns's parents about plea negotiations, counsel did not discuss mitigation with Burns's parents, nor prepare them to take the witness stand.

After the guilt-phase verdict, the trial court asked counsel how many witnesses Burns would call at the penalty phase. Counsel answered that he did not yet know, and left the courtroom to figure it out. Trial counsel then, *for the first time*, spoke to the mitigation witnesses who had been subpoenaed to the courthouse. Counsel described the preparation for the penalty phase, which undisputedly commenced after the jury rendered a guilty verdict, as follows:

> The best of my recollection is we had about twelve individuals here [at the courthouse], and I think this subpoena reflects maybe fourteen people I think, and it was [a] decision after talking to all of the people that were here and talking to Mr. Burns and talking to his parents, which ones we wanted to use, which ones were the best witnesses, which ones we thought would be more convincing to the jury and whether some were redundant.

Counsel then "chose to testify . . . the ones who could say the most positive things about Mr. Burns, that is, he was a decent human being, and basically who deserved to live in their opinion." Six mitigation witnesses were called to the stand.

The undisputed timeline contradicts the TCCA's factual conclusion that trial counsel conducted a mitigation investigation and developed a theory based on that investigation. The jury rendered a guilty verdict at 4:20 p.m. When proceedings resumed that same evening after a short break, the prosecution put on two victim-impact witnesses. Defense counsel then called a church elder and two prison officials who testified very briefly about Burns's religiosity. Burns's brother did the same. His mother and father also took the stand to tell the jury that they loved Burns and that he was a good son. Following is the TCCA's summary of the defense testimony in mitigation:

> During the sentencing portion of the petitioner's trial, counsel presented the testimony of six witnesses. *See Burns,* 979 S.W.2d at 279. Leslie Burns, the petitioner's mother, testified that he was twenty-six years of age, had twelve brothers and sisters, had graduated from high school, and had presented no disciplinary problems while in school. *Id.* His father, Obra Carter, testified that his son had always been obedient and well-mannered. *Id.* Phillip Carter, the petitioner's half-brother, testified that the petitioner had been active in church and had always tried to avoid trouble. *Id.* Norman McDonald, the petitioner's Sunday School teacher, testified that the petitioner was a "faithful" young man who attended church regularly. *Id.* Mary Wilson, a captain with the Shelby County Sheriff's Department, and Bennett Dean, a volunteer chaplain, both testified that the petitioner had actively participated in religious services while in custody for these offenses. *Id.* The petitioner complains that this evidence "failed to say much, if anything, about Kevin Burns."

*Burns v. State*, No. W2004-00914-CCA-R3-PD, 2005 WL 3504990, at *62–63 (Tenn. Crim. App. Dec. 21, 2005). The total mitigation case amounted to less than 14 transcript pages—an average of 2.5 transcript pages per witness. The entire penalty-phase trial—instructions, proof, and argument—was over by 9:20 p.m., a mere five hours after the jury returned its guilt-phase verdict.

The Sixth Amendment guarantees capital defendants the effective assistance of counsel during the penalty phase of trial. This right includes counsel's "obligation to conduct a thorough investigation of the defendant's background," *Williams v. Taylor*, 529 U.S. 362, 396 (2000), so as "to uncover and present . . . mitigating evidence" to the jury at sentencing. *Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *see also Andrus v. Texas,* 140 S. Ct. 1875, 1881 (2020); *Sears v. Upton*, 561 U.S. 945, 956 (2010) (per curiam); *Porter v. McCollum*, 558 U.S. 30, 39–41 (2009)

(per curiam); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005). Likewise, our court has repeatedly found investigation into background and family history to be an important mitigation factor. *See, e.g.*, *Harries v. Bell*, 417 F.3d 631, 639 (6th Cir. 2005) (family violence and instability in the home relevant mitigating evidence); *Hamblin v. Mitchell*, 354 F.3d 482, 490 (6th Cir. 2002) (same).

The mitigation case put forth by Burns's counsel falls short of the investigations undertaken in a number of cases where the Supreme Court found counsel's performance deficient. In *Williams*, counsel began to prepare for its mitigation case a week before trial, 529 U.S. at 395; here, counsel waited until the guilt phase had concluded and the mitigation phase was set to begin. Like *Wiggins*, Burns's "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources," 539 U.S. at 524–25, with no sign that counsel obtained and reviewed Burns's medical, educational, and employment records. Rompilla's trial counsel consulted experts for mitigation purposes but failed to present the jury with more than a "few naked pleas for mercy." *Rompilla*, 545 U.S. at 390–91. Porter's counsel failed to unearth mitigating details concerning his mental health, military service, and discipline at the hand of his father. *Porter*, 558 U.S. at 39–40; *see also Foust v. Houk*, 655 F.3d 524, 536 (6th Cir. 2005). In *Andrus*, trial counsel missed stockpiles of mitigating evidence, presenting instead a rosy and one-dimensional portrait of Andrus's youth. 140 S. Ct. at 1882–84; *see also Greer v. Mitchell*, 264 F.3d 663, 677–79 (6th Cir. 2001). Counsel's investigation here also fell short of the investigation we found to be deficient in *Harries*:

> [W]e cannot escape the conclusion that Harries's counsel failed to conduct a constitutionally adequate investigation. Counsel limited their investigation to contacting by telephone Harries's mother and brother, sending requests for information to some of the institutions in which Harries had been confined, and interviewing Harries's codefendant, and two state witnesses. Although counsel requested two court-ordered competency evaluations, they declined to seek the assistance of a mental health expert or conduct a thorough investigation of Harries's mental health, even after Harries's mother alerted them that Harries suffered from mental illness. Nor did counsel adequately investigate Harries's family background, despite indications of Harries troubled childhood.

417 F.3d at 638.  The TCCA found counsel's investigation into Burns's past adequate, as does the majority.  Under both Supreme Court precedent and our caselaw, it clearly was not.

The Supreme Court has looked to the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines") to determine what constitutes objectively reasonable performance.  *Wiggins*, 539 U.S. at 524. Under these professional guideposts, "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  *Id.* (quoting ABA Guidelines 11.4.1(C) (1989)).

The reasonableness of trial counsel's investigation is assessed from counsel's perspective at the time and in light of contemporaneous professional norms.  *Hinton v. Alabama*, 571 U.S. 263, 273 (2014); *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010).  At the time of Burns's trial, it was commonly accepted, as reflected in the 1989 ABA Guidelines, that capital defense lawyers were obligated to investigate and prepare for a penalty phase presentation long before the case went to trial.  *Rompilla*, 545 U.S. at 387 n.7; *Wiggins*, 539 U.S. at 524.  The ABA Guidelines in place at the time of Burns's trial stated that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial.  *Both investigations should begin immediately upon counsel's entry into the case* and should be pursued expeditiously."  ABA Guideline 11.4.1 (1989) (emphasis added).  ABA Guideline 10.7 states that counsel has "an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."  The commentary to this guideline clarifies that this investigation should include "members of the client's immediate and extended family;" medical history, which includes physical injury and neurological damage; and "family and social history," which includes "physical . . . abuse, . . . domestic violence [and] exposure to criminal violence."

Based on trial counsel's deficient performance in the penalty phase under the then-prevailing law and norms, Burns alleged in the postconviction proceedings in Tennessee state court that his counsel had been ineffective during the penalty phase for failing to investigate, discover, and present readily available mitigation evidence concerning his chaotic and traumatic

childhood. Burns was granted an evidentiary hearing, during which he presented extensive mitigation evidence and the testimony of expert psychologists, none of which were presented at trial. The contrast between the evidence presented at the evidentiary hearing and the evidence presented by trial counsel is stark, and demonstrates that trial counsel failed to investigate even the most basic information about Burns and his background.

Among the most significant information omitted in the mitigation case due to counsel's failure to uncover it was the fact that Burns's father, Obra Carter, had a second family that also lived in West Memphis, a situation known to everyone in the Burns's family and much of the community. Knowing this fact would have put effective counsel on notice that further investigation into Burns's home life during childhood was required, and that expert witnesses such as a social worker and a psychologist or psychiatrist would be needed to explain the repercussions suffered by family members living in such an environment. The embarrassment and anger suffered by Burns's mother, Leslie, due to the fact that Obra had a wife and other children elsewhere in the city manifested as an inability to care for her many children. Also significant is the fact that Obra physically and mentally abused Leslie, abuse continuously viewed by her children, including Burns. As demonstrated by postconviction counsel, minimal investigation into Burns's family circumstances would have presented to the jury a much different, and likely more sympathetic, picture of Burns, starkly contrasting with the rosy picture painted by his parents and the other lay witnesses approved by Burns's mother.

If trial counsel had not been constitutionally inadequate, Burns's sentencing jury would have also learned, among many more life-history details, that Burns lived in eight different houses and apartments before the age of 12; that he took care of his nine siblings, including a severely handicapped older brother; that his father would come to his second family's home only to physically and emotionally abuse Burns, his siblings and their mother; and that Burns's father broke his mother's jaw in the family home, landing her in the hospital for three weeks and in a brace for four months.

In contrast, the evidence given by lay witnesses focused on the fact that Burns was a good guy with a normal upbringing. None of the six witnesses at the penalty phase testified about Burns's troubled childhood, and, even if they had been questioned about the circumstances

of Burns's childhood, they were not equipped to testify about the psychological problems stemming from Burns's troubled background. Experts, such as a social worker and a mental-health professional, would have explained how the family dysfunction affected Burns in his formative years and shaped him as an adult. Despite the availability of funding to procure experts at the mitigation phase, Burn's trial counsel nevertheless relied solely upon the services of a private investigator, not a mitigation specialist or mental-health expert.

In *Andrus*, the Supreme Court held that the quantity and character of mitigation evidence presented in postconviction proceedings, when compared to that presented by trial counsel, unmistakably demonstrated ineffective assistance of counsel. In a passage that bears a striking resemblance to the record in Burns's case, the Court reasoned:

> Although counsel nominally put on a case in mitigation in that counsel in fact called witnesses to the stand after the prosecution rested, the record leaves no doubt that counsel's investigation to support that case was an empty exercise.
>
> To start, counsel was, by his own admissions at the habeas hearing, barely acquainted with the witnesses who testified during the case in mitigation. Counsel acknowledged that the first time he met Andrus' mother was when she was subpoenaed to testify, and the first time he met Andrus' biological father was when he showed up at the courthouse to take the stand. Counsel also admitted that he did not get in touch with the third witness until just before *voir dire*, and became aware of the final witness only partway through trial. . . . [C]ounsel did not prepare the witnesses or go over their testimony before calling them to the stand.
>
> Over and over during the habeas hearing, counsel acknowledged that he did not look into or present the myriad tragic circumstances that marked Andrus' life. . . . Instead, he "abandoned his investigation of Andrus' background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. On top of that, counsel "ignored pertinent avenues for investigation of which he should have been aware," and indeed was aware. . . . Yet counsel disregarded, rather than explored, the multiple red flags. . . . The untapped body of mitigating evidence was, as the habeas hearing revealed, simply vast.
>
> Despite repeated questioning, counsel never offered, and no evidence supports, any tactical rationale for the pervasive oversights and lapses here. Instead, the overwhelming weight of the record shows that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526.

140 S. Ct. at 1882–83 (cleaned up). Andrus also argued, like Burns here, that trial counsel's brief mitigation case, and its presentation of his upbringing as a normal and pleasant one when it was not, served to increase the jury's assessment of his moral culpability. The Court agreed:

> No doubt due to counsel's failure to investigate the case in mitigation, much of the so-called mitigating evidence he offered unwittingly aided the State's case in aggravation. Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment.
>
> The testimony elicited from Andrus' mother best illustrates this deficiency. First to testify during the case in mitigation, Andrus' mother sketched a portrait of a tranquil upbringing, during which Andrus got himself into trouble despite his family's best efforts. . . . Even though counsel called Andrus' mother as a defense witness, he was ill-prepared for her testimony.

*Id.* at 1883–84.

The evidence uncovered by postconviction counsel demonstrates the inadequacies of trial counsel's investigation under applicable case law, as well as the ABA Guidelines and commentary, which explicitly recognize that competent counsel would have investigated and discovered much of the evidence that Burns's counsel failed to unearth. At the evidentiary hearing, Burns presented 210 pages of witness testimony that conveyed a full portrait of Burns. The details that the jury would have learned absent trial counsel's deficient performance would have presented a complete picture of Burns, and, as the Supreme Court has said, "humaniz[ing]" details can be among the most compelling mitigation evidence. *Porter*, 558 U.S. at 41.[1]

---

[1]The dissent cites to two cases from the 1980s to argue that Burns's trial counsel made a deliberate decision not to pursue investigation of further possible mitigating factors in Burns's background to prevent introduction of "damaging evidence" of Burns's prior arrests for burglary and illegal gun possession. Maj. Op. at 9. In *Darden v. Wainwright*, counsel's decision to pursue an alternate strategy at sentencing was reasonable because evidence regarding defendant's background could have opened the door to his prior convictions. 477 U.S. 168, 186 (1986). This case differs from *Darden*. First, counsel's decision must be "strategic"—meaning that the decision was made after proper investigation. Despite the majority's statement to the contrary, Maj. Op. at 7, the record clearly demonstrates that Burns's counsel did not conduct an adequate or timely investigation into Burns's background that would have made any decision "strategic." Second, in *Strickland*, the Supreme Court held it was reasonable for counsel to fail to introduce evidence that would "barely have altered the sentencing profile" and would have opened the door to potentially damaging aggravating evidence. 466 U.S. at 700. That was not the situation confronted by Burns's counsel. Given the paucity of evidence presented at mitigation, evidence of Burns's abusive childhood would have dramatically altered his sentencing profile for the jury. As the Supreme Court has recognized, omission of critical mitigating evidence such as childhood trauma and abuse can prejudice a capital defendant. *See Williams*, 529 U.S. at 395. The majority also cites to *Burger v. Kemp*, 483 U.S. 776 (1987), to

2.    <u>Counsel Cannot Blame Burns's Mother for the Failure to Investigate</u>

At the evidentiary hearing, trial counsel sought to shift the blame for the failure to investigate Burns's family and background to Burns's mother.  Counsel stated that she prohibited family members from talking to counsel.  The TCCA adopted this reasoning, holding that Burns and his family were, in effect, responsible for trial counsel's failure to investigate mitigation evidence.  *Burns*, 2005 WL 3504990, at *67 ("We disagree with the argument that trial counsel's duty to investigate was not "governed" by the petitioner's own cooperation or lack thereof.").  Yet, *Rompilla* and *Porter* dictate that trial counsel's independent duty to investigate mitigation evidence remains even where a defendant or family members are "actively obstructive."  *Rompilla*, 545 U.S. at 382; *Porter* 558 U.S. at 40; *accord Harries*, 417 F.3d at 638 ("defendant['s] resistance to disclosure of information does not excuse counsel's duty to independently investigate.") (quoting *Coleman v. Mitchell*, 268 F.3d 417, 449–50 (6th Cir. 2001)); *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000).  Moreover, where a defendant's family alerts counsel to certain mitigation witnesses, counsel must do more than simply call those witnesses to the stand as counsel did in this case.  *Sears*, 561 U.S. at 952–53; *Andrus*, 140 S. Ct. at 1882–83.

Likewise, the majority adopts this flawed excuse for counsel's deficient investigation by stating that "the record reflects that counsel did investigate and was told by Burns's parents that Burns had a normal childhood.  Also, some witnesses whom counsel wanted to call were told by Burns's mother not to testify."  Maj. Op. at 7; *see also id.* at 9.  Counsel's deficiency cannot be excused by blaming Burns's parents.  The ABA Guidelines address lack of cooperation by a client—and by extension his family.  They specifically state that mitigating evidence must be pursued "regardless of any statement by the client [or his family] that evidence bearing upon penalty is not to be collected or presented."  2003 Guidelines, Guideline 10.7(A)(2); *id.* at Guideline 10.7 commentary ("The duty to investigate exists regardless of the expressed desires of a client.").  The ABA Guidelines recognize that when pursuing mitigating evidence,

---

conclude that we must defer to counsel's penalty-phase strategy if "supported by reasonable professional judgment." Maj. Op. at 9.  But, again, there is no evidence in the record that trial counsel conducted the required independent and thorough mitigation investigation that would lead to "reasonable professional judgment" regarding a mitigation strategy.  Deference is therefore unwarranted here.

"[o]btaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client [and his family] may suffer." *Id.*; *see also* ABA Standards for Criminal Justice 4–4.1 cmt. at 4–55 (2d ed. 1980) ("While not directly addressing a situation where a client purportedly seeks to prohibit an attorney from investigating his background, these guidelines suggest that a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes."). While the majority would excuse otherwise deficient performance because counsel claims that Burns's mother made it difficult for them to find mitigating evidence, case law and the ABA Guidelines require that defense counsel investigate despite barriers that the client or his family may erect.

Regardless of whether a breakdown in communication occurred between Burns's mother and counsel, the attorneys remained obligated to investigate fully potential mitigation evidence. Postconviction counsel managed to find ways to investigate Burns's family, including extensive discussions with Burns's mother Leslie. This suggests that Leslie may have been more forthcoming if trial counsel had presented the evidence to her and explained its significance to the life-or-death decision the jury would make concerning her son. It is not unusual for family members to desire to hide unflattering details about the family from strangers. Leslie's purported opposition to interviewing family members does not excuse counsel's performance.

    3.    <u>Counsel's Mitigation Case Was Not a Strategy Based on Reasonable Investigation</u>

If trial counsel's decision to present an incomplete picture of Burns's childhood is justified as "strategic," as the majority contends, it can only be so if counsel had previously conducted a thorough investigation. The record demonstrates that it had not. Instead, counsel's apparent mitigation strategy was to present Burns as a good person who acted "out of character" on the day of the murders. Counsel failed to present testimony about Burns's abusive childhood, and the jury did not learn anything substantial about his troubled formative years. Almost all of the testimony at the sentencing phase involved good deeds by Burns as an adult. The witnesses described Burns as "religious" and church-going. But their discussion of Burns's background was perfunctory, and none of the witnesses shed any light on his traumatic childhood or family history. Even if a decision to "emphasize the good rather than the bad" was a reasonable

mitigation strategy in the abstract, it was not reasonable in this case because counsel were not fully aware of their options.  *See Sowell v. Anderson*, 663 F.3d 783, 794 (6th Cir. 2011).  Our "principal concern in deciding whether counsel exercised reasonable professional judgment is whether the investigation supporting counsel's decision not to introduce mitigation evidence of [defendant's] background was itself reasonable." *Wiggins*, 539 U.S. at 523.  In this case, as in *Wiggins,* "counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Id.* at 536; *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (finding counsel's failure to investigate and present mitigating evidence at sentencing "an abdication of advocacy" amounting to ineffective assistance rather than a "strategic decision" because of the number and kinds of people willing to testify on petitioner's behalf).

In *Williams v. Taylor*, the Supreme Court found that trial counsel's failure to "fulfill their obligation to conduct a thorough investigation" of the defendant's "nightmarish" background and mental state could not be "justified by a tactical decision" to focus on his remorse and cooperation with police, or to prevent comparatively meager unfavorable evidence—specifically, past juvenile records—from being admitted.  529 U.S. at 395–96, 398.  If counsel had investigated, he would have found, among a "voluminous" amount of mitigating evidence, that the defendant was "borderline mentally retarded" and criminally neglected as a child, and that while incarcerated, he was among the inmates "least likely to act in a violent, dangerous or provocative way" and had "thrive[d] in a more regimented and structured environment." *Id.* at 396.  In *Wiggins*, 539 U.S. at 522, the Court explained that "[e]ven assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy" and "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further," measured objectively "under prevailing norms." *Id.* at 523, 527 (citing *Strickland*, 466 U.S. at 691).  The record, including counsel's own testimony at the evidentiary hearing, demonstrate that essentially no background investigation was conducted. *Williams*, 529 U.S. at 396 ("[T]he failure to introduce the comparatively voluminous amount of evidence that did speak in

Williams' favor was not justified by a tactical decision . . . [Instead, these omissions] clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.").

While there is nothing inherently wrong with a mitigation strategy that emphasizes a capital defendant's redeeming qualities, Burns's trial attorneys did not make a conscious choice among available alternative strategies because they overlooked an entire category of compelling mitigating evidence—evidence that might have caused the jury to rethink its assessment of Burns's moral culpability. Trial counsel failed to discover highly relevant mitigating evidence of his family background. Had trial counsel conducted even the most basic interviews with Burns's family members, they would have found ample evidence that Burns grew up in a deeply troubled home. As demonstrated at the evidentiary hearing, trial counsel appeared to be unfamiliar with nearly all of the potential sources of mitigating evidence from Burns's background. It is not surprising that trial counsel's "strategy" focused simplistically on highlighting that Burns was religiously inclined and a "good guy." Those were the only topics that the assembled lay witnesses, all apparently pre-approved by Burns's mother, could reasonably address. What the TCCA labeled "strategy" was more likely the result of trial counsel's failure to "fulfill their obligation to conduct a thorough investigation of [Burns]'s background." *Id.* at 396. The TCCA's conclusion that counsel performed a mitigation investigation that then determined its penalty-phase strategy and presentation is flatly contradicted by a record that shows the exact opposite—a "strategy" driven by the fact that no pretrial preparation had been undertaken, leaving counsel to present only unprepared acquaintances and family members to testify briefly about Burns's regular church attendance and "good-guy" character. Nor can the record support the majority's conclusion that this case is simply a matter of "a difference of opinion regarding which approach would have been the better strategy." Maj. Op. at 9.

Taken together, these Supreme Court cases reveal the timing, scope, and quality of a constitutionally adequate mitigation investigation. The professional norms that prevailed at the time of Burns's trial required counsel to (1) begin a broad mitigation investigation upon entry into the case; (2) pursue all avenues of reasonable mitigation until it was reasonable to curtail particular investigations; and (3) present a mitigation theory informed by investigation, not

convenience or the wishes of the client's mother. Counsel's investigation was clearly deficient in light of these norms. I cannot conclude "that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691. Trial counsel failed to discover important mitigating information that was reasonably available. When Burns's counsel failed to develop this information and present it to the trial court, their performance fell below an objective standard of reasonableness.

## B. PREJUDICE

Turning to the second prong of *Strickland*, Burns was prejudiced by his counsel's performance because there is a reasonable likelihood that at least one juror would have voted in favor of a sentence less than death had the jury been informed of Burns's difficult and dysfunctional childhood.

We begin with the decision of the TCCA. First, the TCCA's articulation of constitutional prejudice is simply wrong. The hurdle for establishing prejudice is not high: "Petitioner 'need not show that counsel's deficient conduct more likely than not altered the outcome in the case,' rather, only that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694). Instead, the TCCA held Burns to an unduly heightened prejudice standard. It repeatedly required Burns to show that his proffered mitigation evidence "would have changed the outcome" of the penalty-phase trial. *Burns*, 2005 WL 3504990, at *58 ("The petitioner cannot establish that his sentence would have been different."); *id.* at *68 ("[W]e cannot conclude that [the post-conviction] evidence would have persuaded the jury not to impose the death penalty.").

When a habeas petitioner is arguing that the presentation of mitigation evidence during the penalty phase of a capital case was prejudicial, the question is whether "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. This standard does not require Burns to demonstrate that all of the jurors would have come to a different conclusion. The Supreme Court has been clear: whether "it is possible that a jury could have heard [the mitigating evidence] and still have decided on the death penalty . . . is not

the test." *Rompilla*, 545 U.S. at 393 (quoting *Wiggins*, 539 U.S. at 538). The test is whether "mitigating evidence, taken as a whole might have influenced the jury's appraisal of [Burns's] culpability." *Id.* Prejudice is established where there is a "*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (emphasis added). The TCCA put the burden on Burns to present mitigating evidence that would precipitate a different sentencing result. In doing so it unreasonably applied Supreme Court precedent and rendered a decision contrary to federal law. *See Williams*, 529 U.S. at 398; *Porter*, 558 U.S. at 44 ("We do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding." (quoting *Strickland*, 466 U.S. at 693–94)).

The evidence the jury did not hear—specific details about Burns's traumatic childhood—is the kind of evidence that the Supreme Court has held undermines a court's confidence in the outcome of a capital sentencing proceeding. In *Williams*, 529 U.S. at 395, the Supreme Court found prejudice where counsel failed to present evidence that Williams had a "nightmarish" childhood, that his "parents were imprisoned for the criminal neglect" of their children, and that Williams "had been severely and repeatedly beaten by his father." Similarly in *Wiggins*, 539 U.S. at 535, the Court found prejudice where counsel failed to discover "powerful" evidence of "severe privation and abuse in the first six years of [Wiggins'] life while in the custody of his alcoholic, absentee mother," as well as evidence of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." Again in *Rompilla*, the Court considered counsel's failure "to present significant mitigating evidence about Rompilla's childhood," as well as his "mental capacity and health, and alcoholism." 545 U.S. at 378, 391–392. It concluded that "the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Rompilla's culpability, and the likelihood of a different result" sufficient to undermine confidence in the outcome actually reached. And in *Porter*, 558 U.S at 33–34, the Court found prejudicial counsel's failure to present evidence of Porter's "abusive childhood" and "horrible family life," including an incident in which "Porter's father shot at him for coming home late, but missed and just beat Porter instead," and another in which Porter's pregnant mother was beaten "so severely that she had to go to the hospital and lost a child."

In *Sears*, 561 U.S. at 948, the Court found prejudicial counsel's failure to present evidence that Sears's home life was "physically abusive" and that he "suffered sexual abuse at the hands of an adolescent male cousin."

A finding that Burns was prejudiced by counsel's failure to develop and present evidence of Burns's dysfunctional childhood is therefore squarely in line with the Supreme Court decisions addressing ineffective assistance during the penalty phase of a capital trial. Our court has also repeatedly found that ignorance of specifics about a defendant's formative years undermines confidence in the outcome of a capital sentencing proceeding. In *Goodwin v. Johnson*, 632 F.3d 301, 329 (6th Cir. 2011), we deemed prejudicial counsel's failure to present evidence that Goodwin suffered "severe privation and abuse in the early years of his life and while in the custody of his alcoholic and drug using mother," including evidence that he was "frequently beaten, sexually molested, and abandoned by both of his parents." Likewise in *Mason v. Mitchell*, 543 F.3d 766, 780 (6th Cir. 2008), we held that the petitioner was prejudiced where counsel did not present evidence of Mason's "abusive and unhealthy" childhood, including evidence that his parents were "daily drug users as well as traffickers," that his mother "shot at his father because of his involvement with prostitution," and that Mason's parents "regularly abused Mason and isolated all of their children from anyone not associated with the parents' drug dealing activities." And in *Harries*, 417 F.3d at 639, we upheld the district court's finding of prejudice where counsel failed to discover evidence that Harries suffered "significant physical abuse" during his "traumatic" childhood, including an incident in which he was "hit . . . on the head with a frying pan," and another in which he was "choked so severely that his eyes hemorrhaged." Like the additional mitigating evidence presented in these cases, failing to present evidence of Burns's abusive childhood prejudiced Burns and undermines confidence in the outcome of the sentencing proceeding.

Consequently, there is a reasonable probability that a juror would have weighed the mitigation evidence differently if he or she had heard the true nature and extent of the deprivations of Burns's childhood. Even allowing for the highly deferential standard of review, the failure of trial counsel to present critically relevant evidence about Burns's early family history violated his right to constitutionally effective counsel. This failure could not have been

the product of sound trial strategy, and there is a reasonable probability that one juror would have reached a different decision if he or she had heard this evidence.

### 1. No "Rationale" Needed for Mitigation Evidence to Have Effect

The TCCA also improperly discounted the effect of Burns's proposed mitigation because it misconstrued its purpose. The court found that Burns's mitigation evidence might have altered the jury's recommendation only if it "explained" or provided some "rationale" for his conduct. The TCCA quoted the state postconviction trial court:

> This court heard a full week's worth of testimony from mitigation witnesses; family, friends, teachers, a sociologist/mitigation expert and a neuro-psychiatrist. . . . [T]he proof presented showed that this was a well-adjusted young man who committed a crime that was out of character for him. After listening to all of the mitigation proof . . . *this court heard nothing about the petitioner that offered any better insight into why this crime occurred or why the petitioner chose to act the way he did on the day in questio*n. The bulk of the mitigation proof dealt with the petitioner's father. *There was no proof offered . . . that his upbringing played any role in the commission of this offense.*

*Burns*, 2005 WL 3504990, at *57 (emphasis added). The TCCA then repeated the error when it said, "[t]he post-conviction court concluded that the petitioner failed to offer any better insight at the evidentiary hearing into why this crime occurred or why the petitioner chose to act the way he did on the day of the double homicide." *Id.* at *65. Contrary to the TCCA's statements, the Supreme Court has made it clear that mitigation does not play so limited a role. In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Court held that the sentencer in a capital case must be given a full opportunity to consider, as a mitigating factor, "any aspect of a defendant's character or record," in addition to "any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604. Mitigation evidence can be any evidence that may lessen the jury's assessment of a capital defendant's moral culpability—such evidence need not relate to the crime or the prosecution's death-eligibility case. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (The decision to impose a death sentence must be "a reasoned moral response to the defendant's background, character, and crime."); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) ("[A] mitigating factor [is] any aspect of a defendant's character or record that the defendant proffers as a basis for a sentence less than death."). Mitigation evidence is not only

about the depth of hardship in a defendant's past; instead, it provides detail and nuance that humanize the defendant before the jury and it paints a textured portrait of the defendant's life history, which is especially compelling within the *Strickland* prejudice analysis.  *See, e.g.*, *Andrus*, 140 S. Ct. at 1882–83; *Porter*, 558 U.S. at 41; *Rompilla*, 545 U.S. at 391–93.

The Supreme Court, moreover, has explicitly rejected a "nexus" requirement as one we have "never countenanced."  *Smith v. Texas*, 543 U.S. 37, 45 (2004).  The evidence of Burns's unfortunate upbringing need not have offered any "rationale" for the murder he committed in order for the jury to have considered it as weighty mitigation.  It would be enough if there were a "reasonable probability" that, because of Burns's past, the jury's "reasoned moral response" would instead have been to spare his life and sentence him to life imprisonment instead.  By imposing a nexus requirement, the TCCA's decision on *Strickland*'s prejudice prong was contrary to Supreme Court law.

## 2.  The Evidence Presented in the Postconviction Proceedings Was Not Cumulative

Furthermore, the TCCA erred in holding that the failure to present the evidence offered during the postconviction proceedings did not prejudice Burns because the omitted evidence was merely cumulative and would not have created a "reasonable probability" that the jury would have recommended a life sentence.  Burns's trial counsel failed at the mitigation phase to present any evidence of the mental and physical abuse suffered by Burns in childhood.  Evidence about the abuse could not be "cumulative" because no evidence of abuse was presented at trial.  In every way, the evidence offered at the evidentiary hearing was qualitatively different from that presented at trial.  *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (evidence not cumulative that "differ[s] in a substantial way–in strength and subject matter–from the evidence actually presented at sentencing"); *see also Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008) ("In short, rather than being cumulative, this evidence provides a more nuanced understanding of Jells's psychological background and presents a more sympathetic picture of Jells.").  The mitigation presented—his so-called "normal" childhood and the good deeds Burns had done as an adult— provided an incomplete picture of his life and served only to highlight the terrible nature of his crime.  The additional mitigating evidence presented—a lifetime of neglect and abuse, beginning in early childhood and continuing throughout the formative years of Burns's life—is

categorically different and would have provided the jury a way to see Burns's "background, character, and crime," *Penry*, 492 U.S. at 319, as a reason for a sentence less than death.

## C.  CONCLUSION

The mitigation phase of a capital case is premised on "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Foust v. Houk*, 655 F.3d 524, 534–36 (6th Cir. 2011) (omission in original) (quoting *Penry*, 492 U.S. at 319), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  Because Burns's trial counsel provided constitutionally deficient performance at the mitigation phase of his capital trial, and that failure resulted in prejudice to Burns, I would remand Burns's case to the district court with directions to remand his case to the state court for a new penalty-phase trial. I therefore respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 11-5214/14-6089

KEVIN B. BURNS,

     Petitioner - Appellant,

     v.

TONY MAYS, Warden,

     Respondent - Appellee.

```
FILED
Apr 13, 2022
DEBORAH S. HUNT, Clerk
```

Before:  BATCHELDER, COOK, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Tennessee at Memphis.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk